# EXHIBIT 1

1   SOPHIA A. ROMERO, ESQ
    Nevada Bar No.: 12446
2   CHRISTOPHER M. PETERSON, ESQ.
    Nevada Bar No.: 13932
3   SADMIRA RAMIC, ESQ.
    Nevada Bar No.: 15984
4   **AMERICAN CIVIL LIBERTIES**
    **UNION OF NEVADA**
5   601 South Rancho Drive, Suite B-11
    Las Vegas, NV 89106
6   Telephone: (702) 366-1226
7   Facsimile: (702) 366-1331
    Email: romero@aclunv.org
8   *Attorneys for Plaintiffs*

9

    **IN THE UNITED STATES DISTRICT COURT**
10
    **FOR THE DISTRICT OF NEVADA**

11

|  |  |
|---|---|
| 12   KELVIN GORDON, an individual; LILITH MCGRATH, an individual; KIANA FULLMORE, an individual; and the AMERICAN CIVIL LIBERTIES UNION OF NEVADA FOUNDATION, a domestic nonprofit corporation, | Civil Action No.: |
| 13 | |
| 14 | |
| 15                  Plaintiffs, | |
| 16          vs. | |
| 17   THE CITY OF LAS VEGAS, a local municipal government entity; and FREMONT STREET EXPERIENCE, LLC, a domestic limited liability company; | |
| 18 | |
| 19 | |
| 20                  Defendants. | |

21                  **<u>DECLARATION OF KELVIN GORDON</u>**

22

    I, KELVIN GORDON, under penalty of perjury declare:
23
          1.   I have personal knowledge of the facts set forth in this declaration.
24
          2.   I make this declaration in support of the above-referenced action.
25
          3.   I am, and was at all times relevant hereto, a resident of the State of Nevada, County of
26
               Clark, City of Las Vegas.
27

4. I am a registered Fremont Street Experience artist who engages in street performances.

5. I have been a street performer, performing on the Fremont Street Experience Pedestrian Mall, as a contortionist, for 11 years.

6. I will continue engaging in street performances for the foreseeable future.

7. As a street performer on Fremont Street, I have experienced numerous run-ins with Fremont Street Experience, LLC staff and security.

8. As part of my performance, I use a speaker and a 40 lbs. metal box.

9. To transport these props, I use a collapsible metal dolly.

10. In one of the latest encounters, FSE informed me that it is prohibiting people from bringing dollies to transport equipment, such as a speaker or a performance prop.

11. This is true despite the size of the speaker or prop in question.

12. Despite my equipment being fully contained within my assigned circle, my dolly was permanently confiscated by FSE security.

13. Upon information and belief, other street performers have experienced the same treatment.

14. I have emailed the City of Las Vegas, specifically the city attorney, to advise them of this situation, which I believe is in violation of the Las Vegas Municipal Code as it pertains to Fremont Street.

15. I was advised by the city attorney for the City of Las Vegas to review the Las Vegas Municipal Code.

16. When I reviewed the code, I found that the code is completely silent as to the use of a dolly.

17. FSE Security has and is threatening legal action against anyone who performs inside of a "closed" performing circle, stating that the circle closings are done at the request of the City of Las Vegas.

18. However, when I attempted to view which circles were open the City's website, the City lists all locations as being open.

19. Upon information and belief, Fremont Street Experience, LLC is closing performance circles on the Fremont Street Pedestrian Mall without notifying the City.

20. On many occasions, I have been required to turn off my speaker whenever Fremont Street Experience, LLC plays its music during its light show.

21. On many occasions, I have been barred from performing in performance circles due to Fremont Street Experience, LLC sponsored concerts.

22. Upon information and belief, Fremont Street Experience, LLC has never been required stop engaging in expressive activity due to my performance as a street performer.

23. I was barred from performing on December 31, 2021, and January 1, 2022, because no performance circles were made available by the City of Las Vegas.

24. Upon information and belief, no circles were made available by the City of Las Vegas due to Fremont Street Experience, LLC closing the street for an event and performances where Fremont Street Experience, LLC was charging individuals to attend.

25. Upon information and belief, the City of Las Vegas has never permitted any other private person to close the Fremont Street Pedestrian Mall or charge for entry on to the Fremont Street Pedestrian Mall.

26. Currently, Fremont Street Experience, LLC security refuses to let me perform on Fremont Street after 9 PM on Friday, Saturday, or Sunday nights unless I provide photo identification.

***I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. See 28 U.S. Code § 1746.***

Executed on: __8/19/2022_____

DocuSigned by:

Kelvin Gordon

E16BB3A7B19C478...

Kelvin Gordon

DocuSign Envelope ID: DCC0A4D9-95A1-4F87-BC6A-4C7FBEE37238

SOPHIA A. ROMERO, ESQ
Nevada Bar No.: 12446
CHRISTOPHER M. PETERSON, ESQ.
Nevada Bar No.: 13932
SADMIRA RAMIC, ESQ.
Nevada Bar No.: 15984
**AMERICAN CIVIL LIBERTIES**
**UNION OF NEVADA**
601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
Telephone: (702) 366-1226
Facsimile: (702) 366-1331
Email: romero@aclunv.org
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| KELVIN GORDON, an individual; LILITH MCGRATH, an individual; KIANA FULLMORE, an individual; and the AMERICAN CIVIL LIBERTIES UNION OF NEVADA FOUNDATION, a domestic nonprofit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CITY OF LAS VEGAS, a local municipal government entity; and FREMONT STREET EXPERIENCE, LLC, a domestic limited liability company;<br><br>Defendants. | Civil Action No.: |

## DECLARATION OF KIANA FULLMORE

I, Kiana Fullmore, under penalty of perjury declare:

1. I have personal knowledge of the facts set forth in this declaration.

2. I make this declaration in support of the above referenced action.

3. I am, and was at all times relevant hereto, a resident of the State of Nevada, County of Clark, City of Las Vegas.

4.  I am currently 18 years old and was 18 years old on August 12, 2022.

5.  On August 12, 2022 at 9:25 p.m., I attempted to enter upon the Fremont Street Pedestrian Mall alongside Lilith McGrath from the entrance located on 4th Street to observe street performers and to walk the corridor.

6.  I observed posted signage that said "Must be 21+ to enter Fri-Sun 9 pm."

7.  I also observed security barriers and identification check points.

8.  Fremont Street Experience security told me that Lilith and I could not enter because we were not 21.

9.  Because I am not 21, I was denied the ability to enter upon the Fremont Street Pedestrian Mall.

10. It is unfair that I am unable and will remain unable to visit the Fremont Street Pedestrian Mall every Friday, Saturday, and Sunday.

*I declare under penalty of perjury that the foregoing is true and correct.*

Executed on:  8/19/2022

DocuSigned by:

06CB26718A1245E...

Kiana Fullmore

1 | SOPHIA A. ROMERO, ESQ
Nevada Bar No.: 12446
2 | CHRISTOPHER M. PETERSON, ESQ.
Nevada Bar No.: 13932
3 | SADMIRA RAMIC, ESQ.
Nevada Bar No.: 15984
4 | **AMERICAN CIVIL LIBERTIES**
**UNION OF NEVADA**
5 | 601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
6 | Telephone: (702) 366-1226
Facsimile: (702) 366-1331
7 | Email: romero@aclunv.org
*Attorneys for Plaintiffs*
8 |

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEVADA

KELVIN GORDON, an individual; LILITH
MCGRATH, an individual; KIANA FULLMORE,
an individual; and the AMERICAN CIVIL
LIBERTIES UNION OF NEVADA
FOUNDATION, a domestic nonprofit corporation,

          Plaintiffs,

    vs.

THE CITY OF LAS VEGAS, a local municipal
government entity; and FREMONT STREET
EXPERIENCE, LLC, a domestic limited liability
company;

          Defendants.

Civil Action No.:

## <u>DECLARATION OF LILITH MCGRATH</u>

I, Lilith McGrath, under penalty of perjury declare:

1. I have personal knowledge of the facts set forth in this declaration.

2. I make this declaration in support of the above referenced action.

3. I am, and was at all times relevant hereto, a resident of the State of Nevada, County of
Clark, City of Las Vegas.

DocuSign Envelope ID: 1A8E768B-B39E-4C6A-A556-ED9CD4639622

4. I am a member of the American Civil Liberties Union of Nevada.

5. I am currently 18 years old and was 18 years old on August 12, 2022.

6. On August 12, 2022 at 9:25 p.m., I attempted to enter upon the Fremont Street Pedestrian Mall alongside Kiana Fullmore from the entrance located on 4th Street to watch street performers, take pictures and record videos of street performers performing on Fremont Street, and to walk the corridor alongside Kiana.

7. I observed posted signage that said "Must be 21+ to enter Fri-Sun 9 pm."

8. I also observed security barriers and identification check points.

9. Fremont Street Experience security told Kiana and I that we could not enter because we were not 21.

10. Because I am not 21, I was denied the ability to enter upon the Fremont Street Pedestrian Mall.

11. It is unjust that I am unable and will remain unable to visit the Fremont Street Pedestrian Mall and take pictures/videos of the street performers every Friday, Saturday, and Sunday evening.

*I declare under penalty of perjury that the foregoing is true and correct.*

Executed on: 8/19/2022

DocuSigned by:

524F07C8D92C433...

Lilith McGrath

SOPHIA A. ROMERO, ESQ
Nevada Bar No.: 12446
CHRISTOPHER M. PETERSON, ESQ.
Nevada Bar No.: 13932
SADMIRA RAMIC, ESQ.
Nevada Bar No.: 15984
**AMERICAN CIVIL LIBERTIES**
**UNION OF NEVADA**
601 South Rancho Drive, Suite B-11
Las Vegas, NV 89106
Telephone: (702) 366-1226
Facsimile: (702) 366-1331
Email: romero@aclunv.org
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| KELVIN GORDON, an individual; KIANA FULLMORE, an individual; LILITH MCGRATH, an individual; and the AMERICAN CIVIL LIBERTIES UNION OF NEVADA FOUNDATION, a domestic nonprofit corporation, | Civil Action No.: |
| Plaintiffs, | |
| vs. | |
| THE CITY OF LAS VEGAS, a local municipal government entity; and FREMONT STREET EXPERIENCE, LLC, a domestic limited liability company; | |
| Defendants. | |

## DECLARATION OF THE ACLU OF NEVADA

I, Athar Haseebullah on behalf of the ACLU of Nevada, under penalty of perjury declare:

1. I am over the age of 18 and I am competent to testify.

2. I am the Executive Director of the ACLU of Nevada.

3. I have personal knowledge of the facts set forth in this declaration.

4.  I make this declaration in support of the Verified Complaint for Declaratory and Injunctive Relief.

5.  As the guardian of civil liberties of all Nevadans for over 55 years, and with approximately 4,000 members and multiple employees residing in the City of Las Vegas, preventing constitutional violations is of substantial interest to the ACLU of Nevada.

6.  As evidenced by prior litigation surrounding the Fremont Street Pedestrian Mall, the ACLU of Nevada continually works to defend and advance the civil liberties, civil rights, and other fundamental human rights of all Nevadans.

7.  ACLU of Nevada is a local non-profit.

8.  The ACLU of Nevada has previously engaged in expressive activities protected by the First Amendment on the Fremont Street Pedestrian Mall, including artistic performances, engaging in public education campaigns, and soliciting donations.

9.  But for LVMC Chapter 11.68 et. seq the ACLU of Nevada would engage in conduct that is explicitly regulated under LVMC Chapter 11.68, including tabling, handing out leaflets, soliciting donations, and selling ACLU of Nevada merchandise.

10. Additionally, but for the actions of the City and FSE, ACLU of Nevada would invite staff, members, and/or volunteers under the age of 21, including from ACLU of Nevada's collegiate chapter "UNLV People Power", to engage in these activities.

11. ACLU of Nevada's membership and employees face the imminent risk of having their First Amendment Rights violated under the Las Vegas Municipal Code, 11.68 et. seq and through the conduct of Fremont Street Experience, LLC.

12. But for Las Vegas Municipal Code 11.68 et. seq and actions of Fremont Street Experience, LLC, the ACLU of Nevada would engage in conduct that explicitly regulated under LVMC Chapter 11.68, including tabling, hand out leaflets, soliciting donations, and selling ACLU of Nevada merchandise, and would invite staff, members, and/or volunteers under the age of 21, including from ACLU of Nevada's collegiate chapter "UNLV People Power", engage in these activities.

*I declare under penalty of perjury that the foregoing is true and correct.*

Dated September 2, 2022.

ACLU of Nevada

Athar Haseebullah, Executive Director
Name of Authorized Representative

# EXHIBIT 2

1    BILL NO.  93-54

2    ORDINANCE NO. __3747__

3    AN ORDINANCE ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET
      BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING
4    THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE
      PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA;
5    AND PROVIDING FOR OTHER MATTERS PROPERLY RELATED THERETO.

6    Sponsored by:                          Summary: Establishes a Pedestrian Mall
                                            along Fremont Street between Main Street
7    Councilman Arnie Adamsen               and  Las  Vegas  Boulevard  South  and
                                            designates The Fremont Street Experience
8                                           Limited Liability Company as the private
                                            operating entity thereof.
9

10          THE CITY COUNCIL OF THE CITY OF LAS VEGAS DOES HEREBY

11    ORDAIN AS FOLLOWS:

12          SECTION 1:  The City Council finds that there has been a progressive

13    decline in the economic growth and vitality of businesses located in the central business district

14    of the City which is attributable to the decrease in tourists and other visitors to the central

15    business district, that a special effort is needed on the part of the City to create new jobs, maintain

16    existing employment opportunities, attract new businesses, tourists and visitors to the central

17    business district and thereby restore the economic growth and vitality thereof and that the closure

18    of certain streets or parts thereof to vehicular traffic and the creation of a Pedestrian Mall for the

19    movement, safety, convenience, enjoyment, entertainment, recreation and relaxation of pedestrians

20    is in the best interest of the City and beneficial to the owners of adjacent property and the

21    businesses located in the central business district.

22          The City Council further finds that it is in the best interest of the public to

23    select and contract with a private operating entity for the acquisition, construction, improvement,

24    operation, management or maintenance of the Pedestrian Mall.

25          SECTION 2:  With respect to the provisions contained herein, the following

26    definitions shall apply:

-1-

(A)   "Display vehicles" are those vehicles brought into the Pedestrian Mall for purposes of display to the public, and not for the primary purpose of transporting persons or property.

(B)   "Emergency vehicles" are those public police and fire vehicles, public and private ambulances and vehicles owned or operated by public utilities, which require access to the Pedestrian Mall for reasons of the public health, safety and welfare.

(C)   "Motorized vehicles" are those motorized devices in, upon or by which any person or property is or may be transported or drawn upon a street or sidewalk, including, without limitation, automobiles, motorcycles and mopeds.

(D)   "Parade" is a group of persons with or without animals or vehicles in a public procession or march upon a public street, park or other public place but does not include the Sky Parade.

(E)   "Pedestrian Mall Act" refers to Chapter 368, 1993 Nevada Sessions Laws.

(F)   "Maintenance vehicles" are those vehicles owned or operated by the City of Las Vegas, as well as vehicles owned and operated by utilities and other vehicles requiring access onto the Pedestrian Mall for the purpose of the repair and maintenance of the Pedestrian Mall or facilities and structures contained therein.

(G)   "Management Agreement" means that agreement executed between The Fremont Street Experience Limited Liability Company and the City for the purpose of acquisition, construction, operation, management or maintenance of the Pedestrian Mall.

(H)   "Special events" include[s] festivals, sporting events, exhibitions, entertainment and similar activities which are not offered on a continuous basis, whether or not members of the public pay an admission or entrance fee to be spectators or participants.

(I)   "Special Permit Vehicles" are those vehicles authorized by The Fremont Street Limited Experience Liability Company in accordance with Section 8 to enter upon the Pedestrian Mall.

-2-

1   (J) "Sky Parade" is the aerial procession of floats or similar displays for certain

2 designated portions of a twenty-four hour period along the celestial vault which covers the

3 Pedestrian Mall.

4   (K) "Street mall advertising" includes all advertising in connection with the

5 Pedestrian Mall including, without limitation, any means of marketing or promoting the Pedestrian

6 Mall or its adjoining businesses, and the display of consumer goods or products to the users of

7 the Pedestrian Mall for the purpose of encouraging the sale and purchase thereof, including,

8 without limitation, signs, pictures or other displays.

9   (L) "Street mall entertainment" is the conduct on the part of any person intended

10 to provide entertainment, recreation, relaxation and enjoyment to the users of the Pedestrian Mall.

11   (M) "Street mall vending" is the distribution, display or sale, or any combination

12 thereof, of consumer goods or services (including food, drink or merchandise) from a pushcart,

13 concession stand, kiosk or other similar structure designed for such purpose.

14   SECTION 3: There is hereby established in the downtown area of the City

15 of Las Vegas a Pedestrian Mall, the boundaries of which are described in Section 4.  The surface

16 of all streets designated therein as a part of the Pedestrian Mall shall be, after the completion of

17 the streetscape construction thereon as evidenced by the issuance of a certificate of completion

18 therefor by the City, limited to the use of pedestrians.   Except for [motorized vehicles]

19 <u>wheelchairs</u> used to transport the physically disabled, emergency vehicles, maintenance vehicles,

20 special access vehicles, display vehicles, or vehicles granted access to the Pedestrian Mall by the

21 private operating entity, no motorized vehicle shall be permitted on the streets, or in the area,

22 designated under Section 4 as the Pedestrian Mall.

23   SECTION 4:  (A) The following streets and rights-of-ways as constituting

24 and comprising the Pedestrian Mall are legally described in Exhibit A which is adopted herein as

25 a part of this ordinance.

26   (B) The area legally described in subsection A of this section is indicated

-3-

1    on the map attached hereto as Exhibit B and adopted herein as a part of this ordinance.

2                 SECTION 5:   Notwithstanding the prohibition contained in Section 3,

3    vehicular traffic traveling along Casino Center Boulevard and Fourth Street shall be permitted to

4    cross the Pedestrian Mall as those streets intersect with Fremont Street except during the Sky

5    Parade in which case such streets may be closed to through traffic and as otherwise approved in

6    accordance with Section 12.

7                 SECTION 6:  In accordance with the provisions of the Pedestrian Mall Act,

8    the City Council hereby designates The Fremont Street Experience Limited Liability Company

9    as the private operating entity for purposes of acquiring, constructing, improving, operating,

10   managing and maintaining the [Fremont Street] Pedestrian Mall.

11                Subject to the other provisions of this ordinance and the Management

12   Agreement, The Fremont Street Experience Limited Liability Company may determine the uses

13   of the Pedestrian Mall for any purpose that will enhance the movement, safety, convenience,

14   enjoyment, entertainment, recreation or relaxation of pedestrians, and other purposes necessary

15   or appropriate to carry out the provisions of the Pedestrian Mall Act, including, without

16   limitation, seating, merchandising, exhibiting, advertising and any other use, activity or special

17   event which in the judgment of The Fremont Street Experience Limited Liability Company will

18   accomplish any of those purposes.   The authority delegated herein to The Fremont Street

19   Experience Limited Liability Company to determine the uses of the Pedestrian Mall shall not be

20   construed so as to permit any use which is not permitted in a C-2 zone [shall exempt it from the

21   prohibition and requirements contained in Title 19 of the Las Vegas Municipal Code relative to

22   the aforementioned uses of the Pedestrian Mall including, but not limited to, the use restriction

23   and requirements for obtaining special use permits contained therein].

24                SECTION 7:   Notwithstanding any other provision of the Las Vegas

25   Municipal Code, and in accordance with the provisions of the Pedestrian Mall Act, the City

26   Council hereby delegates to The Fremont Street Experience Limited Liability Company authority

-4-

to control and regulate within the Pedestrian Mall the following:

        (A)    The distribution and location of movable furniture, sculpture, devices to control pedestrian traffic, landscaping and other facilities that are incidental to the Pedestrian Mall;

        (B)    The uses to be permitted or restricted on the Pedestrian Mall by occupants of abutting property, any utility provided such is not in conflict with the rights granted under any franchise agreement, concessionaires, vendors, newspaper vending machines and others to serve the convenience and enjoyment of pedestrians and the location of such uses;

        (C)    The raising of revenue through the imposition of a fee for the use of all or a portion of the Pedestrian Mall for special events or activities to offset the cost of operating and maintaining the Pedestrian Mall;

        (D)    The use of the Pedestrian Mall for advertising purposes and the charging of a fee in connection therewith;

        (E)    The operation of any lighting, heating or other facilities in the Pedestrian Mall;

        (F)    The replacement of any landscaping and maintenance of the furniture and facilities in the Pedestrian Mall;

        (G)    The access to the Pedestrian Mall by the public and closure of the Pedestrian Mall to the public for purposes of special events or activities for limited periods of time;

        (H)    Other activities, actions or conduct to promote the best interests of the public and carry out the provision of the Pedestrian Mall Act.

        The authority delegated herein shall be subject to the City's police power, the provisions of the Management Agreement and the other provisions of this ordinance and shall not be construed in derogation of the constitutional or statutory rights of any person.

        SECTION 8:   Upon proper application therefor, The Fremont Street Experience Limited Liability Company shall issue permits authorizing the special permit vehicles

1   to enter upon the Pedestrian Mall.  These permits shall be issued to the owners and occupants of

2   property adjoining the Pedestrian Mall, or their designees, whose property as a result of the

3   adoption of this ordinance does not have sufficient access thereto and therefrom for the delivery

4   or pick up of merchandise and materials, or for the improvement, maintenance or repair of such

5   property.  The permit will identify the hours of each day that the special access vehicles will be

6   granted access in accordance with the plan submitted under Section 12, and may be made effective

7   for such period of time, not to exceed one year, as may be requested by the applicant.

8               SECTION 9:   (A)   The Fremont Street Experience Limited Liability

9   Company shall allow access to pedestrians at all times along the entire length of Fremont Street

10  in the Pedestrian Mall and along the entire length of the other streets therein except as otherwise

11  approved in accordance with Section 12.  This provision does not require that access along the

12  entire length of the Pedestrian Mall always be at the same location but does require that access

13  along the entire length of the Pedestrian Mall be allowed to pedestrians.  For purposes of this

14  Section, pedestrian access includes reasonable access for disabled persons in wheelchairs and

15  similar devices.  As a prerequisite to closure of the Pedestrian Mall, The Fremont Street

16  Experience Limited Liability Company must obtain the review and approval of the City's

17  emergency service (police and fire) providers.

18               (B)  Notwithstanding any other provision contained in Section 7 and subsection A

19  of this Section, The Fremont Street Experience Limited Liability Company shall preserve and

20  retain access for pedestrians to the businesses adjoining the Pedestrian Mall unless consent to the

21  denial thereof has been obtained from the affected businesses.

22               SECTION 10:  The following are hereby prohibited within the Pedestrian

23  Mall:

24               (A)     All animals unless used in connection with a mall activity authorized by The

25  Fremont Street Limited Experience Liability Company or used for the purpose of assisting the

26  visually impaired.

    (B)   All street mall vending, street mall advertising, street mall entertainment special events or other commercial activities unless conducted or authorized by The Fremont Street Experience Limited Liability Company.

    (C)   Parades.

    (D)   All unicycles, bicycles and other types of cycles, skateboards, rollerskates, [rollerblades] in-line skates and shopping carts.

    (E)   Sleeping or camping.

    (F)   Littering.

    (G)   All sexually oriented businesses as described in Section 19.74.020 of the Las Vegas Municipal Code.

SECTION 11:   Notwithstanding the requirements set forth in other provisions of the Las Vegas Municipal Code, The Fremont Street Experience Limited Liability Company shall be licensed with a miscellaneous service license and pay a license fee according to its gross sales as provided in Section 6.04.005 of the Las Vegas Municipal Code.  So long as such fee is paid, The Fremont Street Experience Limited Liability Company is exempt from the [permit fees and licensing requirements] provsions contained in the following Chapters and Sections of the Las Vegas Municipal Code, to wit:  The permit fees and licensing requirements of Chapters 6.11, 6.19, 6.26, 6.28, 6.30, 6.32, 6.42, 6.54, 6.62 (and exempt from the prohibition contained in Section 6.62.130 of this Chapter), 6.73, 6.76, 6.78, 6.81, 6.84 and, with respect to special events, Sections 6.50.120 and 6.50.130 provided the requirements of Sections 6.50.440, 6.50.450 and 6.50.460 have been satisfied and the zoning land use prohibitions contained in Sections 19.46.060, 19.90.085 and Chapters 19.64 and 19.66[, of the Las Vegas Municipal Code].  The exemptions granted herein apply only to The Fremont Street Experience Limited Liability Company and its employees in connection with the acquisition construction, improvement, operation, management and maintenance of the Pedestrian Mall.

SECTION 12:  Prior to completion of construction of the Pedestrian Mall,

-7-

1   The Fremont Street Experience Limited Liability Company shall submit to the City Council for
2   review and approval a plan which shall include the following:

3        (A)   The architectural theme and design standards which are proposed to be in
4   effect for the facade of the buildings and structures adjoining the Pedestrian Mall and for the street
5   scope lying therein;

6        (B)   The time and days of operation of the sky parade;

7        (C)   The location of any traffic control devices (pedestrian or vehicular) within
8   the Pedestrian Mall; [and]

9        (D)   The manner in which access shall be preserved to businesses during the
10  occurrence of any special events requiring the closure of all or a portion of the Pedestrian Mall
11  to the public to the extent that such information can be provided as a part of the plan[.];

12       (E)   The manner in which access will be assured into and onto the Pedestrian
13  Mall by emergency vehicles[.];

14       (F)   The days and hours on which special permit vehicles will be allowed access
15  into and onto the Pedestrian Mall[.];

16       (G)   The days and times in which Casino Center Boulevard or Fourth Street, or
17  both, may be closed to vehicular traffic for special events[.]; and

18       (H)   The manner[, days] and times in which all or a portion of the Pedestrian
19  Mall may be closed to pedestrian access for special events and other activities.

20            After approval of the plan by the City Council, any amendments thereto
21  proposed by The Fremont Street Experience Limited Liability Company may be made with the
22  approval of the City Manager.

23            SECTION 13:  Nothing contained herein shall be interpreted or construed
24  to a vacation, in whole or in part, of any right-of-way within the Pedestrian Mall, and the City
25  shall retain all police powers and other rights and powers to the extent not delegated under Section
26  7 to The Fremont Street Experience Limited Liability Company in such right-of-way.

-8-

1    unconstitutional, or invalid or ineffective by any court of competent jurisdiction, such decision
2    shall not affect the validity or effectiveness of the remaining portions of this ordinance or any part
3    thereof.   The City Council of the City of Las Vegas hereby declares that it would have passed
4    each section, subsection, subdivision, paragraph, sentence, clause or phrase thereof irrespective
5    of the fact that any one or more sections, subsections, subdivisions, paragraphs, sentences, clauses
6    or phrases be declared unconstitutional, invalid or ineffective.

7    SECTION 16:  All ordinances or parts of ordinances, sections, subsections,
8    phrases, sentences, clauses or paragraphs contained in the Municipal Code of the City of Las
9    Vegas, Nevada, 1983 Edition, in conflict herewith are hereby repealed.

10    PASSED,   ADOPTED   and   APPROVED   this 20th    day   of
11    _____October_____, 1993.

12    APPROVED:
13
14    By _____
       JAN LAVERTY JONES, Mayor
15    ATTEST:
16    SANDRA LeBOEUF, Chief Deputy City Clerk
17
18
19
20
21
22
23
24
25
26

1           The above and foregoing Ordinance was first proposed and read by title to

2    the City Council on the 6th day of _____October_____, 199 3 , and referred to the following

3    committee composed of _____Full Council_____ and_____

4    for recommendation; thereafter the said committee reported favorably on said ordinance on the

5    20th  day of _____Ocotber_____, 199 3 , which was a _____regular_____ meeting of said

6    Council; that at said _____regular_____ meeting, the proposed ordinance was read by

7    title to the City Council as first introduced and amended by the following vote:

8    VOTING "AYE": Councilmen Adamsen, Higginson, Hawkins Jr. and Mayor Jones

9    VOTING "NAY": NONE_____

10   ABSENT: _____Ward 3 Vacant_____

11                                           APPROVED:

12

13                                      By _____

    ATTEST:                               JAN LAVERTY JONES, Mayor

14

15   SANDRA LeBOEUF, Chief Deputy City Clerk

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT "A"
FREMONT STREET EXPERIENCE
CLARK'S LAS VEGAS TOWNSITE
A.P.N.  139-34-110-, 210-, 510- & 610-
(020-400- & 020-410-)

Those portions of the North Half (N 1/2) of Section 34,
Township 20 South, Range 61 East, M.D.M., in the City of Las
Vegas, County of Clark, State of Nevada, being those portions of
CLARK'S LAS VEGAS TOWNSITE as shown on the plat thereof on file in
Book 1 of Plats, Page 37 of Clark County, Nevada Records,
described as follows:

The Right-of-Way of FREMONT STREET (80 feet wide) from the
Southeasterly Right-of-Way line of MAIN STREET (80 feet wide) to
the Northwesterly Right-of-Way line of LAS VEGAS BOULEVARD
(formerly FIFTH STREET, 80 feet wide) as shown on said plat of
CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of FIRST STREET (80 feet wide) from the
Southeasterly prolongation of the Southwesterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 2 of
said CLARK'S LAS VEGAS TOWNSITE to the Southeasterly prolongation
of the Northeasterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 3 of said CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of CASINO CENTER BOULEVARD (formerly SECOND
STREET, 80 feet wide) from the Southeasterly prolongation of the
Southwesterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 15 of said CLARK'S LAS VEGAS TOWNSITE to
the Southeasterly prolongation of the Northeasterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 14 of
said CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of THIRD STREET (80 feet wide) from the
Southeasterly prolongation of the Southwesterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 18 of
said CLARK'S LAS VEGAS TOWNSITE to the Southeasterly prolongation
of the Northeasterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 19 of said CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of FOURTH STREET (80 feet wide) from the
Southeasterly prolongation of the Southwesterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 31 of
said CLARK'S LAS VEGAS TOWNSITE to the Southeasterly prolongation
of the Northeasterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 30 of said CLARK'S LAS VEGAS TOWNSITE.



EXHIBIT *B*

See First Amendment

BILL NO.  93-54

ORDINANCE NO. _____

AN ORDINANCE ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA; AND PROVIDING FOR OTHER MATTERS PROPERLY RELATED THERETO.

Sponsored by:

Councilman Arnie Adamsen

Summary: Establishes a Pedestrian Mall along Fremont Street between Main Street and Las Vegas Boulevard South and designates The Fremont Street Experience Limited Liability Company as the private operating entity thereof.

THE CITY COUNCIL OF THE CITY OF LAS VEGAS DOES HEREBY ORDAIN AS FOLLOWS:

SECTION 1:  The City Council finds that there has been a progressive decline in the economic growth and vitality of businesses located in the central business district of the City which is attributable to the decrease in tourists and other visitors to the central business district, that a special effort is needed on the part of the City to create new jobs, maintain existing employment opportunities, attract new businesses, tourists and visitors to the central business district and thereby restore the economic growth and vitality thereof and that the closure of certain streets or parts thereof to vehicular traffic and the creation of a Pedestrian Mall for the movement, safety, convenience, enjoyment, entertainment, recreation and relaxation of pedestrians is in the best interest of the City and beneficial to the owners of adjacent property and the businesses located in the central business district.

The City Council further finds that it is in the best interest of the public to select and contract with a private operating entity for the acquisition, construction, improvement, operation, management or maintenance of the Pedestrian Mall.

SECTION 2: With respect to the provisions contained herein, the following definitions shall apply:

-1-

(A)     "Display vehicles" are those vehicles brought into the Pedestrian Mall for purposes of display to the public, and not for the primary purpose of transporting persons or property.

(B)     "Emergency vehicles" are those public police and fire vehicles, public and private ambulances and vehicles owned or operated by public utilities, which require access to the Pedestrian Mall for reasons of the public health, safety and welfare.

(C)     "Motorized vehicles" are those motorized devices in, upon or by which any person or property is or may be transported or drawn upon a street or sidewalk, including, without limitation, automobiles, motorcycles and mopeds.

(D)     "Parade" is a group of persons with or without animals or vehicles in a public procession or march upon a public street, park or other public place but does not include the Sky Parade.

(E)     "Pedestrian Mall Act" refers to Chapter 368, 1993 Nevada Sessions Laws.

(F)     "Maintenance vehicles" are those vehicles owned or operated by the City of Las Vegas, as well as vehicles owned and operated by utilities and other vehicles requiring access onto the Pedestrian Mall for the purpose of the repair and maintenance of the Pedestrian Mall or facilities and structures contained therein.

(G)     "Management Agreement" means that agreement executed between The Fremont Street Limited Liability Company and the City for the purpose of acquisition, construction, operation, management or maintenance of the Pedestrian Mall.

(H)     "Special events" includes festivals, sporting events, exhibitions, entertainment and similar activities which are not offered on a continuous basis, whether or not members of the public pay an admission or entrance fee to be spectators or participants.

(I)     "Special Permit Vehicles" are those vehicles authorized by The Fremont Street Limited Liability Company in accordance with Section 8 to enter upon the Pedestrian Mall.

(J)     "Sky Parade" is the aerial procession of floats or similar displays for certain

-2-

1   designated portions of a twenty-four hour period along the celestial vault which covers the

2   Pedestrian Mall.

3          (K)    "Street mall advertising" includes all advertising in connection with the

4   Pedestrian Mall including, without limitation, any means of marketing or promoting the Pedestrian

5   Mall or its adjoining businesses, and the display of consumer goods or products to the users of

6   the Pedestrian Mall for the purpose of encouraging the sale and purchase thereof, including,

7   without limitation, signs, pictures or other displays.

8          (L)    "Street mall entertainment" is the conduct on the part of any person intended

9   to provide entertainment, recreation, relaxation and enjoyment to the users of the Pedestrian Mall.

10          (M)    "Street mall vending" is the distribution, display or sale, or any combination

11   thereof, of consumer goods or services (including food, drink or merchandise) from a pushcart,

12   concession stand, kiosk or other similar structure designed for such purpose.

13          SECTION 3:  There is hereby established in the downtown area of the City

14   of Las Vegas a Pedestrian Mall, the boundaries of which are described in Section 4.  The surface

15   of all streets designated therein as a part of the Pedestrian Mall shall be, after the completion of

16   the streetscape construction thereon as evidenced by the issuance of a certificate of completion

17   therefor by the City, limited to the use of pedestrians.  Except for motorized vehicles used to

18   transport the physically disabled, emergency vehicles, maintenance vehicles, special access

19   vehicles, display vehicles, or vehicles granted access to the Pedestrian Mall by the private

20   operating entity, no motorized vehicle shall be permitted on the streets, or in the area, designated

21   under Section 4 as the Pedestrian Mall.

22          SECTION 4:  (A)  The following streets and rights-of-ways as constituting

23   and comprising the Pedestrian Mall are legally described in Exhibit A which is adopted herein as

24   a part of this ordinance.

25          (B)    The area legally described in subsection A of this section is indicated

26   on the map attached hereto as Exhibit B and adopted herein as a part of this ordinance.

-3-

1    SECTION 5:   Notwithstanding the prohibition contained in Section 3,
2  vehicular traffic traveling along Casino Center Boulevard and Fourth Street shall be permitted to
3  cross the Pedestrian Mall as those streets intersect with Fremont Street except during the Sky
4  Parade in which case such streets may be closed to through traffic and as otherwise approved in
5  accordance with Section 12.

6    SECTION 6:  In accordance with the provisions of the Pedestrian Mall Act,
7  the City Council hereby designates The Fremont Street Experience Limited Liability Company
8  as the private operating entity for purposes of acquiring, constructing, improving, operating,
9  managing and maintaining the Fremont Street Pedestrian Mall.

10    Subject to the other provisions of this ordinance and the Management
11  Agreement, The Fremont Street Experience Limited Liability Company may determine the uses
12  of the Pedestrian Mall for any purpose that will enhance the movement, safety, convenience,
13  enjoyment, entertainment, recreation or relaxation of pedestrians, and other purposes necessary
14  or appropriate to carry out the provisions of the Pedestrian Mall Act, including, without
15  limitation, seating, merchandising, exhibiting, advertising and any other use, activity or special
16  event which in the judgment of The Fremont Street Experience Limited Liability Company will
17  accomplish any of those purposes.   The authority delegated herein to The Fremont Street
18  Experience Limited Liability Company shall exempt it from the prohibition and requirements
19  contained in Title 19 of the Las Vegas Municipal Code relative to the aforementioned uses of the
20  Pedestrian Mall including, but not limited to, the use restriction and requirements for obtaining
21  special use permits contained therein.

22    SECTION 7:   Notwithstanding any other provision of the Las Vegas
23  Municipal Code, and in accordance with the provisions of the Pedestrian Mall Act, the City
24  Council hereby delegates to The Fremont Street Experience Limited Liability Company authority
25  to control and regulate within the Pedestrian Mall the following:

26    (A)    The distribution and location of movable furniture, sculpture, devices to

-4-

1  control pedestrian traffic, landscaping and other facilities that are incidental to the Pedestrian

2  Mall;

3          (B)     The uses to be permitted or restricted on the Pedestrian Mall by occupants

4  of abutting property, any utility provided such is not in conflict with the rights granted under any

5  franchise agreement, concessionaires, vendors, newspaper vending machines and others to serve

6  the convenience and enjoyment of pedestrians and the location of such uses;

7          (C)     The raising of revenue through the imposition of a fee for the use of all or

8  a portion of the Pedestrian Mall for special events or activities to offset the cost of operating and

9  maintaining the Pedestrian Mall;

10          (D)     The use of the Pedestrian Mall for advertising purposes and the charging

11  of a fee in connection therewith;

12          (E)     The operation of any lighting, heating or other facilities in the Pedestrian

13  Mall;

14          (F)     The replacement of any landscaping and maintenance of the furniture and

15  facilities in the Pedestrian Mall;

16          (G)     The access to the Pedestrian Mall by the public and closure of the Pedestrian

17  Mall to the public for purposes of special events or activities for limited periods of time;

18          (H)     Other activities, actions or conduct to promote the best interests of the public

19  and carry out the provision of the Pedestrian Mall Act.

20          The authority delegated herein shall be subject to the City's police power,

21  the provisions of the Management Agreement and the other provision of this ordinance and shall

22  not be construed in derogation of the constitutional or statutory rights of any person.

23          SECTION 8:   Upon proper application therefor, The Fremont Street

24  Experience Limited Liability Company shall issue permits authorizing the special permit vehicles

25  to enter upon the Pedestrian Mall to the owners and occupants of property adjoining the Pedestrian

26  Mall, or their designees, whose property as a result of the adoption of this ordinance does not

1   have sufficient access thereto and therefrom for the delivery or pick up of merchandise and
2   materials, or for the improvement, maintenance or repair of such property.  The permit will
3   identify the hours of each day that the special access vehicles will be granted access in accordance
4   with the plan submitted under Section 12, and may be made effective for such period of time, not
5   to exceed one year, as may be requested by the applicant.

6                    SECTION 9:  (A)    The Fremont Street Experience Limited Liability
7   Company shall allow access to pedestrians at all times along the entire length of Fremont Street
8   in the Pedestrian Mall and along the entire length of the other streets therein except as otherwise
9   approved in accordance with Section 12.  This provision does not require that access along the
10  entire length of the Pedestrian Mall always be at the same location but does require that access
11  along the entire length of the Pedestrian Mall be allowed to pedestrians.  For purposes of this
12  Section, pedestrian access includes reasonable access for disabled persons in wheelchairs and
13  similar devices.   As a prerequisite to closure of the Pedestrian Mall, The Fremont Street
14  Experience Limited Liability Company must obtain the review and approval of the City's
15  emergency service (police and fire) providers.

16                   (B)  Notwithstanding any other provision contained in Section 7 and subsection A
17  of this Section, The Fremont Street Limited Liability Company shall preserve and retain access
18  for pedestrians to the businesses adjoining the Pedestrian Mall unless consent to the denial thereof
19  has been obtained from the affected businesses.

20                   SECTION 10:  The following are hereby prohibited within the Pedestrian
21  Mall:

22                   (A)    All animals unless used in connection with a mall activity authorized by The
23  Fremont Street Limited Liability Company or used for the purpose of assisting the visually
24  impaired.

25                   (B)    All street mall vending, street mall advertising, street mall entertainment
26  special events or other commercial activities unless conducted or authorized by The Fremont

-6-

1   Street Experience Limited Liability Company.

2              (C)    Parades.

3              (D)    All unicycles, bicycles, skateboards, rollerskates, rollerblades and shopping

4   carts.

5              (E)    Sleeping or camping.

6              (F)    Littering.

7              (G)    All sexually oriented businesses as described in Section 19.74.020 of the Las

8   Vegas Municipal Code.

9              SECTION 11:   Notwithstanding the requirements set forth in other

10   provisions of the Las Vegas Municipal Code, The Fremont Street Limited Liability Company shall

11   be licensed with a miscellaneous service license and pay a license fee according to its gross sales

12   as provided in Section 6.04.005 of the Las Vegas Municipal Code.  So long as such fee is paid,

13   The Fremont Street Experience Limited Liability Company is exempt from the permit fees and

14   licensing requirements contained in Chapters 6.11, 6.19, 6.26, 6.28, 6.30, 6.32, 6.42, 6.54, 6.62

15   (and exempt from the prohibition contained in Section 6.62.130 of this Chapter), 6.73, 6.76, 6.78,

16   6.81, 6.84 and, with respect to special events, Sections 6.50.120 and 6.50.130 provided the

17   requirements of Sections 6.50.440, 6.50.450 and 6.50.460 have been satisfied, of the Las Vegas

18   Municipal Code.  The exemptions granted herein apply only to The Fremont Street Limited

19   Liability Company and its employees.

20              SECTION 12:  Prior to completion of construction of the Pedestrian Mall,

21   The Fremont Street Limited Liability Company shall submit to the City Council for review and

22   approval a plan which shall include the following:

23              (A)    The architectural theme and design standards which are proposed to be in

24   effect for the facade of the buildings and structures adjoining the Pedestrian Mall and for the street

25   scope lying therein;

26              (B)    The time and days of operation of the sky parade;

-7-

1        (C)     The location of any traffic control devices (pedestrian or vehicular) within

2   the Pedestrian Mall; and

3        (D)     The manner in which access shall be preserved to businesses during the

4   occurrence of any special events requiring the closure of all or a portion of the Pedestrian Mall

5   to the public to the extent that such information can be provided as a part of the plan.

6        (E)     The manner in which access will be assured into and onto the Pedestrian

7   Mall by emergency vehicles.

8        (F)     The days and hours on which special permit vehicles will be allowed access

9   into and onto the Pedestrian Mall.

10       (G)     The days and times in which Casino Center Boulevard or Fourth Street, or

11  both, may be closed to vehicular traffic for special events.

12       (H)     The manner, days and time in which all or a portion of the Pedestrian Mall

13  may be closed to pedestrian access for special events and other activities.

14              After approval of the plan by the City Council, any amendments thereto

15  proposed by The Fremont Street Experience Limited Liability Company may be made with the

16  approval of the City Manager.

17              SECTION 13:  Nothing contained herein shall be interpreted or construed

18  to a vacation, in whole or in part, of any right-of-way within the Pedestrian Mall, and the City

19  shall retain all police powers and other rights and powers to the extent not delegated under Section

20  7 to The Fremont Street Experience Limited Liability Company in such right-of-way.

21              SECTION 14:   Any person violating the provisions contained in this

22  ordinance shall be guilty of a misdemeanor.

23              SECTION 15: If any section, subsection, subdivision, paragraph, sentence,

24  clause or phrase in this ordinance or any part thereof, is for any reason held to be

25  unconstitutional, or invalid or ineffective by any court of competent jurisdiction, such decision

26  shall not affect the validity or effectiveness of the remaining portions of this ordinance or any part

1  thereof.  The City Council of the City of Las Vegas hereby declares that it would have passed

2  each section, subsection, subdivision, paragraph, sentence, clause or phrase thereof irrespective

3  of the fact that any one or more sections, subsections, subdivisions, paragraphs, sentences, clauses

4  or phrases be declared unconstitutional, invalid or ineffective.

5            SECTION 16:  All ordinances or parts of ordinances, sections, subsections,

6  phrases, sentences, clauses or paragraphs contained in the Municipal Code of the City of Las

7  Vegas, Nevada, 1983 Edition, in conflict herewith are hereby repealed.

8            PASSED,  ADOPTED  and  APPROVED  this  _____  day  of

9  _____, 1993.

10                 APPROVED:

11

12                 By_____
                  JAN LAVERTY JONES, Mayor

13  ATTEST:

14

    _____

15  KATHLEEN M. TIGHE, City Clerk

16

17

18

19

20

21

22

23

24

25

26

1                  The above and foregoing Ordinance was first proposed and read by title to

2    the City Council on the _____ day of _____, 199____, and referred to the following

3    committee composed of _____ and_____

4    for recommendation; thereafter the said committee reported favorably on said ordinance on the

5    _____ day of _____, 199____, which was a _____ meeting of said

6    Council; that at said _____ meeting, the proposed ordinance was read by

7    title to the City Council as first introduced and adopted by the following vote:

8    VOTING "AYE":      _____

9    VOTING "NAY":      _____

10   ABSENT:           _____

11                                         APPROVED:

12

13                                       By_____
                                          JAN LAVERTY JONES, Mayor
     ATTEST:

14

15   KATHLEEN M. TIGHE, City Clerk

16

17

18

19

20

21

22

23

24

25

26

**EXHIBIT "A"**
FREMONT STREET EXPERIENCE
CLARK'S LAS VEGAS TOWNSITE
A.P.N.   139-34-110-, 210-, 510- & 610-
(020-400- & 020-410-)

Those portions of the North Half (N 1/2) of Section 34,
Township 20 South, Range 61 East, M.D.M., in the City of Las
Vegas, County of Clark, State of Nevada, being those portions of
CLARK'S LAS VEGAS TOWNSITE as shown on the plat thereof on file in
Book 1 of Plats, Page 37 of Clark County, Nevada Records,
described as follows:

The Right-of-Way of FREMONT STREET (80 feet wide) from the
Southeasterly Right-of-Way line of MAIN STREET (80 feet wide) to
the Northwesterly Right-of-Way line of LAS VEGAS BOULEVARD
(formerly FIFTH STREET, 80 feet wide) as shown on said plat of
CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of FIRST STREET (80 feet wide) from the
Southeasterly prolongation of the Southwesterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 2 of
said CLARK'S LAS VEGAS TOWNSITE to the Southeasterly prolongation
of the Northeasterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 3 of said CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of CASINO CENTER BOULEVARD (formerly SECOND
STREET, 80 feet wide) from the Southeasterly prolongation of the
Southwesterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 15 of said CLARK'S LAS VEGAS TOWNSITE to
the Southeasterly prolongation of the Northeasterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 14 of
said CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of THIRD STREET (80 feet wide) from the
Southeasterly prolongation of the Southwesterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 18 of
said CLARK'S LAS VEGAS TOWNSITE to the Southeasterly prolongation
of the Northeasterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 19 of said CLARK'S LAS VEGAS TOWNSITE.

The Right-of-Way of FOURTH STREET (80 feet wide) from the
Southeasterly prolongation of the Southwesterly line of the
Northwesterly-Southeasterly alley (20 feet wide) in Block 31 of
said CLARK'S LAS VEGAS TOWNSITE to the Southeasterly prolongation
of the Northeasterly line of the Northwesterly-Southeasterly alley
(20 feet wide) in Block 30 of said CLARK'S LAS VEGAS TOWNSITE.

MAIN ST.

OGDEN

CARSON AVE.

GOLDEN GATE Casino

LAS VEGAS CLUB

PIONEER CLUB

SHOPS

SHOP

FIRST ST.

GOLDEN NUGGET Hotel & Casino

HORSESHOE Hotel & Casino

Gate

Gate

CASINO CENTER BLVD. « THROUGH

CARSON

Gate

Gate

FOUR QUEENS Hotel & Casino

FREMONT Hotel & Casino

CASINO

THIRD

Gate

Gate

PIONEER Bank

FITZGERALD'S Hotel & Casino

OGDEN

CITY PARKING GARAGE

OFFICES

SHOPS

FOURTH ST.

FOURTH » THROUGH

GOLD SPIKE HOTEL

Municipal Parking Garage

OFF.

SKY PARADE Future Phase Extension to Las Vegas Boulevard

SHOPS

AVE.

EXHIBIT B

BLVD.

# AFFIDAVIT OF PUBLICATION

PASTE CLIPPING HERE

**FIRST AMENDMENT**
**BILL NO. 93-54**
**ORDINANCE NO. 3747**

AN ORDINANCE ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA; AND PROVIDING FOR OTHER MATTERS PROPERLY RELATED THERETO.
SPONSORED BY: Councilman Arnie Adamsen
SUMMARY: Establishes a Pedestrian Mall along Fremont Street between Main Street and Las Vegas Boulevard South and designates The Fremont Street Experience Limited Liability Company as the private operating entity thereof.
The above and foregoing ordinance was first proposed and read by title to the City Council on the 6th day of October, 1993, and referred to the following committee composed of the Full Council for recommendation; thereafter the said committee reported favorably on said amended ordinance on the 20th day of October, 1993, which was a regular meeting of said City Council; and that at said regular meeting the proposed ordinance was read by title to the City Council as amended and adopted by the following vote:
VOTING "AYE" Councilmen: Adamsen, Higginson, Hawkins Jr. and Mayor Jones
VOTING "NAY" Councilmen: NONE
EXCUSED: WARD 3 VACANT
COPIES OF THE COMPLETE ORDINANCE ARE AVAILABLE FOR PUBLIC INFORMATION IN THE OFFICE OF THE CITY CLERK, 5TH FLOOR, 400 EAST STEWART AVENUE, LAS VEGAS, NEVADA.
PUB: October 23, 1993
Las Vegas Review-Journal

STATE OF NEVADA)
COUNTY OF CLARK)   SS:

KIM WILSON _____, being first duly sworn, deposes and says:

That she/he is a legal clerk for the LAS VEGAS REVIEW-JOURNAL and THE LAS VEGAS SUN, daily newspapers regularly issued, published and circulated in the City of Las Vegas, County of Clark, State of Nevada, and that the advertisement, a true copy of which is attached, was continuously published in the LAS VEGAS REVIEW-JOURNAL or THE LAS VEGAS SUN for a period of _____ONE_____ insertions from the period of _____OCTOBER 23, 1993_____ to _____OCTOBER 23, 1993_____, on the following days:

OCTOBER 23, 1993

Signed: _Kim Wilson_

Subscribed and sworn to before me this
25 day of October, 19 93

_____
Notary Public



NOTARY PUBLIC
STATE OF NEVADA
COUNTY OF CLARK
CHRISTY A. PIERCE
My Appointment Expires May 14, 1996

REV. 2-93



RECEIVED
CITY CLERK

# AFFIDAVIT OF PUBLICATION

Oct 14  3 59 PH '93

---

**PASTE CLIPPING HERE**

**BILL NO. 93-54**

AN ORDINANCE ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA; AND PROVIDING OTHER MATTERS PROPERLY RELATED THERETO.

Sponsored by:
Councilman Arnie Adamsen
Summary: Establishes a Pedestrian Mall along Fremont Street between Main Street and Las Vegas Boulevard South and designates The Fremont Street Experience Limited Liability Company as the private operating entity thereof.
At a City Council meeting October 6, 1993
BILL NO 93-54 WAS READ BY TITLE AND REFERRED TO RECOMMENDING COMMITTEE:
Full Council
COPIES OF THE COMPLETE BILL ARE AVAILABLE FOR PUBLIC INFORMATION IN THE OFFICE OF THE CITY CLERK, 5TH FLOOR, CITY HALL, 400 EAST STEWART AVENUE, LAS VEGAS, NEVADA.
PUB: October 8, 1993
Las Vegas Review-Journal

STATE OF NEVADA)
COUNTY OF CLARK)       SS:

_____ ANDREA DAVIS _____ , being first duly sworn, deposes and says:

That she/he is a legal clerk for the LAS VEGAS REVIEW-JOURNAL and THE LAS VEGAS SUN, daily newspapers regularly issued, published and circulated in the City of Las Vegas, County of Clark, State of Nevada, and that the advertisement, a true copy of which is attached, was continuously published in the LAS VEGAS REVIEW-JOURNAL or THE LAS VEGAS SUN for a period of_____ ONE _____ insertions from the period of _____ OCTOBER 8,1993 to _ OCTOBER 8,1993 _____, on the following days:

OCTOBER 8,1993

_____

_____

_____

Signed: _____

Subscribed and sworn to before me this
_____ day of __ October __, 19 93

_____
                                    Notary Public



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
CHRISTY A. PIERCE
My Appointment Expires May 14, 1996

REV. 2-93

# AFFIDAVIT OF PUBLICATION



RECEIVED
CITY CLERK
OCT 14   3 59 PH '93

RECEIVED
CITY CLERK
OCT 14   3 59 PH '93

PASTE CLIPPING HERE

**BILL NO. 93-54**

AN ORDINANCE ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA; AND PROVIDING OTHER MATTERS PROPERLY RELATED THERETO.

Sponsored by:
Councilman Arnie Adamsen
Summary: Establishes a Pedestrian Mall along Fremont Street between Main Street and Las Vegas Boulevard South and designates the Fremont Street Experience Limited Liability Company as the private operating entity thereof.
At a City Council meeting October 6, 1993
BILL NO 93-54 WAS READ BY TITLE AND REFERRED TO RECOMMENDING COMMITTEE:
Full Council
COPIES OF THE COMPLETE BILL ARE AVAILABLE FOR PUBLIC INFORMATION IN THE OFFICE OF THE CITY CLERK, 5TH FLOOR, CITY HALL, 400 EAST STEWART AVENUE, LAS VEGAS, NEVADA.
PUB: October 8, 1993
Las Vegas Review-Journal

STATE OF NEVADA)
COUNTY OF CLARK)     SS:

_____ ANDREA DAVIS _____ , being first duly sworn, deposes and says:

That she/he is a legal clerk for the LAS VEGAS REVIEW-JOURNAL and THE LAS VEGAS SUN, daily newspapers regularly issued, published and circulated in the City of Las Vegas, County of Clark, State of Nevada, and that the advertisement, a true copy of which is attached, was continuously published in the LAS VEGAS REVIEW-JOURNAL or THE LAS VEGAS SUN for a period of _____ ONE _____ insertions from the period of _____ OCTOBER 8,1993 _____ to _____ OCTOBER 8,1993 _____ , on the following days:

OCTOBER 8,1993

_____

_____

_____

_____

Signed: _____

Subscribed and sworn to before me this _____ /o _____ day of _____ October _____ , 19 93

_____
Notary Public

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
CHRISTY A. PIERCE
My Appointment Expires May 14, 1996



085834

REV. 2-93



RECEIVED
CITY CLERK

Oct 7  10 30 AM '93

# AFFIDAVIT OF PUBLICATION

PASTE CLIPPING HERE

**NOTICE OF PUBLIC HEARING ON THE PROPOSED ADOPTION OF AN ORDINANCE (BILL NO. 93-54) ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA; AND PROVIDING FOR OTHER MATTERS PROPERLY RELATED THERETO.**

PUBLIC NOTICE IS HEREBY GIVEN that a public hearing before the City Council of the City of Las Vegas has been scheduled at the City Council Chambers at 9:00 a.m. on October 19, 1993, at 400 East Stewart Avenue, Las Vegas, Nevada to discuss the adoption of the Ordinance described above which will have the effect of closing a portion of Fremont Street from Main Street to Las Vegas Boulevard South to vehicular use for the purpose of creating a Pedestrian Mall and designating the Fremont Street Limited Liability Company as the Private Operating Entity pursuant to Chapter 368, 1993 Nevada Sessions Law.

A copy of the proposed Ordinance may be obtained from the City Clerk of the City of Las Vegas located on the 5th Floor of the City Hall Complex, 400 East Stewart, Las Vegas, Nevada.

You are cordially invited to attend this public hearing to give your comments concerning the proposed adoption of this Ordinance.

DATED this 4th day of October, 1993.

KATHLEEN M. TIGHE, City Clerk

PUB: October 4, 1993
Las Vegas Review-Journal

STATE OF NEVADA)
COUNTY OF CLARK)    SS:

ANDREA DAVIS_____ , being first duly
sworn, deposes and says:

That she/he is a legal clerk for the LAS VEGAS
REVIEW-JOURNAL and THE LAS VEGAS SUN,
daily newspapers regularly issued, published and
circulated in the City of Las Vegas, County of
Clark, State of Nevada, and that the
advertisement, a true copy of which is attached,
was continuously published in the LAS VEGAS
REVIEW-JOURNAL or THE LAS VEGAS SUN for a
period of ____ONE____ insertions
from the period of _____OCTOBER 4,1993_____
to ____OCTOBER 4,1993____, on the following
days:

OCTOBER 4,1993

Signed: _____

Subscribed and sworn to before me this
____5____ day of ___Oct___, 19 93

_____
Notary Public

GLENDA L. HARRIS
Notary Public - State of Nevada
CLARK COUNTY
My Appointment . . .



085842

# AFFIDAVIT OF PUBLICATION

PASTE CLIPPING HERE

**FIRST AMENDMENT**
**BILL NO. 93-54**
**ORDINANCE NO. 3747**

AN ORDINANCE ESTABLISHING A PEDESTRIAN MALL ALONG FREMONT STREET BETWEEN MAIN STREET AND LAS VEGAS BOULEVARD SOUTH AND DESIGNATING THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY AS THE PRIVATE OPERATING ENTITY THEREOF FOR THE CITY OF LAS VEGAS, NEVADA; AND PROVIDING FOR OTHER MATTERS PROPERLY RELATED THERETO. SPONSORED BY: Councilman Arnie Adamsen
SUMMARY: Establishes a Pedestrian Mall along Fremont Street between Main Street and Las Vegas Boulevard South and designates the Fremont Street Experience Limited Liability Company as the private operating entity thereof.
The above and foregoing ordinance was first proposed and read by title to the City Council on the 6th day of October, 1993, and referred to the following committee composed of the Full Council for recommendation; thereafter the said committee reported favorably on said amended ordinance on the 20th day of October, 1993, which was a regular meeting of said City Council; and that at said regular meeting the proposed ordinance was read by title to the City Council as amended and adopted by the following vote:
VOTING "AYE" Councilmen: Adamsen, Higginson, Hawkins, Jr. and Mayor Jones.
VOTING "NAY" Councilmen: NONE
EXCUSED: WARD 3 VACANT
COPIES OF THE COMPLETE ORDINANCE ARE AVAILABLE FOR PUBLIC INFORMATION IN THE OFFICE OF THE CITY CLERK, 5TH FLOOR, 400 EAST STEWART AVENUE, LAS VEGAS, NEVADA.
PUB: October 23, 1993
Las Vegas Review-Journal

STATE OF NEVADA)
COUNTY OF CLARK) SS:

KIM WILSON _____, being first duly sworn, deposes and says:

That she/he is a legal clerk for the LAS VEGAS REVIEW-JOURNAL and THE LAS VEGAS SUN, daily newspapers regularly issued, published and circulated in the City of Las Vegas, County of Clark, State of Nevada, and that the advertisement, a true copy of which is attached, was continuously published in the LAS VEGAS REVIEW-JOURNAL or THE LAS VEGAS SUN for a period of _____ ONE _____ insertions from the period of _____ OCTOBER 23, 1993 to _____ OCTOBER 23, 1993 _____, on the following days:

OCTOBER 23, 1993 _____

_____

_____

_____

Signed: 

Subscribed and sworn to before me this
_____ 25 _____ day of _____ October _____, 19 93

_____
Notary Public



085816

# EXHIBIT 3

1

## MANAGEMENT AGREEMENT
## FREMONT STREET EXPERIENCE PROJECT

2

3    This Management Agreement for the Fremont Street Experience Project (this

4    "Agreement") is made and executed as of this  20th day of  October  , 1993 between the

5    **CITY OF LAS VEGAS, NEVADA** (the "City"), a municipal corporation of the State of Nevada

6    (the "State"), and **THE FREMONT STREET EXPERIENCE LIMITED LIABILITY**

7    **COMPANY** (the "Company").

8    **WHEREAS,** each of the parties to this Agreement represents and warrants that it

9    has the power to enter into, execute and perform this Agreement as provided herein; and

10   **WHEREAS**, it is the desire of the parties hereto that the Company manage the

11   Fremont Street Experience Project (the "Project"), as herein provided; and

12   **WHEREAS,** the City has adopted its Ordinance No.  3747  (the "Ordinance")

13   which creates a pedestrian mall on a part of Fremont Street and adjoining streets, and designated

14   the Company as the Private Operating Entity of that mall pursuant to Ch. 368, 1993 Nevada

15   Session Laws (the "Act").

16   NOW, **THEREFORE, IN CONSIDERATION OF THE MUTUAL**

17   **COVENANTS AND CONDITIONS CONTAINED HEREIN, THE PARTIES HERETO**

18   **AGREE AS FOLLOWS:**

19                          **ARTICLE I**

20                          **GENERAL.**

21       1.1.    **Description.**  The Project shall consist of the Celestial Vault Project and

22   the Right-of Way Improvements Project (herein, the "Celestial Vault Project" and the "Right-of-

23   Way Improvements Project," respectively), each substantially as described in Exhibit A to the

24   Fremont Street Experience Project Development Agreement among the parties hereto, the City

25   of Las Vegas Downtown Redevelopment Agency (the "Agency") and Fremont Street Experience

26   Parking Corporation (the "Corporation"), dated as of the date hereof (the "Development

Agreement"), and sky floats which will operate in the celestial vault (the "Skyfloat Project") and

all related appurtenances and equipment therefor.  The Project and a parking garage project (the "Parking Garage Project"), which is not a part of the "Project" as herein defined, are further described in substance in the Development Agreement and its Exhibits.

     1.2.   Purpose.  It is the desire of the parties to this Agreement that the Company shall have overall responsibility for operating and maintaining the Project, including the Skyfloat Project, the Celestial Vault Project, and the pedestrian mall created by the Ordinance (the "Mall Area").

## ARTICLE II

### RIGHTS, DUTIES AND RESPONSIBILITIES OF MANAGER.

     2.1.   In General.  Except as otherwise provided herein, it shall be the duty and responsibility of the Company to maintain the Project as a safe, clean, and attractive area for the residents of and visitors to the City of Las Vegas.  The Company agrees to operate and maintain the Project as a first class attraction in the City of Las Vegas.  This Agreement is intended to give the Company all powers permitted to a private operating entity under the Act, except as otherwise provided herein and in the Ordinance.   Nothing herein shall be deemed to impose any responsibility on the Company with respect to the front of any building facing any street.

     2.2.   Regulation and Control of Non-Commercial Activity.

     A.  Generally.  It is understood that the responsibility for the regulation and control of non-commercial activities in the Mall Area shall remain with the City, and such activities shall generally be controlled by an ordinance or ordinances or other form of regulation.  "Non-commercial activities" include charitable solicitation activities, activities undertaken in connection with labor disputes, panhandling, loitering, and distribution of published material of a non-commercial nature and any other non-commercial activities protected by the constitution or a statute of the United States or Nevada.  The Company shall have the right to propose additional or amended regulations for the regulation and control of non-commercial activities in the Mall Area to the City.  If in the opinion of the City Attorney, those proposed regulations would be

2

1   legal, the Company's proposals will be submitted by staff to the City Council for consideration.

2   Except as otherwise provided by law, including, but not limited to, the Ordinance and other

3   applicable ordinances of the City, the Company is also permitted to regulate non-commercial

4   activity in the Mall Area.

5              B.  Cross Street Vehicular Traffic.  Casino Center Boulevard and Fourth

6   Street will be through streets across Fremont Street.  The City will have the right and the

7   responsibility for determining the traffic patterns for those streets, and excluding their physical

8   intersection with Fremont Street, whether parking will be allowed, the size and extent of any

9   taxicab stands, loading zones or other specialized areas in these streets.  The City agrees to

10  consult with the Company in making those rules and to give the Company an opportunity to

11  comment on any changes thereto.  The Company shall be permitted to close Casino Center

12  Boulevard and Fourth Street as provided in the Ordinance.

13          2.3   Regulation and Control of Commercial Activities.

14              A.   Generally.  It is the intent of the parties that except as otherwise

15  expressly provided in this Agreement or in the Ordinance, the regulation and control of all

16  commercial activities that take place within the Mall Area is delegated to the maximum extent

17  permissible by law to the Company.  Commercial activities include the operation of the "Sky

18  Parade,"  "special events,"  "street mall vending,"  "street mall advertising" and "street mall

19  entertainment" (as such quoted terms are defined in the Ordinance) operation of the Celestial Vault

20  Project and any other commercial activities.  Commercial activities do not include any activities

21  which the City cannot control under the constitution or statutes of the United States or Nevada.

22              B.   Business Licenses, Permits and Other Requirements.      Except as

23  otherwise provided in the Ordinance, the activities of the Company and all other commercial

24  activities undertaken in the Mall Area, shall be required to obtain the permits from the City that

25  they would be required to obtain under City ordinances and all fees, taxes and other levies that

26  normally would have to be paid shall be paid.  All permits granted by governmental entities other

3

1  than the City that are required for any activity undertaken in the Mall Area, must be acquired
2  from those entities as provided in applicable ordinances, resolutions, policies, rules, regulations
3  and statutes. If the City is required to pay a fee or charge to another governmental entity because
4  of activities in the Mall Area conducted by the Company or commercial users using the Mall Area
5  pursuant to an agreement with the Company, the Company is obligated to reimburse the amount
6  of that fee or charge to the City on request of the City. The Company is not hereby prohibited
7  from contesting any such fee in good faith.

8         C.     Selection of Commercial Users. The Company shall have the right
9  to select all concessionaires and other commercial users of the Mall Area, including, but not
10 limited to, the Skyfloat Project and Celestial Vault Project, including, but not limited to, the
11 providers of street mall vending and street mall entertainment, advertisers in the Mall Area and
12 operators and sponsors of special events all or a portion of which take place in the Mall Area.
13 In making this selection, the Company agrees to abide by any laws which apply to concessions
14 on public property, including without limitation, to the extent applicable to the Project, the
15 provisions of NRS 426.630 to 426.720.

16         D.     Fees for Commercial Use. The Company shall determine, set,
17 collect and retain all fees for commercial use of the Mall Area, other than fees and other
18 governmental charges which are payable to the City or other governmental entities. The fees must
19 not be fixed so as to discriminate against any person or group of persons in a manner prohibited
20 by law.

21         E.     The Company will require evidence of proper licensing of all
22 commercial users of the Mall Area.

23     2.4.   Mall Access.

24         The Company shall have the right to regulate access to and along the Mall
25 Area subject to the Ordinance, Section 2.2B above and the following:

26         A.     Pedestrian Access. Except as permitted under the Ordinance, the

4

Company shall generally allow access at all times by pedestrians along the entire length of Fremont Street in the Mall Area, and along the entire length of the other streets therein. The Company shall be entitled to regulate such pedestrian traffic to the extent permitted by the Ordinance.

B. <u>Access to Businesses</u>. Except for emergencies and as permitted under the Ordinance, without the consent of the affected business, pedestrian access shall always be provided to each business located on Fremont Street and the other streets in the Mall Area to the extent under the control of the Company or persons acting pursuant to an agreement with the Company.

C. <u>Access By Vehicles</u>. The Company shall provide a reasonable period of time for vehicle access for commercial deliveries to businesses located along the Mall Area which do not have other useable vehicular access, as provided in the Ordinance.

D. <u>Other Non-Pedestrian Traffic</u>. Except to the extent otherwise provided in this Agreement and the Ordinance, the Company is authorized to regulate or prohibit all non-pedestrian traffic along the mall, including, without limitation, all bicycles, roller-blades, skates, skateboards, unicycles, shopping carts or other wheeled traffic (other than wheelchairs and other similar devices for the disabled, whether motorized or not, which are "pedestrian traffic" for purposes of this Article). The Company is authorized to regulate or prohibit pets in the Mall Area except for "seeing eye" dogs and other pets that assist disabled persons.

2.5. **Nuisances; Interference with Businesses.** The Company shall not use or permit use of the Project by any commercial user of the Project in a manner that violates the law or constitutes an illegal nuisance. The Company's manner of use of the Mall Area, as distinct from the mere existence of the Project, shall not illegally interfere with any business or constitute an inverse condemnation or taking of any property or business which is operated adjacent to the Mall Area.

. . .

5

2.6.   <u>Maintenance of Mall and Celestial Vault</u>.

A.   <u>Maintenance in General</u>.  The Company understands that it is the intention of the parties that the Project be maintained in good working condition as a first class facility and the Company agrees to expend sufficient funds to so maintain the Project.  The Company will repaint, refurbish or otherwise perform upkeep on all parts of the Project that reasonably require such repainting, refurbishing or upkeep.  The City will continue to provide the same level of street maintenance and cleaning to the Mall Area as it provided to the streets comprising the Mall Area before creation of the pedestrian mall unless the Company requests that it cease to provide any such service.  The City may at its option contribute an amount of funds to the Company that equals its cost of maintenance as provided in the preceding sentence in lieu of providing that maintenance.  The Company may provide additional maintenance and repair for Casino Center Boulevard and Fourth Street in addition to that performed by the City.

B.   <u>Security</u>.  The Company shall provide uniformed security guards for the Project.  In addition, for special events, the Company will provide such additional uniformed security guards as are recommended by the Las Vegas Metropolitan Police Department ("LVMPD").  The City will use its best efforts to cause the LVMPD to provide at least as much security in the Mall Area as it currently does.

C.  <u>Traffic Diversion</u>.  The Company will provide whatever traffic diversion devices and personnel as are necessary to divert traffic from the Mall Area during the operation of the Sky Parade and special events in the Mall Area.

D.   [Intentionally Deleted.]

E.   <u>Rest Rooms, Etc</u>.  The Company  will provide or cause to be provided public rest rooms, public telephones and drinking fountains which are available to the public for 24 hours a day (except during normal short term shutdowns for maintenance and cleaning) in a sufficient quantity for a facility of this size. These facilities may be provided in the Parking Garage Project, at the Company's option.

6

1               F.    [Intentionally Deleted.]

2               G.  Liability Insurance.  Prior to the expiration of the insurance required

3  by the Development Agreement, the Company shall furnish or cause to be furnished to the City,

4  duplicate originals or appropriate certificates of comprehensive general liability insurance policies

5  in the amount of at least $25,000,000 combined single limit naming the City, and its officers and

6  employees, as additional insureds. The Company shall also furnish or cause to be furnished to

7  the City evidence satisfactory to the City that it and any contractor with whom it contracts for the

8  performance of work under this Agreement carries workers' compensation insurance as required

9  by law.

10              H.  Casualty Insurance.  Prior to the expiration of the Development

11  Agreement, the Company shall furnish or cause to be furnished to the City, appropriate

12  certificates of an "All Risk," Fire, Property Damage, and other casualty insurance in an amount

13  equal to the full replacement cost of the Project, including property in transit or elsewhere, and

14  including the interests of the City and the Company, and their related entities, their

15  subcontractors, and contractors. Such insurance shall include an insurer's waiver of subrogation

16  in favor of each party insured thereunder. Proceeds of any such insurance shall be made available

17  to reconstruct and repair the damage to the Project for which the insurance was received.

18              I.    Insurance--General. The insurance policies mentioned in this Section

19  shall provide that they will not be amended or cancelled without 30 days' notice to the City.

20              J.    Failure to Perform. In the event the Company fails to undertake and

21  perform any activity required in this Section 2.6, the City after reasonable notice to the Company

22  shall have the right, but not the obligation, to undertake that activity with its own funds and

23  submit a bill therefor to the Company. The Company agrees to pay any such bill within 15 days

24  of receipt.

25  . . .

26  . . .

7

**ARTICLE III**

**BUDGETS: REVENUES.**

3.1.   Budgets.   The Company shall provide to the City a budget for its operation, maintenance and promotional activities for each year at least 30 days before the beginning of the year.   The City is entitled to comment on that budget for a period that extends for at least twenty (20) days.

3.2.   **Collection of Revenues.**   The Company shall have the right to retain all revenues from all commercial activities undertaken in the Mall Area.  This clause does not allow the Company to collect any fees for permits or other governmental type charges imposed on users of the mall by the City or any other governmental entity.

3.3.   **Payments by the City.**

A.   Revenues from Mall and Celestial Vault.   The City agrees that the Company may retain all revenues collected by it as provided in Section 3.2 above.

B.   Room Tax Revenues.   The City will pay to the Company within two months after the close of each calendar quarter an amount which represents amounts collected from the room tax imposed by the City's Ordinance No. 3722 ("Tax Ordinance") for the preceding calendar quarter in excess of the amounts required for that same period to be applied by the City's ordinance authorizing the issuance of bonds payable from the room tax imposed by the Tax Ordinance (the "Bond Ordinance") to the bonds ("Bonds") secured by that tax or required to be similarly applied by any ordinance authorizing any bonds which are issued in order to refund the Bonds (including a series of refundings).  No payment need be made under this Section to the extent the funds in excess of room tax collections are projected to be needed to pay the Bonds during the current or immediately succeeding quarter.  Upon termination of this Agreement any room tax collections or Bond proceeds not previously used to pay the Bonds or paid to the Company shall be so used or paid.  For purposes of this paragraph, interest on room tax collections, including, but not limited to, interest in the Room Tax Bonds Revenue Fund and the

8

1 Room Tax Bonds Bond Fund, shall be deemed room tax collections.  The City is aware that the

2 Company is relying on revenues pursuant to this paragraph and agrees that the Bonds may not be

3 redeemed prior to their original stated maturities without the consent of the Company.

4           C.  Use of Revenues.  Except as provided in the Development Agreement,

5 the revenues provided to the Company under this Section 3.3 must be used by the Company to

6 pay the costs of managing, operating, maintaining, repairing or improving the Project and the

7 costs of the other services required by this Agreement.

8           3.4.   Payments by the Company.  The Company agrees to pay to the Agency,

9 in each year, a management fee computed as described in this Section.  The amount of the

10 management fee shall be equal to the amount that would be charged as ad valorem property taxes

11 on the Celestial Vault Project and the Skyfloat Project.  The amount of those taxes in each year

12 shall be determined by multiplying the ad valorem tax rate applied to real property located in the

13 Mall Area by the assessed valuation of the Celestial Vault Project and the Skyfloat Project, as

14 determined by the Clark County Assessor.  The management fee shall be due and payable on the

15 same dates ad valorem taxes are due.

16           The City agrees to defer the management fee imposed by this Section determined

17 with respect to the Celestial Vault Project for a period ("Deferral Period") of 3 years commencing

18 July 1 of the first fiscal year for which the Celestial Vault Project is assigned an assessed

19 valuation by the Clark County Assessor.  In the event that the audits of the Company for the

20 Deferral Period provided pursuant to Article IV of this Agreement reveal that the Company has

21 had in the aggregate a profit (which is defined for this purpose as the excess of operating revenues

22 over operating expenses as computed in accordance with generally accepted accounting principles),

23 on a consolidated basis with the Corporation, during the Deferral Period, the Company shall be

24 obligated to pay to the Agency, within 180 days of the release of the last of such audits, an

25 amount equal to 1/3 of the lesser of (a) the amount of the management fee which was deferred

26 pursuant to this Section or (b) such aggregate profits.  The Company shall likewise be required

9

1  to pay an amount equal to 1/3 of the deferred management fee or aggregate profits for the

2  Deferral Period in each subsequent year until the deferred fee or aggregate profits for the Deferral

3  Period, whichever is less, have been fully repaid to the City. Should the Company not have an

4  aggregate profit during the Deferral Period, the deferred management fee need not be paid. The

5  payment required of the deferred management fee shall be in addition to the payment of the

6  normal management fee due under this Section 3.4. If in any year a property tax is levied on the

7  Celestial Vault Project, the Skyfloat Project or any part thereof, the fee due under this Section

8  shall be reduced by the amount of the tax levied. Without limiting the generality of the foregoing,

9  should any such tax be levied with respect to the Celestial Vault Project during the Deferral

10  Period, the management fee due thereafter shall be reduced by the same amount.

11

### ARTICLE IV

### MISCELLANEOUS COVENANTS

13       4.1.  **Status; Licenses**. The Company promises to maintain its status as a limited

14  liability company throughout the term of this Agreement. Except as otherwise provided in the

15  Ordinance, the Company has or will obtain prior to the completion of the Project all licenses and

16  permits required by any governmental entities, including the City, to perform its duties hereunder.

17       4.2  **Employees**. The Company is an independent contractor of the City. The

18  Company will hire all employees it needs to carry out the requirements of this Agreement or

19  contract for services or any combination thereof. No persons hired by the Company or any

20  contractor of the Company will be employees of the City for any purposes. The Company agrees

21  to pay, and counsel its contractors to pay, all required payroll taxes and levies for their respective

22  employees.

23       4.3.  **No Dilution**. The Company covenants that, if the same would substantially

24  reduce the Company's net worth during the term of this Agreement, it will not transfer all or a

25  substantial portion of its assets to another entity, merge into or with another entity, or take any

26  other similar voluntary action without the prior written consent of the City.

10

4.4.   <u>Security Interest</u>.  To secure the performance of its obligations hereunder, the Company hereby grants to the City a security interest in all property in which it has granted a security interest to the City and the Agency under the Development Agreement, pari passu with the security interest granted in the Development Agreement.

4.5.   <u>Inspection of Books</u>.   Each party covenants that it will allow the other party to inspect its books and records pertaining to the Project and this Agreement at all reasonable times on reasonable notice.  The City's books and records with respect to the Project include, but are not limited to, its books and records relating to the Bonds and the room tax.

4.6.   <u>Audits</u>.  Each party to this Agreement will have its books and records pertaining to the Project audited by a firm of Certified Public Accountants at least annually, and will furnish a copy of that audit, without charge, to the other party to this Agreement.

**ARTICLE V**

**DEFAULTS**.

5.1   <u>Events of Default</u>.  Each of the following shall be deemed an "event of default" under this Agreement.

A.   Either party to this Agreement fails to pay an amount under this Agreement when due.

B.   Either party to this Agreement fails to perform any of its duties or obligations hereunder or to abide by any covenant or representation contained in this Agreement.

C.   Either party to this Agreement is dissolved or liquidated without the prior written consent of the other party to this Agreement; however, it is not an "event of default" if the City is dissolved, liquidated or merged pursuant to a statute of the State of Nevada which specifically requires the dissolution, liquidation or merger, so long as another governmental entity that is legally and financially able to perform assumes responsibility for the obligations of the City hereunder.

D.   The entry of a decree or order for relief by a court having

11

1   jurisdiction of the premises in respect of either party in an involuntary case under the Federal

2   bankruptcy laws, or any other applicable Federal or state insolvency or similar laws, or appointing

3   a receiver, liquidator, assignee, custodian, trustee, or similar official for any party to this

4   Agreement, or ordering the winding up or liquidation of the affairs of any party to this

5   Agreement, and the continuance of that decree or order unstayed and in effect for a period of 90

6   consecutive days.

7           E.      The commencement by any party to this Agreement of a voluntary

8   case under the Federal bankruptcy laws or other applicable Federal or state insolvency or other

9   similar laws, or the consent by a party to this Agreement to the appointment of or taking

10   possession by a receiver, liquidator, assignee, trustee, custodian or similar official for or of any

11   substantial part of the property of a party to this Agreement.

12           F.      A default by any party to the Development Agreement in the

13   performance of any of its duties and obligations thereunder, or failure by any such party to abide

14   by any covenant or representation applicable to that party which is contained in the Development

15   Agreement. A default by the Agency under this paragraph shall be deemed a default by the City

16   under this Agreement and a default by the Corporation under this paragraph shall be deemed a

17   default by the Company under this Agreement.

18           Notwithstanding the provisions stated above, none of the above events shall

19   constitute an "event of default" unless the other party to this Agreement gives the defaulting party

20   to this Agreement notice in writing of the default and the default remains uncured for a period

21   of 30 days; but (1) if the default is such that it cannot be cured it shall be an event of default

22   immediately upon the delivery of notice and there is no need for the non-defaulting party to wait

23   30 days, to allow an opportunity for cure prior to exercising the remedies provided hereby and

24   (2) if the default is capable of cure, but not within thirty (30) days, it shall not be an event of

25   default if the defaulting party commences to cure the same within the above-referenced thirty (30)

26   day period and prosecutes such cure to completion with all due diligence.

12

5.2   Remedies for Default.

A. Remedies of City.   Subject to Section 6.6, if an event of default has occurred and the Company is the defaulting party, the City shall be entitled to exercise all rights that it has under any security interests granted by the Company or the Corporation in any of the Company or Corporation assets hereunder or under the Development Agreement. The proceeds of any sale of or foreclosure on any property in which a security interest has been granted may be applied by the City toward curing the default, toward otherwise meeting the Company's obligation under this Agreement, the Development Agreement, or both, and toward repaying or defeasing any bonds issued by the City or the Agency issued in whole or in part to fund any portion of the Project, provided that in no event may the City recover more than once for any item of damage and any surplus shall be paid to the Company.   In addition, the City may terminate this Agreement, the Development Agreement or both and shall have no liability to the Company thereafter for any money or property whatsoever with respect to such termination.

If an event of default has occurred, subject to Section 6.6, the City shall also have the right to bring any suit, action or proceeding at law or in equity to enforce its rights under the provisions of this Agreement and to require that the Company carry out the agreements that it has made hereunder or in the Development Agreement. The suit may be for specific performance, for damages, or for both, and the City may also, by action in equity, enjoin any acts or things which are unlawful or in violation of the City's rights under this Agreement. Upon an event of default, the City shall also be entitled to commence an action for the appointment of a receiver or receivers for the Project and the Company's assets, and of the rents, revenues, income products and profits thereof.

B.   Remedies of Company.   Subject to Section 6.6, in the event of a default by the City hereunder, the Company shall be entitled to bring a lawsuit at law or in equity seeking damages from the City on account of the breach, and the Company shall also be entitled to bring a lawsuit for specific performance to order the City to comply with its duties under this

13

1  Agreement, or bring an action for an injunction to enjoin acts of the City or the Agency which
2  may be unlawful or in violation of the rights of the Company under this Agreement.  The City
3  is aware that the failure of the City or the Agency to perform their obligations in the Development
4  Agreement with respect to the Parking Garage Project, including, but not limited to, their
5  obligation to provide the Corporation with possession of and title to the Parking Garage Property,
6  as defined and provided in the Development Agreement, and/or to deposit $15.2 million into the
7  account described in Section 4.3 of the Development Agreement, constitutes a default hereunder
8  which shall substantially damage the Company and that any limitations in the Development
9  Agreement on the Company's or Corporation's ability to recover damages for such default do not
10  apply to any claim by the Company hereunder as a result of such default.

11          5.3. **Mutual Remedies**.  In addition to the above, the parties to this Agreement
12  shall have all other rights and remedies afforded them by law or in equity for the enforcement of
13  this Agreement if an event of default has occurred and the other party is the defaulting party.
14  Subject to Section 6.6, no right or remedy conferred by this Agreement is intended to be exclusive
15  of any other right or remedy, and each and every said right or remedy is cumulative in addition
16  to any other right or remedy given under this Agreement or now or hereafter existing at law or
17  in equity, or by statute.

18          5.4. **No Implied Waivers**.  The delay or omission of any party in exercising any
19  right or power accruing upon any event of default hereunder shall not exhaust or impair any such
20  right or power, and shall not be construed to be a waiver of any such default or acquiescence
21  therein.  Every power or remedy given by this Agreement or at law or in equity may be exercised
22  from time to time and in any manner as may be deemed expedient.

23          5.5.    **Effect of Waiver**.  No waiver of any individual default hereunder by any
24  party shall extend toward any subsequent or other event of default hereunder, or shall impair any
25  rights or remedies for any such subsequent or other event of default hereunder.

26  . . .

14

## ARTICLE VI

## MISCELLANEOUS.

6.1.   Indemnification.

A.   The Company agrees to protect and indemnify and hold the City, its officers and employees and agents harmless from and against any and all claims, losses, expenses, suits, actions, decrees, judgments, awards, attorneys' fees, and court costs which the City, its officers, employees or agents or any combination thereof may suffer or which may be sought against or recovered or obtained from the City, its officers, employees or agents or any combination thereof as a result of or by reason of or arising out of or in consequence of (i) the operation or maintenance of the Project by the Company pursuant to this Agreement, including, without limitation, any claims of any business located on or adjacent to the Mall Area or the owner of any such business or of the property on which it is located that the manner of operation or maintenance of the Project by the Company (including any use of the Mall Area authorized by the Company) unreasonably interferes with that business or property or constitutes an inverse condemnation of all or a part of that business or property, (ii) any environmental or hazardous waste condition heretofore or hereafter existing on any of the property which is a part of the Project which was caused by the Company, any commercial users of the Project acting pursuant to an agreement with the Company or any contractors, subcontractors, or agents of the Company or any such users or anyone who is directly employed by the Company or any such users or any of their contractors, subcontractors, or agents, in connection with the Project, or (iii) any act or omission, negligent or otherwise, of the Company, any of the above-described commercial users of the Project or any contractors, subcontractors, agents of the Company or any such users or anyone who is directly employed by the Company or any such users or any of their contractors, subcontractors or agents, in connection with the Project.

B.   The Company agrees that it shall at its sole cost and expense defend the City, its officers, employees and agents and each of them in any suit or action for which the

15

Company has agreed to indemnify the City, its officers, employees or agents. The City shall promptly notify the Company of any claim made against it for which it may seek indemnification and shall fully cooperate with the Company in the defense and/or settlement thereof. If the Company fails to defend the City as herein provided, the City shall have the right but not the obligation to defend the same and charge all of the direct or incidental costs of such defense (including any attorneys' fees or court costs) to, and recover the same from, the Company.

C.   No indemnification is required to be paid by the Company for any claim, loss or expense arising from the willful misconduct or gross negligence of the City or its officers or employees.

D.   The provisions of this Section shall survive the termination of this Agreement. It is not intended by the parties hereto that this indemnification provision revive any claim of or extend any statute of limitations which has run against any third party.

6.2.   **No Third-Party Beneficiaries**. None of the provisions of this Agreement is intended to constitute the general pubic, any member thereof, or any other person a third party beneficiary hereunder or to authorize anyone who is not a party to this Agreement to maintain any suit for personal injuries, other damage, or any other cause of action, pursuant to this Agreement.

6.3.   **Force Majeure**.   In the event timely performance is prevented by an occurrence beyond the control of and without the fault of the party that is required to perform (financial inability excepted), such as, but not limited to, an act of God, the act of war, flood, earthquake, labor dispute, governmental regulations (other than existing applications of existing regulations of which the parties could reasonably be anticipated to be aware on the date hereof) or control and shortages of materials, the time in which performance is required to occur shall be continued for a reasonable period of time, not less than the number of days the party was delayed by the occurrence.

6.4.   **No Property Interest**. The parties agree that this Agreement, as distinct from the Development Agreement, does not in any manner grant or provide a property interest

16

1. in the Project to the Company.

2.       6.5.  **Contract Interpretation**.  All questions concerning interpretation or
3. clarification of this Agreement will be resolved if possible by the representatives of the City and
4. the Company administering this Agreement.  If those parties are unable to resolve the question,
5. any party to this Agreement may request in writing a meeting of the President of the Company
6. and the Manager of the City to attempt to resolve the question.  The parties agree to use their best
7. efforts to cause those individuals to meet within five (5) days of a request.  If there is no
8. resolution to the question within ten (10) days after such request any party may request binding
9. arbitration as provided in Section 6.6.

10.       6.6.  **Arbitration**. All claims, disputes, or other questions that may arise between
11. the City and the Company concerning any provision or provisions of this Agreement which cannot
12. otherwise be settled and which have not been waived, must be submitted to and be finally settled
13. by binding arbitration in the manner set forth in this Section.  After expiration of the ten (10) day
14. period referred to in Section 6.5, any party involved in such dispute, by written notice to the
15. others, may demand arbitration.  The notice to arbitrate shall provide a complete statement of the
16. nature of the claim and the amount of money in dispute, if known.  The notice to arbitrate shall
17. be null and void if received beyond the time allowed by law for the presentation of the claim to
18. the City Council, if applicable, or filing of a lawsuit, whichever occurs first, presenting the same
19. claims as those presented in the notice to arbitrate.

20.       Except as provided to the contrary in these provisions on arbitration, the
21. arbitration shall be in conformity with and subject to applicable rules and procedures of the
22. American Arbitration Association.  If the American Arbitration Association is not then in
23. existence or for any reason fails or refuses to act, the arbitration shall be in conformity with and
24. subject to the provisions of the Nevada Uniform Arbitration Act as they stand amended at the time
25. of the notice. The arbitrators shall be persons experienced in the subject matter of the arbitration
26. and they shall be bound by this Agreement.  All arbitrators shall be impartial and unrelated,

17

1  directly or indirectly, so far as employment of services is concerned, to any party. The City, on
2  the one hand, and the Company, on the other, shall pay one-half the cost of arbitration including
3  arbitrators' fees.  Within twenty (20) days after notice requiring arbitration, the City and the
4  Company shall appoint one arbitrator and give notice of the appointment to the other party.  The
5  two arbitrators shall choose a third arbitrator within ten (10) days after appointment of the second.
6  If any party fails to appoint an arbitrator, or if the two arbitrators fail to choose a third, the
7  appointment shall be made by the then presiding judge of the Eighth Judicial District Court of the
8  State of Nevada, acting in his or her individual and nonofficial capacity, on the application of any
9  party and on five (5) days' notice to the other party; provided that any party may, by notice given
10 before commencement of the arbitration hearing, consent to arbitration by the arbitrator appointed
11 by the other party.  In that event, no further appointments of arbitrators shall be made and any
12 other arbitrators previously appointed shall be dismissed.

13        All arbitration proceedings shall be held in Clark County, Nevada.  The
14 arbitrator(s) shall investigate the facts and shall hold hearings at which the parties may present
15 evidence and arguments, be represented by counsel and conduct cross-examination.    The
16 arbitrator(s) shall render a written decision upon the matter presented to them by majority vote
17 within ninety (90) days after the date upon which the last arbitrator is appointed.  The decision
18 rendered in such arbitration shall be final and binding on the parties and judgment thereon may
19 be entered by any court having jurisdiction thereof.

20        All fees, costs and/or expenses of the arbitration, excluding preparation and
21 presentation, shall be assessed equally against the City and the Company and shall be paid one-
22 half by the City and one-half by the Company.

23        The Company shall carry on the management, operation and maintenance
24 of the Project, and the City shall continue to perform, during any arbitration, court proceedings
25 or any other disputes, unless the duty of such party to so perform is the subject of the dispute.
26        The City and the Company shall each pay their own costs for preparation

18

1 | of and presentation of all claims.

2 | For purposes of payment of an arbitrated claim under the terms of this
3 | Agreement, the definition of due and payable of a claim, shall be the date of the arbitration
4 | decision of that claim, plus forty-five (45) calendar days. Interest will be allowed from the date
5 | the arbitrators decide payment should have been made at the prime rate referred to in NRS 99.040
6 | plus 2% annum.

7 | 6.7.   **Successors; Assignments**. This Agreement shall be binding upon and inure
8 | to the benefit of the parties hereto and their respective successors and assigns. Except as
9 | otherwise permitted herein, no assignment of this Agreement or any right or obligation hereunder
10 | by any party hereto shall be valid unless the other party hereto consents to such assignment in
11 | writing.

12 | 6.8.   **Entire Agreement**.   This Agreement, including the exhibits hereto, and the
13 | Development Agreement constitute the entire agreement of the parties hereto. This Agreement
14 | may be modified by the parties hereto, but only by a written instrument signed by each party.

15 | 6.9.   **Further Assurances**. The Company and the City agree to do such further
16 | acts and things and to execute and deliver to the other such additional certificates, documents and
17 | instruments as the other may reasonably require or deem advisable to carry into effect the
18 | purposes of this Agreement or to better assure and confirm unto the other its rights, powers and
19 | remedies hereunder.

20 | 6.10. **Notices**.   All notices, demands, instructions and other communications
21 | required or permitted to be given to or made upon any party hereto shall be in writing and shall

22 | . . .

23 | . . .

24 | . . .

25 | . . .

26 | . . .

19

1  be personally delivered or sent by registered or certified mail, postage prepaid, addressed as

2  follows:

3           If to the City:

4                   City of Las Vegas, Nevada
                    c/o City Manager
5                   400 East Stewart Avenue, 10th Floor
                    Las Vegas, Nevada 89101
6
           If to the Company:
7
                    The Fremont Street Experience
8                     Limited Liability Company
                    302 East Carson Avenue, Suite 808
9                   Las Vegas, Nevada 89101
                    Attn: Donald D. Snyder
10
           If any notice hereunder is given to the City, a copy shall be forwarded by certified
11
   mail, postage prepaid, to the City's Director of Economic and Urban Development, the City
12
   Treasurer and the City Attorney, at:
13
                    Director of Economic and Urban Development
14                  City Hall
                    400 East Stewart Avenue
15                  Las Vegas, Nevada 89101

16                  City Treasurer
                    City Hall
17                  400 East Stewart Avenue
                    Las Vegas, Nevada 89101
18
                                   and
19
                    City Attorney
20                  City Hall
                    400 East Stewart Avenue
21                  Las Vegas, Nevada 89101

22         If notice hereunder is given to the Company, a copy shall be forwarded by certified

23 mail, postage prepaid, to the Company's counsel, at:

24                  Lionel Sawyer & Collins
                    Attn: Jeffrey P. Zucker
25                  1700 Bank of America Plaza
                    300 Fourth Street
26                  Las Vegas, Nevada 89101

20

1  Notices delivered personally shall be deemed received on delivery and notices by

2  mail shall be deemed received upon receipt or first attempted delivery, whichever first occurs.

3  Any party hereto may change the above addresses by notice delivered to the other

4  parties as provided in this Section, provided that a notice of change of address shall not be

5  effective against any party until actually received by such party.

6  6.11.  [Intentionally Deleted.]

7  6.12.  **Severability**.  If any provision of this Agreement is deemed to be invalid

8  or unenforceable, such invalidity or unenforceability shall not affect the remaining provisions

9  hereof that can be given effect without the invalid or unenforceable provision and the parties agree

10  to replace such invalid or unenforceable provision with a valid provision which has, as nearly as

11  possible, the same effect.

12  6.13.  **Authorized Representatives.**  Each party hereto shall by written notice to

13  the other party designate an authorized representative, who will be responsible for all acts  and

14  approvals on behalf of that party except as otherwise specified in that notice.  The authorized

15  representative may be changed from time to time by notice to the other party designating the new

16  authorized representative.  Any such designation by the City must be signed by the Mayor and

17  the City Clerk.  Any such designation by the Company must by signed by the President thereof.

18  Until another person is designated, the Company hereby designates Donald D. Snyder, its

19  President, as its authorized representative and the City hereby designates its Acting Manager,

20  Larry Barton as its authorized representative.

21  6.14.  **Governing Law.**  This Agreement shall be governed by and construed in

22  accordance with the laws of the State of Nevada.

23  6.15.  **Termination Date**.  Except as otherwise provided in Section 6.1D hereof,

24  this Agreement shall be in effect from the date and year first mentioned above until the date of

25  all of the Bonds or any bond refunding the Bond (including a series of refunds) have been retired.

26  This Agreement may be thereafter extended for up to four (4) periods of five (5) years each at

21

the option of the Company.  Prior to such termination the City shall pay to the Company all funds the Company is entitled to receive pursuant to Section 3.3B.

6.16.  **Captions**.  The captions appearing at the commencement of the Articles and Sections hereof are descriptive only and for convenience in reference to this Agreement and in no way whatsoever define, limit or describe the scope or intent of this Agreement, nor in any way affect this Agreement.

6.17.  **Counterparts**.    This  Agreement  may  be  executed  in  one  or  more counterparts, each of which shall be regarded as an original and all of which shall constitute the same Agreement.

6.18.  **Time Calculation**.  Whenever in this Agreement a reference is made to a period of days, the same shall mean calendar days unless otherwise specified, provided that should any time period so computed end on a non-business day, the time shall be extended to the next business day.

IN WITNESS WHEREOF the City and the Company have caused this Agreement to be executed as of the day and year first mentioned above.

(SEAL)

City Clerk, Chief Deputy

CITY OF LAS VEGAS, NEVADA

By: _____
                    Mayor
                                    10/27/93

THE FREMONT STREET EXPERIENCE LIMITED
LIABILITY COMPANY

Secretary

By: _____
                    President

22

013

SEP 2 0 1995

1

## AMENDED AND RESTATED FREMONT STREET EXPERIENCE PROJECT DEVELOPMENT AGREEMENT

2

3    This Amended and Restated Fremont Street Experience Project Development

4  Agreement (this "Agreement") is made and executed as of this _27_ day of _September_,

5  1995 among the **CITY OF LAS VEGAS, NEVADA** (the "City"), a municipal corporation of the

6  State of Nevada (the "State"), the **CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT**

7  **AGENCY** (the "Agency"), **THE FREMONT STREET EXPERIENCE LIMITED LIABILITY**

8  **COMPANY** (the "Company"), and **FREMONT STREET EXPERIENCE PARKING**

9  **CORPORATION** (the "Corporation").

10                    R E C I T A L S

11    1.    On October 20, 1993, the City, Agency, Company and Corporation entered

12  into a Fremont Street Experience Project Development Agreement ("Original Agreement") with

13  respect to the development of the "Project," as therein defined ("Original Project").

14    2.    At the time the Original Agreement was executed, the Original Project was

15  still in the planning stages.

16    3.    As the development of the Original Project proceeded, the parties

17  determined that in order for the Original Project to accomplish its purposes, certain changes with

18  respect thereto were desirable.

19    4.    To effect such changes, the parties desire to amend the Original Agreement.

20    NOW, THEREFORE, in consideration of the foregoing and other good and

21  valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties

22  hereby agree that the Original Agreement shall be amended and restated in its entirety to read as

23  follows:

24    **WHEREAS,** each of the parties to this Agreement represents and warrants that it

25  has the power to enter into, execute and perform this Agreement as provided herein; and

26

014

SEP 2 0 1995

1       **WHEREAS**, it is the desire of the parties hereto that the Company construct the

2    Celestial Vault Project (including,without limitation, the Celestial Vault Lightshow, as hereinafter

3    defined), Right-of-Way Improvements Project (all as defined below and collectively referred to

4    herein as the "Company Projects") and that the Corporation construct the Parking Garage Project

5    (as defined below) (collectively, the "Project") and that such Projects be funded in part by the

6    parties to this Agreement, all as herein provided; and

7       **WHEREAS,** the construction of the Project is in furtherance of and a part of the

8    Agency's redevelopment plan for the redevelopment of the downtown area of the City; and

9       **WHEREAS,** the City has adopted its Ordinance No. 3747 (as amended from time

10   to time, the "Ordinance") which creates a pedestrian mall in a part of Fremont Street, and

11   designates the Company as the Private Operating Entity of that mall pursuant to Ch. 368, 1993

12   Nevada Session Laws (the "Act"); and

13      **WHEREAS,** this Agreement is a culmination of negotiations of the above parties

14   and those four parties are coming together in a way that none can separately to enhance

15   employment opportunities, keep companies from leaving the downtown area, attract new

16   businesses to the downtown area, and provide inducement to Company member and non-member

17   hotels and other businesses in the downtown area thereby benefitting the public and community

18   at large.

19      **NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL**

20   **COVENANTS AND CONDITIONS CONTAINED HEREIN, THE PARTIES HERETO**

21   **AGREE AS FOLLOWS:**

22                                    **ARTICLE I**

23                          **GENERAL; PROJECT PROPERTY**.

24      1.1.   **Description**. The Project shall consist of the Celestial Vault Project, the

25   "First Western" Site Project and the "Right-of Way Improvements Project," each as described in

26

2

015
SEP 2 0 1995

1   Exhibit A hereto (herein, the "Celestial Vault Project," the "Parking Garage Project," and the

2   "Right-of-Way Improvements Project," respectively), and all related appurtenances and equipment

3   therefor.   Except as designated on Exhibit A and except for such other variations as may be

4   approved or deemed approved by the City and Agency, the Project shall be substantially as

5   described in the Fremont Street Experience Implementation Study Final Report dated October

6   1992 Volumes 1 through 4, and Executive Summary Volume 1, Revised January 1993,

7   (collectively "Base Books") copies of all of which are on file in the office of the City Clerk.  As

8   noted in paragraph (h) on page 2 of Exhibit A, the Celestial Vault Project will include elements

9   (the "Celestial Vault Lightshow") to provide for the display of computer generated electronic

10  images which were not shown in the Base Books.

11            1.2.   **Parking Garage Property**.

12                    A.  Transfer of Title.  Upon the Corporation obtaining a favorable revenue

13  ruling as referred to in Section 1.10, the Agency shall transfer to the Corporation fee simple title

14  to the real property on which the Parking Garage Project will be located legally described in the

15  description attached to Exhibit B (the "Parking Garage Property") by a grant, bargain and sale

16  deed (the "Deed") in the form hereto attached as Exhibit B, subject to no exceptions which would

17  materially interfere with use of the Parking Garage Project as contemplated in this Agreement.

18  Simultaneously, the Corporation shall grant to the City a first deed of trust on the Parking Garage

19  Property in the form attached as Exhibit C (the "Deed of Trust") to secure the performance of the

20  Company's obligations hereunder and under the Management Agreement (as hereinafter defined).

21                    B.  Recording Instructions.   This Agreement constitutes the joint recording

22  instructions of the Agency and the Corporation, and a duplicate original of this Agreement shall

23  be delivered to a recording agent to be mutually agreed upon by the parties, (the "Recording

24  Agent") upon the execution hereof.  The Agency and the Corporation shall provide such additional

25  recording instructions as shall be necessary and consistent with this Agreement.  The Recording

26  Agent hereby is empowered to act under this Agreement, and, upon indicating its acceptance of

3

016

SEP 2 0 1995

1   the provisions of this Section 1.2B in writing, delivered to the Agency and to the Corporation

2   within five (5) days after the delivery of this Agreement to the Recording Agent, shall carry out

3   its duties as Recording Agent hereunder.

4           The Agency shall pay from the trust account established under Section 4.3

5   of this Agreement to the Recording Agent the following fees, charges and costs promptly after

6   the Recording Agent has notified the Agency of the amount of such fees, charges and costs, but

7   not earlier than ten (10) days prior to the scheduled date for the recording:

8           1.      The fee of the Recording Agent.

9           2.      The premium for an owner's title insurance policy in form and

10  amount satisfactory to the Corporation insuring the Corporation's title to the Parking Garage

11  Property and any special endorsements requested by the Corporation and the premium for similar

12  lender's title insurance, insuring the first priority interest of the City and the Agency in the

13  Parking Garage Property under the Deed of Trust.

14          3.      Recording fees for the Deed and the Deed of Trust.

15          4.      Notary fees.

16          5.      Any State, County or City document or transfer taxes.

17          6.      All other closing expenses.

18          Upon delivery of the Deed and the Deed of Trust to the Recording Agent

19  by the Agency and the Corporation and receipt of the above amounts from the Agency, the

20  Recording Agent shall record the Deed and Deed of Trust when title can be vested in the

21  Corporation and title insurance can be issued in accordance with the terms and provisions of this

22  Agreement.

23          The Recording Agent is authorized to:

24          a.      Pay and charge the Agency for any fees, charges and costs payable

25  under this Section 1.2B. Before such payments are made, the Recording Agent shall notify the

26  Agency and the Corporation of the fees, charges and costs necessary to clear title (other than (i)

4

017

SEP 2 0 1995

1  the "Assignments" (as defined below) and (ii) consideration for the Parking Garage Property) and
2  record the Deed and Deed of Trust; and

3              b.    Disburse funds and deliver the Deed, Deed of Trust and other
4  documents to the parties entitled thereto when the conditions therefor have been fulfilled by the
5  Agency and the Corporation; and

6              c.    Record any instrument delivered through it, if necessary or proper,
7  to vest title in the Corporation and to vest the interest in the Parking Garage Property granted by
8  the Deed of Trust in the City and the Agency in accordance with the terms and provisions of this
9  Agreement.

10              Recording shall be accomplished as soon as reasonably possible, considering
11  the likely need to pursue court proceedings in order to obtain title to a portion of the Parking
12  Garage Property.  The Agency agrees to use its best efforts to obtain title to the Parking Garage
13  Property and, subject to Section 1.10, transfer it to the Corporation (on the conditions provided
14  herein) as soon as reasonably possible.  Unless recording is accomplished and the Parking Garage
15  Property conveyed to the Corporation prior to the date specified in paragraph E of this Section,
16  possession of the Parking Garage Property will be transferred from the Agency to the Corporation
17  on that date.  If possession is not transferred on or before that date or any extension thereof
18  requested by the Agency and agreed to by the Corporation, any party may, in writing terminate
19  this Agreement, and demand the return of its money, papers or documents.  Thereupon all
20  obligations and liabilities of the parties under this Agreement shall cease and terminate, and the
21  parties shall have no further liabilities to each other.  Should the Corporation terminate this
22  Agreement as a result of such failure to transfer possession, the same shall be the Corporation's
23  and the Company's sole and exclusive remedy for such failure to so deliver possession.

24              Any amendment of these recording instructions shall be in writing and
25  signed by the Agency and the Corporation.  At the time of any amendment, the Recording Agent
26  shall agree to carry out its duties as Recording Agent under such amendment.

5

018

SEP 2 0 1995

1          All communications from the Recording Agent to the Agency or the
2 Corporation shall be directed to the addresses and in the manner established in this Agreement for
3 notices, demands and communications among the parties hereto.

4          The liability of the Recording Agent under this Agreement is limited to
5 performance of the obligations imposed upon it under this Section 1.2B.

6          C.  <u>No Real Estate Agent Fees.</u>  Neither the Agency nor the Corporation
7 shall be liable for any real estate commission or brokerage fees which may arise herefrom.  The
8 Agency and the Corporation each represent that neither has engaged any broker, agent or finder
9 in connection with this transaction.

10          D.  <u>Taxes and Assessments.</u>  Ad valorem taxes and assessments, if any, on
11 the Parking Garage Property, and taxes upon this Agreement or any rights hereunder, levied,
12 assessed or imposed for any period commencing prior to the transfer of possession shall be borne
13 by the Agency.  All ad valorem taxes and assessments levied or imposed for any period
14 commencing after transfer of possession shall be paid by the Corporation.

15          E.  <u>Transfer of Possession</u>.  Possession of the Parking Garage Property
16 sufficient to allow its use by the Corporation as contemplated by this Agreement will be
17 transferred to the Corporation from the Agency by the earlier of January 15, 1994 or the date of
18 recording of the Deed, provided that the Agency shall provide the Corporation access to the
19 Parking Garage Property for the purpose of environmental and other similar studies as soon as
20 reasonably possible.  Except as otherwise provided in the Deed and except for easements, rights-
21 of-way and other restrictions and limited rights of use of record which do not materially interfere
22 with the Corporation's use of such property as contemplated by this Agreement, and any leases
23 with a term of 1 month or less, possession of the Parking Garage Property shall be transferred
24 free of any encumbrances or other restrictions or limitations.  All income from the Parking
25 Garage Property while the Corporation has the right of possession under this Section shall belong
26 to the Corporation.

6

019

SEP 2 0 1995

1          F.  Zoning of the Site.  The Corporation shall be responsible to obtain

2 zoning of the Parking Garage Property that permits the development, construction and operation

3 of the Parking Garage Project in accordance with the provisions of this Agreement.

4          G.  Condition of the Parking Garage Property.  The Parking Garage

5 Property shall be conveyed from the Agency to the Corporation in an "as is" condition.  The

6 Agency shall not be responsible for any items of site work or any environmental or hazardous

7 material or conditions on the Parking Garage Property.  The Agency is responsible for the

8 removal of asbestos in the buildings located at 118 Las Vegas Blvd. South and 113 South Fourth

9 Street and will provide proof of such removal by providing a document signed by John Worlund,

10 P.E. (Converse Associates) indicating that such asbestos removal has been done.  However, the

11 Corporation may elect to assume responsibility for removing such asbestos and shall be

12 reimbursed by the Agency for their cost of such removal not to exceed $120,000.00.  The

13 Corporation may request, and the Agency shall provide, copies of data and information on the

14 Parking Garage Property available to the Agency, but any such information furnished shall be

15 without warranty or representation by the Agency as to the completeness, correctness or validity

16 of such data and information.

17          It shall be the sole responsibility of the Corporation, at the Corporation's

18 sole expense, to investigate and determine the soil and other conditions of the Parking Garage

19 Property and the suitability of such soil and other conditions for the improvements to be

20 constructed by the Corporation, provided that the cost of any such studies may be paid from the

21 Agency Funds (as hereinafter defined).  If the soil and other conditions are not in all respects

22 entirely suitable for the use or uses to which the Parking Garage Property will be put, then except

23 as provided in Section 1.9, it is the sole responsibility and obligation of the Corporation to take

24 such action as may be necessary to place the soil and other conditions of the Parking Garage

25 Property in a condition suitable for the Parking Garage Project.

26

7

020

SEP 2 0 1995

H. <u>Work by the Corporation before Close of Escrow</u>. Prior to the transfer of possession, representatives of the Corporation shall have the right of access to the portion of the Parking Garage Property which the Agency then owns or controls at all reasonable times for the purpose of obtaining data and making surveys and tests necessary to carry out this Agreement. After transfer of possession, the Corporation may commence construction work on the Parking Garage Project. Any work by the Corporation under this paragraph shall be undertaken only after securing any necessary permits from the appropriate governmental agencies.

The Corporation shall hold the Agency and the City harmless for any injury or damages arising out of any activity pursuant to this paragraph and shall save and protect the Agency against any claims resulting from such work, access or use of the Parking Garage Property.

Upon request, copies of data, surveys and tests obtained or made by the Corporation on the Parking Garage Property shall be filed with the Agency.

I. <u>Cost of Parking Garage Property</u>. The Agency will pay the cost of acquiring the Parking Garage Property from its present owners, however, the Corporation agrees to pay to the Agency all of its costs in acquiring the Parking Garage Property in excess of $6,400,000. If the cost of acquiring the Parking Garage Property is less than $6,400,000 the Agency shall deposit the difference between that cost and $6,400,000 in the account mentioned in Section 4.3 hereof. The Agency will consult with the Corporation regarding, and keep the Corporation informed of the status of, all negotiations and other proceedings to acquire any portion of such property. The Agency will notify the Corporation prior to signing a contract, settlement or other transaction for the acquisition of any of the Parking Garage Property. If the transaction requires payment by the Agency of a price that exceeds by more than 10% the most recent appraisal of that Property prepared for the Agency, the Agency will not agree to the transaction if the Corporation objects thereto in writing within five (5) business days after the receipt of notice by the Corporation of the proposed transaction.

8

021
SEP 2 0 1995

1    In calculating the cost of acquiring the Parking Garage Property, all out of

2  pocket expenses of the Agency related thereto shall be included, including, without limitation, the

3  cost of purchasing the Parking Garage Property, condemnation awards, all legal fees and

4  expenses, any environmental surveys paid by the Agency and any asbestos removal on a portion

5  of the Parking Garage Property accomplished by the Agency or the Corporation pursuant to

6  Section 1.2G. The Corporation's obligation to pay the Agency any costs in excess of $6,400,000

7  shall be payable only from the following in the following order of priority: (i) amounts described

8  in Section 4.3 hereof which are not needed for the construction of the Parking Garage Project,

9  and (ii) and, the net rental revenues from the lease of any retail space on the first or second floors

10  of the Parking Garage Project (the "Retail Space"), and the Corporation shall apply all net rental

11  revenues of the Retail Space to meeting this obligation until the Agency has been fully paid;

12  provided, however, that no such application shall be made in any year until the payments on the

13  indebtedness secured by the Assignments required in that year have been made and deducted from

14  such net rental revenues. No net revenues from the Retail Space shall be paid to the Corporation

15  or the Company until the Agency has been fully paid all amounts due it pursuant to this Section

16  1.2I. "Net rental revenues" for this purpose means the rental revenues of the Retail Space less

17  related expenses, including, but not limited to, applicable income taxes, but exclusive of

18  depreciation, amortization and similar types of expenses, related to the Retail Space, determined

19  in accordance with generally accepted accounting principles. The repayment of indebtedness for

20  borrowed money is not a cash expense for this purpose. The only office space included in the

21  Retail Space is office space within a retail store leased to a third party. The "Assignments" are

22  one or more assignments of rent or other income from all or a portion of the Parking Garage

23  Property ("Rents") securing indebtedness, provided (a) the maximum original principal amount

24  of such indebtedness is $4,375,000; (b) not more than $750,000 of such $4,375,000 may be used

25  for purposes other than financing or refinancing improvements to, or equipment located on, the

26  Parking Garage Property; (c) not more than $125,000 of such $4,375,000 may be used for the

9

022

SEP 2 0 1995

1  purpose of financing or refinancing improvements to the Parking Garage Property other than

2  improvements required pursuant to leases with tenants approved by the City Manager; (d) not

3  more than $3,500,000 of such $4,375,000 may be used for purposes of financing or refinancing

4  improvements to the Parking Garage Property which are required pursuant to leases with tenants

5  approved by the City Manager; (e) the indebtedness described in clauses (b) and (c) of this

6  sentence ("Parking Loan") is borrowed from the manager of the parking garage portion of the

7  Parking Garage Property, is payable first and primarily from parking revenues, and is payable

8  from the net rental revenue of the Retail Space only if and to the extent that parking revenues

9  themselves are insufficient to make the required payments on the Parking Loan (it being

10 understood that parking revenues will always be applied before non-parking revenues to payment

11 of the Parking Loan, and if net rental revenue of the Retail Space is ever used to pay such Parking

12 Loan and at a later time there are available parking revenues after making all required payments

13 of the Parking Loan, those available parking revenues will be applied to the uses to which the net

14 rental revenue of the Retail Space used to pay the Parking Loan would have applied if it was not

15 used to pay the Parking Loan); (f) the terms of any such indebtedness must provide that it will

16 be paid in full within fifteen (15) years of the date of the first advance and that interest will be

17 paid on a current basis; and (g) any refinancing of indebtedness must be repaid within fifteen (15)

18 years of the date of the first advance of the original indebtedness.  If amounts described in clause

19 (i) or (ii) above arise before acquisition by the Agency of title to the entire Parking Garage

20 Property, and if the amounts claimed due by the owners of the property not yet acquired, plus

21 amounts already paid by the Agency to other owners for such property, exceeds $6,400,000 the

22 amounts described in said clauses shall first be applied to pay the Agency for costs already paid

23 for acquisition of the Parking Garage Property in excess of $6,400,000.  Once such excess, if

24 any, has been paid, the amounts described in clauses (i) and (ii) above shall be deposited with an

25 escrowee pursuant to an agreement, both satisfactory to the Agency and the Corporation, until the

26 total amount in such escrow equals the amount of such claimed excess.  As particular properties

10

023

SEP 2 0 1995

are acquired, the Agency shall be paid out of the escrow for such amounts as it is entitled to under this paragraph and the Corporation shall be paid such amount as is necessary so that the amount in escrow does not exceed the amount by which the sum of the amounts claimed due for still unacquired portions of the Parking Garage Property plus amounts previously paid to acquire the Parking Garage Property exceed the sum of $6,400,000 plus the amounts previously reimbursed to the Agency under this Section.

### 1.3   Celestial Vault Property.

A. Airspace Easements. The Company and the City will obtain for the City "Airspace Easements" from the owners of all property on which the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) will be constructed or on which the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) structures will encroach (the "Celestial Vault Property"), except the City and the Agency, in substantially the form attached as Exhibit E. Any changes from the form attached as Exhibit E must be approved by the City and the Company. The Company and the City agree to use their best efforts to obtain these Airspace Easements or court orders giving the Company the right to occupy the same by February 1, 1994. Any out of pocket costs incurred in obtaining the Airspace Easements will be paid from the trust account described in Section 4.2A. The Company shall be responsible for obtaining Airspace Easements from its members, its members' owners, and the owners of property leased to its members and to its members' owners. The City shall be responsible for obtaining all other Airspace Easements. The Company may request the Agency or the City to use its powers of condemnation to assist in acquiring any Airspace Easements the Company deems necessary for the Project, and the requested entity shall do so. The Company shall use its best efforts to make such requests on or before December 1, 1993. Concurrently with any such request, the Company shall furnish the City with a copy of any appraisal the Company may have obtained with respect to the subject property. The Company will record each Airspace Easement

11

024

SEP 2 0 1995

in the office of the Clark County Recorder.  The Company hereby agrees to all provisions of the Airspace Easement and agrees to perform all obligations of the City thereunder.

B.  [Intentionally Deleted]

C.  <u>Use of Property for Celestial Vault</u>.  Subject to the City's normal conditions for issuance of a permit to work in or along the public right-of-way, the City will issue a permit to the Company to construct the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) on that portion of the Celestial Vault Property owned by the City or the Agency or subject to an Airspace Easement.

D.  <u>Condition of Property.</u>  It shall be the sole responsibility of the Company to investigate and determine the soil and other conditions of the Celestial Vault Property and the suitability of the soil and other conditions for the improvements to be constructed by the Company.  If the soil and other conditions are not in all respects entirely suitable for the use or uses to which the property will be put, then except as provided in Section 1.9, it is the sole responsibility and obligation of the Company to take such action as may be necessary to place the soil and other conditions of the property in a condition suitable for the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow).

1.4  **Right-of-Way Improvements Project**.  Subject to the City's normal conditions for issuance of a permit to work in or along the public right-of-way, the City will issue a permit to the Company to construct the Right-of-Way Improvements Project.

1.5  [Intentionally Deleted]

1.6  **Security Interest in Company Property**.  Subject to Section 1.10 and this Section 1.6, the Company hereby grants the City and the Agency a first priority security interest in all of the property owned by the Company with respect to the Project or otherwise, including, without limitation, tangible and intangible personal property, fixtures, rents, revenues and profits and its trust account as provided in Section 4.1A hereof, and the notes mentioned in Section 4.1B. This security interest secures the performance of this Agreement and the Management Agreement

12

025

SEP 2 0 1995

1  by the Company.  The Company agrees not to consent to a lien or encumbrance on any of the

2  property described in this Section 1.6 other than the liens or encumbrances granted in this

3  Agreement and its exhibits; provided, however, that the Company shall have the right to pledge

4  all or any portion of the rents and other income from such property, which pledge may be senior

5  to any interest of the City and Agency therein, provided further that the original principal amount

6  of the indebtedness secured by such pledge does not exceed the greater of $300,000 or 15% of

7  the annual gross revenues of the Company for the last fiscal year of the Company prior to the date

8  such indebtedness is originally incurred and that the agreement pursuant to which such

9  indebtedness is incurred provides that the same be paid in full for at least one week during each

10  year.  It is specifically understood and agreed that the Company may not pledge its stock in the

11  Corporation, room tax collections, Company Funds or the notes described in Section 4.1B.  The

12  Company promises to pay all taxes and other lawful charges with respect to any part of the

13  Company Projects and its other property, and to execute and deliver all documents in form and

14  substance reasonably satisfactory to the City and the Agency as are necessary to perfect the

15  security interest granted hereby, including, without limitation, deeds of trust, assignments, leases

16  and rents, UCC Financing Statements and UCC Continuation Statements.  Similarly, the City and

17  Agency agree to execute and deliver all documents in form and substance reasonably satisfactory

18  to the Company as are necessary to assure and perfect the rights of pledgees under pledges

19  permitted hereunder.

20      1.7  **Intellectual Property**.  The Company will own all intellectual property rights,

21  including, without limitation, any patent, trademark, service mark, trade dress, and copyright

22  rights developed or acquired by the parties relating to the Project.  The Company shall have the

23  right to acquire such registrations or other means of protection as it sees fit for any such

24  properties, in the Company's name and at its own expense.  The City shall have the right to

25  include information and photographs relating to the Project and any related logos in the City's

26  customary media advertising and promotional materials provided that the same does not harm or

13

026

SEP 2 0 1995

disparage the properties referred to above in this paragraph.  If the Company does not renew the Management Agreement or it is terminated because of the Company's breach, the Company shall grant the City by separate document a non-exclusive, royalty-free license to use the logos, trademarks and other intellectual property reasonably needed to continue to operate the Project.

1.8  **Profits**.  The Company agrees that all of its net operating profits on the Project, computed on a consolidated basis with the Corporation, determined, except as noted below, in accordance with generally accepted accounting principles, will be used first to fund a reserve in an amount mutually determined by the parties for demolition of the Celestial Vault Project at the end of the term of the Management Agreement and then to improve, better, extend, expand or enlarge the Project.  Net operating profits on the Project will be computed after deducting all debt service and after payment of any current or previous operating deficit and after returning contributions to the Company members, provided that to the extent that the principal of any indebtedness is used to finance any expenditure that has already been deducted in the computation of net operating profits, such debt service shall not be so deducted in order to avoid double deductions for the same expenditure.  Similarly, if any payment of principal has already been deducted in the computation of net operating profits, any depreciation attributable to a capital item the purchase of which was financed by such debt shall not be so deducted.

1.9  **Soil Conditions/Environmental Hazards**.  If the Company or the Corporation encounters any unusual soil conditions or environmental hazards not caused by either of them in any of the Project property and the Company or the Corporation reasonably determines that cost of alleviating the soil conditions or eliminating the environmental hazard to such an extent as to permit construction and operation of the Project as is contemplated by this Agreement and the Management Agreement renders the Project uneconomical, the Company or the Corporation may notify the City of that fact and thereupon this Agreement will terminate without further liability of any party to any other, except that if title or the right of possession to the Parking Garage

14

027

SEP 2 0 1995

1  Property has already been conveyed to the Corporation, the Corporation shall reconvey such
2  property or right of possession to the Agency.

3        1.10  **Tax Contingency**. Expeditiously after the execution hereof, the Corporation
4  shall apply for a ruling from the Internal Revenue Service ("IRS") that the transfer of the Parking
5  Garage Property to the Corporation and the funding of the development of the Parking Garage
6  Project as provided herein will not cause the Corporation or the Company to recognize any
7  income or similar tax.  The Corporation shall keep the Agency informed of the status of such
8  proceedings and shall, to the extent lawfully permitted, allow the Agency the right to participate
9  therein.  The Corporation, with the consent of the Agency, may withdraw the request for such
10  ruling at any time.  In the event that the IRS has not granted a favorable ruling on or before
11  August 31, 1994, or on such earlier date as the IRS rules that such transactions will be taxable
12  to the Corporation or the request for a ruling is withdrawn, at the option of the City exercised by
13  written notice to the other parties within thirty (30) days after August 31, 1994, or the date the
14  Agency receives notice of such unfavorable ruling or withdrawal of the request, whichever is
15  earlier, either (i) this Agreement shall be amended to provide that no lien on the Corporation's
16  assets or stock shall be granted or (ii) the Lease Option shall become effective, provided that the
17  alternative in clause (i) may not be effected unless the IRS has ruled that such alternative will not
18  cause the Corporation or the Company to recognize any tax as a result of the above described
19  transactions.  Except as provided in this Section, this Agreement, including, but not limited to,
20  the Agency's obligation to obtain possession of, and title to, the Parking Garage Property, and
21  the Management Agreement shall remain in effect after either of the above alternatives has been
22  implemented.  To the extent necessary to effect the applicable alternative, this Agreement and the
23  Management Agreement shall be accordingly amended.

24        Under the Lease Option, the Agency shall own the Parking Garage Project,
25  which shall be constructed as herein provided, except that the Agency shall be responsible for all
26  acquisition costs, even if they exceed $6,400,000 (including, without limitation, reimbursement

028

SEP 2 0 1995

for any sums already applied in payment of such excess pursuant to Section 1.2I).  All of the Parking Garage Project, except for the parking portion thereof ("Leased Property"), shall be leased to the Corporation for a reasonable rent for a term of fifty (50) years, or such lesser term as the Corporation deems appropriate, provided that the aggregate of taxes paid on the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) and Parking Garage Project by the Corporation and the Company, rent for the Leased Space and the management fee referred to in Section 3.4 of the Management Agreement shall be the same as the aggregate now due under this Agreement and the Management Agreement for taxes on the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) and the Parking Garage Property and such management fee.  Under the lease for the Leased Property the Corporation shall be entitled to use the Leased Property in the same manner as now permitted under this Agreement and the Management Agreement.  The Company shall also be entitled to all net revenue from the remainder of the Parking Garage Project ("Parking Space") for a period equal to the term of the Management Agreement provided that such net revenues after taxes must be used to defray the cost of operating, maintaining and repairing the Company Projects.  Subject only to mandatory restrictions under tax laws related to the issuance of tax free bonds, the Corporation shall be provided validation rights which will be sufficient to allow the Company's members to validate parking in the Parking Space as fully as is now permitted under this Agreement and the Management Agreement.  The Corporation shall be entitled to sell advertising space inside and outside of the Parking Garage Project. The Corporation will also be provided adequate assurances that the net revenue from the Parking Space will be maximized to the same extent, and the parking space will be operated in the same manner, as it would be under the current terms of this Agreement and the Management Agreement.  Subject only to mandatory restrictions under tax laws related to issuance of tax free bonds, the Corporation and the Agency will enter into an agreement by which the Corporation manages the Parking Space with all the rights with respect thereto as now provided in this Agreement and the Management Agreement.  The Corporation

029

SEP 2 0 1995

1 and the Agency shall also enter into an agreement by which any successor manager must manage
2 the Parking Space in the same manner as the Corporation. All of the Corporation's rights under
3 the Lease Option may be transferred to the Company or any other affiliate with an equivalent net
4 worth, provided that the Corporation shall remain liable for all of its obligations under the Lease
5 Option.

**ARTICLE II**

**ARCHITECTURAL SERVICES**.

8         2.1. **Architectural Services**. The Company and the Corporation shall contract
9 with JPI - Nevada, Ltd/Wang, Cloud ("JPI") for architectural services with respect to the Project
10 by no later than December 1, 1993 or twenty days after all deposits made in Sections 4.2 and 4.3
11 are made, whichever is later. The contract with JPI (the "JPI Contract") shall be presented to the
12 City and the Agency for their review at least five (5) business days before it is effective. The JPI
13 Contract shall among other things provide that neither JPI nor any affiliated corporation shall use
14 any plans, drawings, design work, or other work product with respect to the skyfloat feature
15 referred to in the Base Books or the display of images in the Celestial Vault Project generated
16 under the JPI Contract in any other project in the United States, Canada or Mexico, or accept a
17 job or consult on a job in the United States, Mexico or Canada for an improvement similar to
18 such skyfloat or Celestial Vault Project for a period of ten years without the written consent of
19 the City, the Company and the Corporation. It is recognized that a mere inert arch or vault is
20 not similar to the Celestial Vault Project.

21         2.2. **Construction Plans, Drawings and Related Documents**.

22         The Company and the Corporation will cause to be prepared by JPI or
23 others and submit to the City and the Agency for review and approval, all construction plans,
24 drawings, and similar documents ("Plans") for all parts of the Project. The Plans shall be
25 submitted as completed. The City and the Agency review contemplated by this paragraph is in
26 addition to all other City or Agency reviews required by law, and shall take place concurrently

17

030

SEP 2 0 1995

1   with other City reviews required by law. Plans shall be deemed to be approved under this Section
2   if the City or the Agency does not raise an objection to the Plans by the time the City and, if
3   applicable, the Agency has approved those Plans pursuant to the other reviews required by law.
4   The review contemplated by this Section is only to assure that the Plans substantially conform to
5   the Base Books standard for the Project described in Section 1.1 as modified pursuant to that
6   section, to the extent not covered by other reviews required by law. Should there be any dispute
7   as to whether the Plans so conform, the decision of JPI made in good faith with respect to all
8   parties shall be binding on all parties. Notwithstanding City and the Agency review and approval
9   of Plans, it is the Company's or the Corporation's responsibility, as applicable, to see that all
10  required governmental and other permits are obtained at the required time and that all contract
11  requirements listed in Section 3.2 are met.

12              During the preparation of the Plans, the City and the Agency staff, the
13  Company and the Corporation shall hold regular progress meetings not less frequently than
14  monthly to coordinate the preparation of, submission to, and review of the Plans by the City and
15  the Agency. The City, the Agency, the Company and the Corporation shall communicate and
16  consult informally as frequently as is necessary to insure that the formal submittal of any
17  documents to the City and the Agency can receive prompt and speedy consideration, provided that
18  nothing in this paragraph shall give the City or the Agency any approval rights not otherwise
19  required by law or provided in this Agreement.

20              If any revisions or corrections of the Plans approved by the City and the
21  Agency shall be required by any government official, agency, department or bureau having
22  jurisdiction, the Company, the Corporation, the City and the Agency shall cooperate in efforts to
23  obtain a waiver of such requirements or to develop a mutually acceptable alternative.

24              Any disapproval of Plans shall state in writing the reasons for disapproval
25  and the changes which the City and the Agency request be made. Such reasons and such changes
26  must be substantially consistent with any items previously approved or deemed approved

18

SEP 2 0 1995

hereunder by the City and the Agency. The Company or the Corporation, as applicable, upon receipt of a disapproval shall revise such plans, drawings and related documents and resubmit them to the City and the Agency as soon as possible after receipt of the notice of disapproval, provided that in no case shall the City and the Agency be entitled to require changes substantially inconsistent with any previously approved items.

If the Company or the Corporation desires to make any substantial change in the Plans after their approval by the City and the Agency, the Company or the Corporation shall submit the proposed change to the City or the Agency for their approval, as described below. For the purposes of this Section, a change is "substantial" if either it is required to be submitted to and approved by the City or the Agency pursuant to law or if it is determined to be substantial by JPI in good faith with respect to all parties. If other review and approval are required by law, the City's and Agency's review pursuant to this Section must be completed at or prior to the time approval is granted pursuant to the review required by law; otherwise, the City's and Agency's review must be completed in three (3) business days. If the change is not disapproved in writing by the deadline stated in the preceding sentence for the completion of review, the City and the Agency shall be deemed to have approved such requested change. Any disapproval must state in detail the reason therefor.

## ARTICLE III

## CONSTRUCTION OF PROJECT.

3.1. **In General**. The Company shall be responsible for the construction of the Company Projects and the Corporation shall be responsible for the construction of the Parking Garage Project.

3.2. **Contract Requirements**.

A. Public Funds Contract Law Requirements. The Company and the Corporation shall comply with the requirements of Ch. 279, 332, 338 and 339 of NRS and with all other statutes that apply to public works, contracting and bidding and with the policies listed ·

19

SEP 2 0 1995

1  in Exhibit F in contracting for any work the cost of which will be paid from public funds (i.e.,

2  from the accounts mentioned in Sections 4.2 and 4.3). The Company and the Corporation shall

3  comply with the requirements of NRS 338.010 to 338.090 in contracting for work or hiring

4  workmen on all aspects of the Project, including, without limitation, those parts that are not

5  funded with public funds. A copy of the prevailing wage rates in effect for the period October

6  1, 1993 - September 30, 1994 is attached hereto as Exhibit G.

7           B.  Employment Plan, MBE/WBE Guideline and Policy Requirements.

8  The Corporation shall adopt the objectives of the City of Las Vegas Downtown Redevelopment

9  Agency Employment Plan Policy, in accordance with the Employment Plan attached as Exhibit

10  H. In addition, in all cases where public funds are expended the Company and the Corporation

11  shall adopt the guidelines established in the City's Minority and Women-Owned Business

12  Enterprises Policy in all contracts for construction and, to the extent applicable, shall require that

13  all contractors and subcontractors comply with that policy and those guidelines.

14           3.3  **Construction Schedule.**  As soon as reasonably possible, but not later than

15  June 30, 1994 the Company and the Corporation shall furnish to the City and the Agency,

16  respectively, a proposed construction schedule, showing the expected construction schedules for

17  each part of the Project to be constructed by such party and an expected expenditure of funds

18  schedule, showing the amount expected to be spent, its source and the purpose of the expense for

19  each month during the construction period. The Company and the Corporation will revise and

20  update these schedules as frequently as necessary.

21           The Company and the Corporation each will promptly begin and thereafter

22  diligently prosecute to completion the construction of that portion of the Project to be constructed

23  by it. The Company and the Corporation will each complete its respective portion of the Project

24  by August 15, 1996, or such reasonable extension thereof as may be granted by the City and the

25  Agency.

26

20

033

SEP 2 0 1995

During the period of construction, but not more frequently than once a month, the Company and the Corporation shall submit to the City and the Agency a written progress report of the construction when and as requested by the City and the Agency. The report shall include a reasonable number of construction photographs taken since the last report submitted to the City and the Agency.

3.4 **Construction and Acceptance Procedure**.

The Company and the Corporation shall cause all construction to be accomplished in strict conformity with the Plans, except as changed by changes as are approved under the procedure for changing approved Plans as described in Section 2.2 hereof, or which do not require such approval.

3.5 **Insurance**.

A. Liability and Workers' Compensation Insurance. Prior to the commencement of construction, the Company and/or the Corporation shall furnish or cause to be furnished to the Agency and the City, duplicate originals or appropriate certificates of comprehensive general liability insurance policies in the amount of at least $25,000,000 combined single limit naming the Company, the Corporation, the Agency and the City, and their officers and employees, as insureds. The Company and/or the Corporation shall also furnish or cause to be furnished to the City and the Agency evidence satisfactory to the City and the Agency that they and any contractor with whom they have contracted for the performance of work carries workers' compensation insurance as required by law.

B. Casualty Insurance. Prior to the commencement of construction, the Company and the Corporation each shall furnish or cause to be furnished to the City and the Agency duplicate originals or appropriate certificates of an "All Risk", Builder's Risk or Course of Construction Insurance with a limit equal to the maximum possible loss and all materials and equipment to be incorporated in its respective portion of the Project, including, without limitation, property in transit or elsewhere, and including the interests of the City, the Agency, the

21

034

SEP 2 0 1995

Company, the Corporation, as the case may be, and their related entities, their contractors and their subcontractors of any tier providing equipment, materials or services for the Project. Proceeds of any such insurance shall be made available to reconstruct and repair the damage to the Project for which the insurance was received.  Such insurance shall include an insurer's waiver of subrogation in favor of each party insured thereunder.

C.  Term of Insurance.  The obligations of each of the Company and the Corporation set forth in this Section 3.5 shall remain in effect until the later of (i) a final Certificate of Completion has been issued by the City and the Agency covering the entire Project as hereinafter provided, or (ii) comprehensive general liability and casualty policies of insurance are provided by the Company to the City as provided in the Management Agreement.  All of the policies mentioned in this Section shall provide that they will not be amended or cancelled without 30 days' notice to the City and the Agency.

3.6  **Bonds**.  All performance, payment, guarantee and other bonds obtained for contractors or subcontractors with respect to any part of the Project shall name the Agency and the City as additional insureds, provided that all proceeds thereof shall be made available for repair, restoration or operation of the Project.

3.7  **City and Other Governmental Agency Permits**.  At such time as is required by law, the Company and the Corporation shall, at their respective expense, secure or cause to be secured any and all required permits and pay any and all fees which may be required by the City or any other governmental agency affected by the construction of the Project.  The City hereby waives payment of the fees listed in Exhibit I.

3.8  **Rights of Access**.  For the purposes of assuring compliance with this Agreement, representatives of the Agency and the City shall have the reasonable right of access to any area where construction is taking place without charge or fee and at normal construction hours during the period of construction, including, but not limited to, the inspection of the work being performed in constructing the Project.

22

035

SEP 2 0 1995

3.9 **Local, State and Federal Laws**.  The Company and the Corporation shall each carry out the construction of its portion of the Project in conformity with all applicable laws, including, without limitation the Americans with Disabilities Act and all applicable federal and state labor standards, safety and environmental laws.

3.10 **Taxes, Assessments, Encumbrances and Liens**.  Each of the Company and the Corporation will not place or allow to be placed on any property on which the Project is located or any part of the Project itself which is owned by it, any mortgage, trust deed, encumbrance or lien, including, without limitation, any materialmen's or mechanic's lien, other than (a) the security interests granted to the City and the Agency by this Agreement, (b) the Assignments (made by the Corporation) and, (c) liens permitted by Section 1.6.  The Company and the Corporation shall each remove or have removed any levy or attachment made on any of the property described above in this Section 3.10 or on the Project (or any portion thereof) which is owned by it within 15 days after such levy or attachment.  Nothing herein contained shall be deemed to prohibit the Company and the Corporation from contesting in good faith the validity or amounts of any tax, assessment, encumbrance or lien without being required to remove the same during the pendency of such contest, nor to limit the remedies available to the Company and the Corporation in respect thereto.

3.11 **Completion**.  When the Project has been completed to the satisfaction of the Company and the Corporation, they shall request a Certificate of Completion from the City and the Agency.  If the Project is complete as required by this Agreement, that certificate will be issued and the insurance requirements of Section 3.5 will no longer apply (but the applicable insurance requirements of the Management Agreement shall apply).  Failure to issue such certificate or state the reasons for such failure within ten (10) days after either the Company or the Corporation requests such certificate shall be deemed issuance of such certificate.  The Company or the Corporation, as the case may be, will furnish to the City copies of "as built"

23

036

SEP 2 0 1995

drawings for all components of the Project at such reasonable time as those drawings are available.

3.12 **Enforcement of Warranties, Guarantees and Bonds**.  The Company or the Corporation, as applicable, will be responsible for enforcing all warranties, guarantees and bonds given with respect to workmanship and materials furnished to or for the Project or for repairing any defect which is the subject thereof.

**ARTICLE IV**

**FUNDING**.

4.1 **Company Funds**.

A. Cash.  The Company agrees to deposit into a trust account at a bank to be mutually agreed upon by the parties to this Agreement the sum of $17,000,000, less up to $1,000,000 which has been expended on the Project before the date this deposit is required, to pay a portion of the cost of the Project, provided that instead of so reducing the deposit, the Company or the Corporation may request reimbursement for all or a portion of such costs, which shall be funded in the same manner as provided in this Article IV for costs incurred after the date of the deposits.  This deposit will be made on the next business day after the Company has been notified that all the deposits required by Sections 4.2 and 4.3 have been made.  If the deposit required by this Section is not made at that time, in addition to all other remedies the City and the Agency may have, the City and the Agency may terminate this Agreement and seek damages from the Company for all costs and expenses incurred by either or both the City or the Agency in complying with or performing the terms of this Agreement to the date of termination and all future costs related to the Project and the financing thereof, including without limitation, the costs of issuing any bonds issued by the City or the Agency all or a portion of the proceeds of which were to be used for the Project, and the incidental and the escrow cost of defeasing or otherwise repaying any or all of those bonds, to the extent those repayment, defeasance, issuance, or other costs cannot be paid with the proceeds of those bonds.

24

037

SEP 2 0 1995

B. Notes. In addition, the Company will on the same date it makes the above deposit, furnish to the City evidence that it has received one or more promissory notes from Las Vegas Club Experience, Inc. and Golden Gate Experience, Inc. in the aggregate sum of $1,000,000, as a contribution to the Company. The note or notes must be payable in not more than 120 substantially equal monthly installments of principal and interest, commencing within 6 months of the date of the deposit mentioned in Section 4.1A above.

C. Investments. Amounts in the account mentioned in this Section may be invested at the direction of the Company in investments which would be legal for the City funds under Chapter 355 of NRS. All interest earned from investing amounts in this account shall be credited to the account. (All funds in such account are herein referred to as "Company Funds.")

4.2 **City Funds.**

A. Room Tax Bonds. The City agrees to deposit into a separate trust account at a bank to mutually agreed upon by the parties to this Agreement, the amount received for the sale of its "City of Las Vegas, Nevada, Taxable General Obligation (Limited Tax) Fremont Street Experience Bonds (Additionally secured with Pledged Revenues)" (the "Room Tax Bonds") in the aggregate principal amount of $21,000,000, after deducting therefrom the costs of issuing those bonds and the sum of $400,000 to be held in a separate trust account by a bank to mutually agreed upon by the parties to this Agreement as a reserve fund for the Room Tax Bonds (the "Reserve Fund") and applied as provided in the ordinance of the City authorizing those Bonds, the proposed form of which has been submitted to the Company and which is hereby approved by the Company (the "Room Tax Bond Ordinance").

B. Other Unrestricted Funds. In addition, the City will deposit an additional $1.4 million into the account described in Section 4.2A. (All funds in such account are herein referred to as "Unrestricted Funds.")

C. Restricted Funds. In addition, the City will deposit $3.0 million ("Gas Tax Funds") and $800,000.00 ("Question 10 Funds") into two separate trust accounts held by a

25

038

SEP 2 0 1995

1  bank to mutually agreed upon by the parties to this Agreement. All funds in such accounts are
2  herein referred to as "Restricted Funds." The Restricted Funds and Unrestricted Funds are
3  collectively referred to as the "City Funds.")

4           D. Timing. The City shall use its best efforts to deposit all City Funds as
5  provided above on or before November 23, 1993, and in all events shall make such deposits on
6  or before January 18, 1994, provided that in any event at least $1,000,000 of the deposit referred
7  to in Section 4.2B shall be made on or before November 1, 1993.

8           E. Investments. Funds in the accounts mentioned in this Section may be
9  invested at the direction of the City Treasurer in investments that are legal investments for City
10 funds under Chapter 355 of NRS. All interest earned on investments of amounts in such accounts
11 shall be credited to the respective account.

12          4.3 **Agency Funds**. The Agency agrees to deposit into a separate trust account
13 at a bank to mutually agreed upon by the parties to this Agreement an amount equal to
14 $15,200,000. Amounts in the account mentioned in this Section may be invested at the direction
15 of the Agency Treasurer in investments that are legal investments for City funds under Chapter
16 355 of NRS. All interest earned on amounts in the account mentioned in this Section shall be
17 transferred to the Agency on receipt. (All funds in such account are herein referred to as
18 "Agency Funds.") The Agency shall use its best efforts to deposit all Agency Funds as provided
19 above on or before December 23, 1993, and in all events shall make such deposit on or before
20 January 31, 1994.

21          4.4 **Expenditures - Initial and Subsequent Allocations**.

22          A. Company Funds. Up to $3,000,000 of the Company Funds may be
23 used for pre-start up expenses, operation and maintenance expenses, and other non-capital
24 expenses. For purposes of this Article IV, it is understood that design, engineering and other
25 professional services with respect to the Project are capital expenses. All other Company Funds
26 and interest earned thereon described in Section 4.1 hereof will be used for the construction of

26

039

SEP 2 0 1995

1   the Company Projects.  If after a Certificate of Completion is issued by the City and the Agency,
2   it is determined that Company Funds remain unspent and are not needed for any capital costs, the
3   funds may be used as working capital or for operation, maintenance and repair expenses of the
4   Project.

5           B.  Unrestricted Funds.  Up to $4,000,000 of the Unrestricted Funds may
6   be used for pre-start up expenses, operation and maintenance expenses and other non-capital
7   expenses of the Projects.  The balance of such funds will be used for the design and construction
8   of the Company Projects.  In all events, at least an amount equal to the current value of the
9   contributions of the Las Vegas Convention and Visitors Authority ("LVCVA") pursuant to the
10  Cooperative Agreement between the City and the LVCVA (attached hereto as Exhibit J) shall be
11  used for capital expenses.  Those Funds will not be expended on the Parking Garage Project
12  without an opinion of the City Attorney that the expenditure is legal.  If there are unexpended
13  funds after a Certificate of Completion is issued by the City and the Agency, those funds may be
14  used to pay a portion of the costs of operating, maintaining, and repairing the Company Projects.

15          C.  Restricted Funds.  Gas Tax Funds will be used for any purpose
16  permitted by Article 9, Section 5, of the Constitution of the State of Nevada and Question 10
17  Funds will be used for construction and maintenance of sidewalks, streets, avenues, boulevards,
18  highways and other public rights of way used primarily for vehicular traffic, and if not needed
19  for that purpose, may only be expended on expenses which (i) are legal expenses for those monies
20  in the opinion of the City Attorney, and (ii) would not cause the City to violate an applicable
21  contract to maintain the tax exempt status of interest on bonds issued to fund those amounts.  If
22  there remain unexpended funds from the amounts described in this paragraph after a Certificate
23  of Completion is issued by the City and the Agency, they will be used, if legally permissible, to
24  pay a portion of the costs of operating, maintaining, and repairing the Company Projects.

25          D.  Agency Funds.  The Agency Funds will be used to construct the
26  Parking Garage Project, including, but not limited to, build out of the Retail Space, provided that

27

040

SEP 2 0 1995

$9.215 million of the Agency Funds may not be expended for the Retail Space. If the Agency
Funds are not needed for the foregoing purposes, they shall be first be applied to pay for any
costs in acquiring the Parking Garage Property in excess of $6,400,000, and if those costs are
paid, will be applied to any other aspect of the Project, as needed, provided that payment for such
other aspects of the Project is a legal expenditure for the bond issue which would not cause the
Agency to violate its contract to maintain the tax exempt status of interest on those bonds. If
there remains Agency Funds which are not needed for construction after a Certificate of
Completion is issued by the City and the Agency and all costs for acquisition and development
of the Parking Garage Project are paid, those Funds will be used, if legally permissible, to pay
a portion of the costs of operating, maintaining, and repairing the Parking Garage Project.

4.5 **Expenditures - Approvals Required**.

Funds in the trust accounts mentioned in Sections 4.1, 4.2 and 4.3 above
shall be expended at the request of the Company, the Corporation, the City or the Agency, as the
case may be (the "Requesting Party"), on expenses for which the Requesting Party is permitted
to use those funds as set forth above, which expenses are incurred pursuant to a contract which
has been previously submitted to the other non-affiliated parties ("Approving Parties"). The
Requesting Party shall furnish the Approving Parties with a requisition for the expenditure which
shows the amount, the payee and the contract pursuant to which the expense was incurred,
specifying the account from which it is to be paid. The Requesting Party will pass requests for
disbursements to the Approving Parties not less than eight (8) days before the date it desires
payment to be made. The Approving Parties will, during the next succeeding eight (8) days
review the disbursement request and the work (if applicable) performed to see if it complies with
this Agreement, including, but not limited to, verifying, if applicable, that the invoiced work has
been performed in accordance with the Plans, as modified in accordance with this Agreement, and
that all mechanics' and/or materialmen's lien that might arise from such work being paid will be
waived upon such payment. If the payment should be so made, the Approving Parties shall so

28

041

SEP 2 0 1995

notify in writing the Requesting Party, and also so notify the bank which is holding the funds from which the payment is to be made. If the Requesting Party also so notifies such bank that the work is acceptable and payment shall be made, the bank shall issue a check to the proposed payee.

4.6 **Ownership**. The Corporation will own the Parking Garage Project and the City will own the Right-of-Way Improvements Project. The Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) will be owned in part by the City and in part by the Company, based on the amount of funding provided by these parties for the costs (hard and soft) of acquisition and construction of that Project, provided that upon termination of this Agreement title to the entire Celestial Vault Project will vest in the City except that title to all lights, all computers and the light grid frame will vest in the Company.

4.7 **Cost Overruns**. Except as provided in Section 1.2I, if the cost of the Project, or any portion of it, exceeds the amounts deposited in the accounts mentioned in Section 4.1, 4.2 or 4.3, and available to pay those costs as provided in Section 4.4, the Company or the Corporation, as the case may be, shall pay the amount of the excess from its own funds.

4.8 **Construction Account Audits**. All funds and accounts mentioned in this Article, and the expenditures thereof, will be audited annually prior to a Certificate of Completion being issued, and be audited for the year in which that Certificate is issued. The audit will be performed by a mutually acceptable firm of Certified Public Accountants. The City and the Agency hereby approve Arthur Andersen & Co. as an acceptable firm of Certified Public Accountants. The expenses of the audit shall be paid by the Company or the Corporation, as the case may be, as an operation and maintenance expense of their respective portion of the Project.

## ARTICLE V

## MISCELLANEOUS COVENANTS

5.1. **Management Agreement**. The Company and the City each covenant concurrently with the execution hereof to enter into an Amended and Restated Management

29

042
SEP 2 0 1995

Agreement (as amended from time to time, the "Management Agreement") in substantially the form attached as Exhibit D with only those changes as are approved by such parties.

5.2 **Federal Tax Covenant**. The Company and the Corporation promise to make no use of any part of the Parking Garage Project and Right-of-Way Improvements Project that was financed with the proceeds of bonds issued by the City or the Agency, the interest on which was intended to be excluded from gross income for federal income tax purposes ("tax-exempt bonds"), which would cause that interest to be included in gross income or individual alternative minimum taxable income for federal income tax purposes. In addition, the Company and the Corporation each covenant it will not omit to take any action with respect to the Parking Garage Project and Right-of-Way Improvements Project which, if omitted, would cause interest on any tax-exempt bonds of the City or the Agency issued all or in part for such portions of the Project to lose its exclusion from gross income and individual alternative minimum taxable income for federal income tax purposes. It is understood that the foregoing covenant applies only to the portions of the Project financed with tax-exempt bonds. It is also understood that generally as long as (a) those monies are used only for capital costs associated with (i) providing parking spaces that are available to the general public subject to incidental use including, without limitation, advertising and to validation procedures or (ii) providing a public right-of-way which is available for use by the general public at all times, except as provided in the Ordinance and/or Management Agreement, (b) the Company does not establish any fund pledged or expected to be used to pay any of those bonds, and (c) the Company does not cause the bonds to be federally guaranteed, the interest on the bonds will remain tax-exempt. The City and the Agency have advised the Company and the Corporation that development and use of the Project as provided above will not, per se, violate this Section 5.2 and the Company and the Corporation have relied on such advice in entering into this Agreement and the Management Agreement. The Company and the Corporation have been advised to seek the advice of nationally recognized bond attorneys, if they take any action with respect to the Parking Garage Project, the Right-of-Way Improvements

30

043

SEP 2 0 1995

1   Project or the above-referenced bonds which is not described above.  In the event the Lease
2   Option is exercised as outlined in Section 1.10, spaces in the parking garage must be available
3   to all members of the general public on the same basis at all times, and any validation procedures
4   allowed must be available on the same terms to all businesses and members of the general public.

5               5.3  **Status**.  The Company promises to maintain its status as a limited liability
6   company throughout the term of this Agreement.    The Corporation promises to maintain its
7   corporate status as a corporation throughout the term of this Agreement.

8               5.4  **No Dilution**.  The Company and the Corporation each also covenants that, if
9   the same would substantially reduce the Company's or the Corporation's net worth, as the case
10  may be, during the term of this Agreement, it will not transfer all or a substantial portion of its
11  assets to another entity, merge into or with another entity, or take any other similar voluntary
12  action without the prior written consent of the City and the Agency.

13              5.5  **Room Tax Bonds - Restrictions**.  The City agrees that it will not either lower
14  the rate of the room tax imposed by its Ordinance Number 3722 or issue any bonds other than
15  the Room Tax Bonds to which the taxes imposed by Ordinance No. 3722 are pledged, including,
16  without limitation, any refunding bonds, without the consent of the Company.

17              5.6  **Reserve Fund; Payment of Bonds**.  The Company promises to restore the
18  balance in the Reserve Fund to an amount equal to $400,000.00 in the event the Reserve Fund
19  balance falls below that figure as a result of the application thereof to the Room Tax Bonds.  The
20  City shall notify the Company whenever the Reserve Fund so falls below that figure, and the
21  Company shall have a period of six (6) months after receiving such notice within which to
22  replenish the Reserve Fund to the full $400,000.00.  In addition, if the City has exhausted
23  available room tax revenues and the Reserve Fund and needs additional monies to pay the
24  principal of or interest on the Room Tax Bonds, the Company shall after notice thereof and
25  request for such payment immediately deliver an amount of money equal to the amount so needed
26  to the City provided that at least thirty (30) days prior thereto the City has notified the Company

31

$044$

SEP 2 0 1995

1   that it anticipates such a payment may be required.  The City shall invest the Reserve Fund in
2   investments which would be legal for City funds under Chapter 355 of NRS.  Prior to termination
3   of this Agreement such interest may either be used to pay regularly scheduled payments of
4   principal of or interest on the Room Tax Bonds or paid to the Company.  Unless otherwise agreed
5   by the Company, upon termination of this Agreement the Reserve Fund and any interest thereon
6   not paid pursuant to the previous sentence shall be paid to the Company.

7           5.7  **Inspections and Reviews**.  Each party covenants that it will allow the other
8   parties to inspect its books and records pertaining to the Project at all reasonable times and upon
9   reasonable notice.  Without limiting the generality of the foregoing, the City and the Agency will
10  have the right to inspect all construction documents, including, without limitation, contractor
11  bidding documents, advertisements for bids and form of contracts.

12          5.8  **Audits**.  Each party to this Agreement will have its books and records
13  pertaining to the Project audited by a firm of Certified Public Accountants at least annually, and
14  · will furnish a copy of that audit, without charge, to the other parties to this Agreement.

15                                    **ARTICLE VI**

16                                    **DEFAULTS**.

17          6.1  **Events of Default**.  Each of the following shall be deemed an "event of
18  default" under this Agreement.

19                  A.  Any party to this Agreement fails to pay an amount under this
20  Agreement when due.

21                  B.  Any party to this Agreement fails to perform any of its duties or
22  obligations hereunder or to abide by any covenant or representation contained in this Agreement.

23                  C. A party to this Agreement is dissolved or liquidated without the prior
24  written consent of the other parties to this Agreement; however, it is not an "event of default" if
25  the City or the Agency is dissolved, liquidated or merged pursuant to a statute of the State of
26  Nevada which specifically requires the dissolution, liquidation or merger, so long as another

045

SEP 2 0 1995

1    governmental entity that is legally and financially able to perform assumes responsibility for the

2    obligations of the dissolved or liquidated entity.

3            D.   The entry of a decree or order for relief by a court having jurisdiction

4    in respect of any party in an involuntary case under the Federal bankruptcy laws, or any other

5    applicable Federal or state insolvency or similar laws, or appointing a receiver, liquidator,

6    assignee, custodian, trustee, or similar official for any party to this Agreement, or ordering the

7    winding up or liquidation of the affairs of any party to this Agreement, and the continuance of

8    that decree or order unstayed and in effect for a period of 90 consecutive days.

9            E.   The commencement by any party to this Agreement of a voluntary case

10   under the Federal bankruptcy laws or other applicable Federal or state insolvency or other similar

11   laws, or the consent by a party to this Agreement to the appointment of or taking possession by

12   a receiver, liquidator, assignee, trustee, custodian or similar official for or of any substantial part

13   of the property of such party.

14           F.   A default by any party to the Management Agreement in the

15   performance of any of its duties and obligations under the Management Agreement,  or failure

16   by such party to abide by any covenant or representation applicable to such party which is

17   contained in the Management Agreement.

18           Notwithstanding the provisions stated above, none of the above events shall

19   constitute an "event of default" unless one or more of the other parties to this Agreement gives

20   the defaulting party to this Agreement notice in writing of the default and the default remains

21   uncured for a period of thirty (30) days; but (i) if the default is a default by the Company to make

22   the deposits required by Section 4.1 or 5.6 hereof, a default by the City to make the deposits

23   required by Section 4.2 hereof, a default by the Agency to make the deposit required by Section

24   4.3 hereof, or is such that it cannot be cured, it shall be an event of default immediately upon the

25   delivery of notice and there is no need for the non-defaulting parties to wait 30 days to allow an

26   opportunity for cure prior to exercising the remedies provided hereby and (ii) if the default is

33

046

SEP 2 0 1995

capable of cure, but not within thirty (30) days, it shall not be an event of default if the defaulting party commences to cure the same within the above-referenced thirty (30) day period and prosecutes such cure to completion with all due diligence.

6.2    **Remedies for Default**.

A.  Remedies of City and Agency.  Subject to Section 7.5, if an event of default has occurred and the Company or the Corporation is the defaulting party, the City or the Agency, or both of them, as applicable, shall be entitled to exercise all rights that they have under any security interests granted in any Company or Corporation assets, including, without limitation, the Deed of Trust on the Parking Garage Property and any other security interests in any property granted by the Company or the Corporation under this Agreement or the Management Agreement. The proceeds of any sale of or foreclosure on any property in which a security interest has been granted may be applied by the City and the Agency, at the option of the City and the Agency, toward curing  the default, toward otherwise meeting the Company's or the Corporation's obligation under this Agreement and the Management Agreement, as the case may be, and toward repaying or defeasing any bonds issued by the City or the Agency issued in whole or in part to fund any portion of the Project, provided that in no event may the City or the Agency recover more than once for any item of damage and any surplus shall be paid to the Company or the Corporation, as applicable. In addition, the City and the Agency may terminate this Agreement, the Management Agreement or both may terminate any right of possession of the Parking Garage Property the Corporation may have if title thereto has not been transferred and shall have no liability to the Company or the Corporation for any money or property whatsoever with respect to such termination.

In addition to the above, subject to Section 7.5, upon an event of default both the City and the Agency shall have the right to bring any suit, action or proceeding at law or in equity to enforce their rights under the provisions of this Agreement and to require that each of the Company and the Corporation carry out the agreements that it has made hereunder or in

34

047

SEP 2 0 1995

1  the Management Agreement. The suit may be for specific performance, for damages, or for both,
2  and the City and the Agency may also, by action in equity, enjoin any acts or things which are
3  unlawful or in violation of the City's or Agency's rights under this Agreement. Upon an event
4  of default the City and the Agency shall also be entitled to commence an action for the
5  appointment of a receiver or receivers for the Project and the assets of the Company, and of the
6  rents, revenues, income products and profits thereof.

7       B.  <u>Remedies of Company and the Corporation</u>.  Subject to Section 7.5, in the
8  event of a default by the City or the Agency hereunder, the Company or the Corporation, or both
9  of them, as applicable, shall be entitled to bring a lawsuit at law or in equity seeking damages
10 from the City or the Agency on account of the breach, and the Company and the Corporation shall
11 also be entitled to bring a lawsuit for specific performance to order the City and the Agency to
12 comply with their duties under this Agreement, or bring an action for an injunction to enjoin acts
13 of the City and the Agency which may be unlawful or in violation of the rights of the Company
14 or the Corporation under this Agreement. All monetary obligations of the City and the Agency
15 with respect to the Parking Garage Project hereunder, including without limitation any claim for
16 damages, are subject to the provision that neither the City nor the Agency has any obligation to
17 pay out money absent an appropriation and cannot legally (under, in particular, NRS 354.626)
18 make a commitment to appropriate funds beyond this fiscal year, except for an appropriation of
19 the proceeds of bonds theretofore issued.

20      6.3  **Mutual Remedies**.  In addition to the above, the parties to this Agreement
21 shall have all other rights and remedies afforded them by law or in equity for the enforcement of
22 this Agreement if an event of default has occurred and one of the other parties is the defaulting
23 party. Subject to Section 7.5, no right or remedy conferred by this Agreement is intended to be
24 exclusive of any other right or remedy, and each and every said right or remedy is cumulative in
25 addition to any other right or remedy given under this Agreement or now or hereafter existing at
26 law or in equity, or by statute.

35

048

SEP 2 0 1995

6.4 **No Implied Waivers**. The delay or omission of any party in exercising any right or power accruing upon any event of default hereunder shall not exhaust or impair any such right or power, and shall not be construed to be a waiver of any such default or acquiescence therein. Every power or remedy given by this Agreement or at law or in equity may be exercised from time to time and in any manner as may be deemed expedient.

6.5 **Effect of Waiver**. No waiver of any individual default hereunder by any party shall extend toward any subsequent or other event of default hereunder, or shall impair any rights or remedies for any such subsequent or other event of default hereunder.

## ARTICLE VII

## MISCELLANEOUS.

7.1 **Indemnification**.

A. The Company and the Corporation each agrees to protect and indemnify and hold the City, the Agency, their officers and employees and agents and each of them, harmless from and against any and all claims, losses, expenses, suits, actions, decrees, judgments, awards, attorneys' fees, and court costs which the City, the Agency, their officers, employees or agents or any combination thereof may suffer or which may be sought against or recovered or obtained from the City, its officers, employees or agents or any combination thereof as a result of or by reason of or arising out of or in consequence of (i) the acquisition, construction, operation or maintenance of the Project pursuant to this Agreement or the Management Agreement by such indemnifying party (including, without limitation, any claims of any business located on or adjacent to the area in which the Project is to be constructed or the owner of any such business or of the property on which the business is located that the manner of construction, operation, or maintenance of the Project by such indemnifying party unreasonably interferes with the business or property or constitutes an inverse condemnation of all or a part of that business or property), (ii) any environmental or hazardous waste condition hereafter existing on any of the property which is a part of the Project under the control of such indemnifying party which was caused by

36

049

SEP 2 0 1995

the action of the Company or the Corporation, as applicable, or any contractor, subcontractor, agent, licensee or anyone who is directly employed by the Company or the Corporation, as applicable, or any of its contractors, subcontractors or agents, in connection with the Project, (iii) any act or omission, negligent or otherwise, of the Company or the Corporation, as applicable, or any of its contractors, subcontractors, agents, licensees or anyone who is directly employed by the Company or the Corporation, as applicable, or any of its contractors, subcontractors, agents or licensees, in connection with the Project, or (iv) any application by a holder of an Assignment of any net rental revenue of the Retail Space to costs of enforcing the indebtedness secured by such Assignment.

B. The Company and the Corporation, as applicable, each agrees that it shall at its sole cost and expense defend the City, the Agency, their officers, employees and agents and each of them in any suit or action for which the Company or the Corporation, as the case may be, has agreed to indemnify the City, the Agency, their officers, employees or agents. The City and/or the Agency, as applicable, shall promptly notify the Company or the Corporation, as applicable, of any claim made against them for which they may seek indemnification and shall fully cooperate with the Company and the Corporation in the defense and/or settlement thereof. If the Company or Corporation fails to defend the City or Agency as herein provided, the City or the Agency shall have the right but not the obligation to defend the same and charge all of the direct or incidental costs of such defense, including, without limitation, any attorneys' fees or court costs to, and recover the same from, the Company or the Corporation, as applicable.

C. No indemnification is required to be paid by the Company or the Corporation for any claim, loss or expense arising from the willful misconduct or gross negligence of the City, the Agency, or their officers or employees.

D. The provisions of this Section shall survive the termination of this Agreement. It is not intended by the parties hereto that this indemnification provision revive any claim of or extend any statute of limitations which has run against any third party.

37

050

SEP 2 0 1995

1   7.2  **No Third-Party Beneficiaries**.  None of the provisions of this Agreement is

2   intended to constitute the general public, any member thereof, or any other person a third party

3   beneficiary hereunder or to authorize anyone who is not a party to this Agreement to maintain any

4   suit for personal injuries, other damage, or any other cause of action, pursuant to this Agreement.

5   7.3  **Temporal Obligations**.  The time in which to perform the obligations of the

6   Company and the Corporation under provision of Sections 1.3A [Airspace Easements], 2.1

7   [Architectural Services], 2.2 [Construction of Plans, Drawings and Related Documents], and 3.3

8   [Construction Schedule] and the obligations of the Agency under 1.3A [Airspace Easements] and

9   under 1.2E [Transfer of Possession] to convey title, but not the obligations to transfer possession,

10  is subject to the following:

11  A.  Force Majeure.  In the event timely performance is prevented by an

12  occurrence beyond the control of and without the fault of the party that is required to perform

13  (financial inability excepted), such as, but not limited to, an act of God, the act of war, flood,

14  earthquake, labor dispute, governmental regulations (other than existing applications of existing

15  regulations of which the parties could reasonably be expected to be aware on the date hereof) or

16  control and shortage of materials, the time in which performance is required to occur shall be

17  continued for a reasonable period of time, not less than the number of days the party was delayed

18  by the occurrence.

19  B.  Reasonable Requests for Extension.  If the party expected to perform

20  reasonably requests an extension of time to perform, that request will not be unreasonably denied.

21  This clause shall not apply to any delay exceeding one (1) year from the date for performance

22  specified herein.

23  7.4  **Contract Interpretation**.  All questions concerning interpretation or

24  clarification of this Agreement will be resolved if possible by the representatives of the City, the

25  Agency, the Company, and the Corporation, as applicable, administering this Agreement. If those

26  parties are unable to resolve the question, any party to this Agreement involved in such dispute

38

051

SEP 2 0 1995

1   may request in writing a meeting of the President of the Company or the Corporation, as the case

2   may be, and the Manager of the City to attempt to resolve the question.  The parties involved in

3   such dispute agree to use their best efforts to cause those individuals to meet within five (5) days

4   of a request.  If there is no resolution to the question within ten (10) days after such request any

5   party involved in such dispute may request binding arbitration as provided in Section 7.5.

6           7.5  **Arbitration**.  All claims, disputes, or other questions that may arise between

7   the Agency, City, Company and Corporation concerning any provision or provisions of this

8   Agreement which cannot otherwise be settled and which have not been waived, must be submitted

9   to and be finally settled by binding arbitration in the manner set forth in this Section.  After

10  expiration of the ten (10) day period referred to in Section 7.4, any party involved in such

11  dispute, by written notice to the others, may demand arbitration.  The notice to arbitrate shall

12  provide a complete statement of the nature of the claim and the amount of money in dispute, if

13  known.  The notice to arbitrate shall be null and void if received beyond the time allowed by law

14  for the presentation of the claim to the City Council, if applicable, or filing of a lawsuit,

15  whichever occurs first, presenting the same claims as those presented in the notice to arbitrate.

16          Except as provided to the contrary in these provisions on arbitration, the

17  arbitration shall be in conformity with and subject to applicable rules and procedures of the

18  American Arbitration Association.   If the American Arbitration Association is not then in

19  existence or for any reason fails or refuses to act, the arbitration shall be in conformity with and

20  subject to the provisions of the Nevada Uniform Arbitration Act as they stand amended at the time

21  of the notice.  The arbitrators shall be persons experienced in the subject matter of the arbitration

22  and they shall be bound by this Agreement.  All arbitrators shall be impartial and unrelated,

23  directly or indirectly, so far as employment of services is concerned, to any party.  The City

24  and/or the Agency, on the one hand, and the Company and/or the Corporation, on the other, shall

25  pay one-half the cost of arbitration including, without limitation, arbitrators' fees.  Within twenty

26  (20) days after notice requiring arbitration, the City and/or the Agency, on the one hand, and the

052

SEP 2 0 1995

1   Company and/or the Corporation, on the other, shall appoint one arbitrator and give notice of the
2   appointment to the other parties included in the dispute. The two arbitrators shall choose a third
3   arbitrator within ten (10) days after appointment of the second. If any party fails to appoint an
4   arbitrator, or if the two arbitrators fail to choose a third, the appointment shall be made by the
5   then presiding judge of the Eighth Judicial District Court of the State of Nevada, acting in his or
6   her individual and nonofficial capacity, on the application of any party involved in the dispute and
7   on five (5) days' notice to the other parties involved in the dispute; provided that any party
8   involved in the dispute may, by notice given before commencement of the arbitration hearing,
9   consent to arbitration by the arbitrator appointed by another party. In that event, no further
10  appointments of arbitrators shall be made and any other arbitrators previously appointed shall be
11  dismissed.

12          All arbitration proceedings shall be held in Clark County, Nevada. The
13  arbitrator(s) shall investigate the facts and shall hold hearings at which the parties may present
14  evidence and arguments, be represented by counsel and conduct cross-examination. The
15  arbitrator(s) shall render a written decision upon the matter presented to them by majority vote
16  within ninety (90) days after the date upon which the last arbitrator is appointed. The parties
17  waive any right to a trial de novo and the decision rendered in such arbitration shall be final and
18  binding on the parties and judgment thereon may be entered by any court having jurisdiction
19  thereof.

20          All fees, costs and/or expenses of the arbitration, excluding preparation and
21  presentation, shall be assessed equally against the City and/or the Agency, on the one hand, and
22  the Company and/or the Corporation, on the other, and shall be paid one-half by the City/or and
23  the Agency, on the one hand, and one-half by the Company and/or the Corporation, on the other.

24          The Company and the Corporation shall carry on the work and maintain
25  progress, and the City and the Agency shall continue to perform, during any arbitration, court
26  proceedings or any other disputes, unless the duty of such party to so perform is the subject of

40

the dispute or a reasonable person would consider it imprudent to proceed further because of the default in question. The City, the Agency, the Company and the Corporation shall each pay their own costs for preparation of and presentation of all claims.

For purposes of payment of an arbitrated claim under the terms of this Agreement, the definition of due and payable of a claim, shall be the date of the arbitration decision of that claim, plus forty-five (45) calendar days. Interest will be allowed from the date the arbitrators decide payment should have been made at the prime rate referred to in NRS 99.040 plus 2% annum.

7.6 **Successors; Assignments**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Except as otherwise permitted herein, no assignment of this Agreement or any right or obligation hereunder by any party hereto shall be valid unless the other parties hereto consent to such assignment in writing.

7.7 **Entire Agreement**. This Agreement, including, without limitation, the exhibits hereto, constitutes the entire agreement of the parties hereto. This Agreement may be modified by the parties hereto, but only by a written instrument signed by each party.

7.8 **Further Assurances**. The Company, the Corporation, the Agency and the City agree to do such further acts and things and to execute and deliver to the other such additional certificates, documents and instruments as any other may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm unto the other its rights, powers and remedies hereunder. Without limit or foregoing, the City and the Agency will execute and acknowledge the instruments reasonably requested by the Corporation or the Company evidencing termination of this Agreement.

7.9 **Notices**. All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, addressed as follows:

41

054

SEP 2 0 1995

If to the City or the Agency:

City of Las Vegas, Nevada
c/o City Manager
400 East Stewart Avenue, 10th Floor
Las Vegas, Nevada 89101

If to the Company:

The Fremont Street Experience
   Limited Liability Company
302 East Carson Avenue, Suite 808
Las Vegas, Nevada 89101
Attn: Donald D. Snyder

If to the Corporation:

Fremont Street Experience Parking Corporation
302 East Carson Avenue, Suite 808
Las Vegas, Nevada 89101
Attn: Donald D. Snyder

If any notice hereunder is given to the City or the Agency, a copy shall be forwarded by certified mail, postage prepaid, to the City's Director of Economic and Urban Development, City Treasurer and City Attorney, at:

Director of Economic and Urban Development
City Hall
400 East Stewart Avenue
Las Vegas, Nevada 89101

City Treasurer
City Hall
400 East Stewart Avenue
Las Vegas, Nevada 89101

and

City Attorney
City Hall
400 East Stewart Avenue
Las Vegas, Nevada 89101

If notice hereunder is given to the Company or the Corporation, a copy shall be forwarded by certified mail, postage prepaid, to the Company's counsel, at:

. . .

42

055

SEP 2 0 1995

1   Lionel Sawyer & Collins
    Attn: Jeffrey P. Zucker
2   1700 Bank of America Plaza
    300 Fourth Street
3   Las Vegas, Nevada 89101

4          Notices delivered personally shall be deemed received on delivery and

5   notices by mail shall be deemed received upon receipt or first attempted delivery, whichever first

6   occurs.

7          Any party hereto may change the above addresses by notice delivered to the

8   other parties as provided in this Section, provided that a notice of change of address shall not be

9   effective against any party until actually received by such party.

10         7.10  [Intentionally Deleted]

11         7.11  **Severability**.  If any provision of this Agreement is deemed to be invalid or

12   unenforceable, such invalidity or unenforceability shall not affect the remaining provisions hereof

13   that can be given effect without the invalid or unenforceable provision and the parties agree to

14   replace such invalid or unenforceable provision with a valid provision which has, as nearly as

15   possible, the same effect.

16         7.12  **Authorized Representatives.**  Each party hereto shall by written notice to

17   the other parties designate an authorized representative, who will be responsible for all acts  and

18   approvals on behalf of that party except as otherwise specified in that notice.  The authorized

19   representative may be changed from time to time by notice to the parties designating the new

20   authorized representative.  Any such designation by the City must be signed by the Mayor and

21   the City Clerk.  Any such designation by the Agency must be signed by the Chairperson and the

22   City Clerk.  Any such designation by the Company or the Corporation must by signed by the

23   President thereof.  Until another person is designated, the Company hereby designates Donald D.

24   Snyder, its President, as its authorized representative, the Corporation hereby designates Donald

25   D. Snyder, its President, as its authorized representative, the City hereby designates its City

26

43

056

SEP 2 0 1995

1  Manager as its authorized representative, and the Agency hereby designates the City's City

2  Manager as its authorized representative.

3      7.13  **Governing Law.**  This Agreement shall be governed by and construed in

4  accordance with the laws of the State of Nevada.

5      7.14  **Interpretation**.  The captions appearing at the commencement of the Articles

6  and Sections hereof are descriptive only and for convenience in reference to this Agreement and

7  in no way whatsoever define, limit or describe the scope or intent of this Agreement, nor in any

8  way affect this Agreement.

9      7.15  **Termination Date**.  Except as otherwise provided in Section 7.1D hereof,

10  and in this Section, this Agreement shall be in effect from the date and year first mentioned above

11  until the date of all of the Room Tax Bonds and any bonds issued to refund those bonds have been

12  retired.  The security interest granted herein in the property of the Company shall remain in effect

13  until the Company has performed all of its obligations under this Agreement and the Management

14  Agreement.  The security interest granted herein in the property of the Corporation shall remain

15  in effect until the Company and the Corporation have performed all of their obligations hereunder

16  and the term of this Agreement has expired.

17      7.16  **Time Calculation**.  Whenever in this Agreement a reference is made to a

18  period of days, the same shall mean calendar days unless otherwise specified, provided that should

19  any time period so computed end on a non-business day, the time shall be extended to the next

20  business day.

21      7.17  **Counterparts**.  This Agreement may be executed on one or more

22  counterparts, each of which shall be regarded as an original and all of which shall constitute the

23  same Agreement.

24      **IN WITNESS WHEREOF** the City, the Agency, the Company and the

25  . . .

26

44

057

SEP 2 0 1995

1    Corporation have caused this Amended and Restated Fremont Street Experience Project

2    Development Agreement to be executed as of the day and year first mentioned above.

3    (SEAL)                                              CITY OF LAS VEGAS, NEVADA

4

5    City Clerk                                    By: _____
                                                                  Mayor

6

7                                                        DOWNTOWN REDEVELOPMENT AGENCY of

8    (SEAL)                                              the City of Las Vegas, Nevada

9

10   City Clerk                                    By: _____
                                                                  Chairperson

11

12   Approved as to form:

13   _____ 10-2-95                            THE FREMONT STREET EXPERIENCE

14                              Date                     LIMITED LIABILITY COMPANY

15

16   Secretary                                     By: _____
                                                                  President

17

18   (SEAL)                                              FREMONT STREET EXPERIENCE

19                                                       PARKING CORPORATION

20

21

22   Secretary                                     By: _____
                                                                  President

23

24

25

26

45

058

SEP 2 0 1995

# EXHIBIT A

## THE FREMONT STREET EXPERIENCE

### "FIRST WESTERN" SITE PROJECT

Except as noted below or in Section 1.1 of the Agreement the generalities of the project are described in the Base Books.  The project comprises the parking structure\retail\parade facilities building to be constructed on the block bounded by Fremont, Las Vegas, Carson, and Fourth Streets.  More specifically, except as noted below or in Section 1.1 of the Agreement, the scope is as described in Volume 4 of the <u>Fremont Street Experience Implementation Study Final Report</u> dated October 1992, Section 2.0; (Scheme 5AR), Section 5.0, and Volume 2, Subsection 3.11.  However,

   (a) The parking structure entrance will be on Fourth Street and the exit on Carson Avenue.

   (b) The loading dock exit and entry will be on Las Vegas Boulevard.

   (c) There will be no float storage and staging area.

These improvements consist of site demolition including removal of hazardous materials, utility relocation and construction, and a new structure to accommodate parking, retail facilities, and the administrative facilities.  The components are:

  1. Approximately 1,430 parking spaces in a multi-level structure.

  2. Retail store space of approximately 43,800 gross square feet fronting on Fremont Street.

  3. Administrative space (including, without limitation, light show controls) of approximately 7,700 gross square feet.

059

SEP 2 0 1995

THE FREMONT STREET EXPERIENCE

CELESTIAL VAULT PROJECT

Except as noted below or in Section 1.1 of the Agreement, the generalities of the project are described in the Base Books. The project comprises the Celestial Vault and related improvements on Fremont Street. More specifically, except as noted below or in Section 1.1 of the Agreement, the scope is as described in Volume 2 of the Fremont Street Experience Implementation Study Final Report dated October 1992, Section 2.0, Sub-sections 3.2 thru 3.7, and Section 6.0 (as modified in the Executive Summary, Volume 1, Revised January 1993). However,

(a)    The Celestial Vault will be approximately 90 feet high and 1,386 feet long. It will terminate approximately 60 feet west of the centerline of Fourth Street and approximately 73 feet east of the centerline of Main Street.

(b)    There will be no entry gates on the cross streets. A series of rising palm trees will provide the entry statement.

(c)    The monorail/track system envisioned to support the moving floats has been deleted.

(d)    The misting system has been deleted, although provisions have been made so that it may be added later.

(e)    The radiant heating system has been deleted, although provisions have been made so that an electrical heating system may be added later.

(f)    Reflectors attached to the Celestial Vault were deleted.

(g)    Current plans call for six kiosks on or near opening.

(h)    The Celestial Vault will be designed to provide for the display of computer generated electronic images on it and various light and sound effects. In connection with that change various aspects of specialty show lighting have changed. Among other things, some specialty show lighting features such as lasers and search lights have been deleted. The closed circuit TV system to monitor the sky parade has been deleted.

(i)    The landscape design is comprised of concrete with a colored epoxy overlay and added glitter with no stone pavers nor sandblasted features.

(j)    The procession of celestial floats traversing Fremont Street has been deleted.

Page 2 - Exhibit A

060

SEP 2 0 1995

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1.      These improvements occur within the Fremont Street right-of-way from Main Street to Fourth Street and extending into the intervening cross streets (First, Casino and Third) for a distance of approximately 15' each way from Fremont Street.  The Celestial Vault includes lighting effects and audio system.  Other improvements include retail kiosks.

2.      This Project also includes any necessary utility relocation.

Page 3 - Exhibit A

061

SEP 2 0 1995

THE FREMONT STREET EXPERIENCE

RIGHT-OF-WAY IMPROVEMENTS PROJECT

Except as noted below or in Section 1.1 of the Agreement, the generalities of the project are described in the Base Books. The project comprises street level and below grade improvements on Fremont Street. More specifically, except as noted below or in Section 1.1 of the Agreement, the scope is as described in Volume 2 of the Fremont Street Experience Implementation Study Final Report dated October 1993, Section 2.0; Sub-sections 3.1, 3.2, and 3.4 through 3.8 and Section 6.0 (as modified in the Executive Summary, Volume 1, Revised January 1993).

1.  These improvements comprise site demolition and preparation, new ground plans (architectural resurfacing) improvements for the Fremont Street right-of-way from Main Street to Las Vegas Boulevard and extending into the intervening closed cross streets (First and Third) for a minimum distance of approximately 150' each way from Fremont Street, street furniture, and relocation of all overhead and underground utilities.

2.  The improvements include:

A.  Install protective left-turn lane for the southbound left-turning movement at the intersection of Main Street and Stewart Avenue.

B.  Remove landscape island on Stewart Avenue between Casino Center and Third Street and repave Stewart Avenue where landscape island was located.

C.  Modify existing signal at Casino Center Boulevard and Stewart Avenue for two-way flow.

D.  Remove existing traffic signal at First and Fremont Streets and install pedestrian signals.

E.  Remove existing traffic signal at Third Street and Fremont Street and install pedestrian signals.

F.  Modify existing signal at Main Street and Fremont Street to include phases for north and southbound traffic and a pedestrian phase.

G.  With the completion of the proposed parking garage at the existing First Western block, install exclusive left-turn phase on the northbound left and eastbound left-turn movements at Carson Avenue and Las Vegas Boulevard.

H.  Modify existing signal at Fremont Street and Las Vegas Boulevard to accommodate the closure of Fremont Street west of Las Vegas Boulevard.

I.  Expand existing Traffic Impact Analysis for the Fremont Street Experience to include the closure of Third Street from Stewart to Ogden. Such additional study is to be commissioned within ninety (90) days after the

062

SEP 2 0 1995

grand opening of the Company Projects.  Provide City with report of the impacts.

J.      Prepare interim and permanent plans for the allocation of curb space in the downtown area.   Boundaries will be north side of Stewart, east side of Sixth, south side of Bridger and west side of Main.

063

SEP 2 6 1995

Exhibit B

Form of Grant Deed for Parking Garage Property

Recording Requested by:

City of Las Vegas                                    Grantee's Address:

After Recording, Mail to:          ·Fremont Street Experience
                                                      Parking Corporation
Fremont Street Experience            302 East Carson Avenue
  Parking Corporation                          Suite 808
302 East Carson Avenue                   Las Vegas, Nevada
Suite 808
Las Vegas, Nevada

                                                   Assessors Parcel Nos.:

                                                   _____

                                    **GRANT DEED**

          For valuable consideration, the receipt of which is hereby acknowledged,

                    THE CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY, a
public body, corporate and politic, in the State of Nevada (herein called "Grantor"), hereby
grants, bargains and sells to the FREMONT STREET EXPERIENCE PARKING
CORPORATION (herein called "Grantee"), the real property (the "Property") legally described
in the document attached hereto, labeled Exhibit 1, and incorporated herein by this reference.

                    1.     The Property is conveyed pursuant to an Amended and Restated
Development Agreement (the "Development Agreement") entered into by and among Grantor,
Grantee, the City of Las Vegas (the "City") and The Fremont Street Experience Limited Liability
Company (the "Company") and dated _____, 199___.

                    2.     This property is conveyed subject to all easements, rights of use and
covenants, conditions and restrictions of record as listed in Exhibit 2.

                    3.     The Grantee hereby covenants and agrees for itself, its successors, its
assigns and every successor in interest, that the Grantee, its successors and assignees, will
maintain the improvements in the Property and keep the Property free from any accumulation of
debris or waste materials.  If at any time the Grantee, or its successors or assignees, shall fail to
keep the Property free of debris or waste materials, and said condition is not corrected within a
reasonable time after written notice from the Grantor, the Grantor may perform the necessary
cleanup, and the Grantee, or its successors or assignees, shall pay such costs as are reasonably
incurred for such cleanup.

                    4.     During the term of the Development Agreement, the Grantee shall not,
except as permitted by the Development Agreement or herein, sell, transfer, convey, assign or
lease the whole or any part of the Property or the buildings or improvements thereon without the
prior approval of the Grantor.  This prohibition shall not be deemed to prevent the granting of

                                    Page 1 - Exhibit B

064

SEP 2 0 1995

1   easements or permits to facilitate the development of the Property pursuant to Development
2   Agreement, or to prohibit or restrict the leasing of any part or parts of a building or structure.

3           5.      The Grantee hereby covenants and agrees that for itself, its successors, its
    assigns and every successor in interest that the Grantee, its successors and its assigns shall not use
4   the Property for other than parking, retail, administrative offices and other uses incidental to
    operating the Fremont Street Experience, and uses incidental to any of the foregoing, all as
5   contemplated by the Development Agreement and the documents referred to therein.

6           6.      There shall be no discrimination against or segregation of any person or
    group of persons on account of race, color, creed, religion, sex, age, national origin or ancestry
7   in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property, nor
    shall the Grantee itself or any person claiming under or through it establish or permit any such
8   practice or practices of discrimination or segregation with reference to the selection, location,
    number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees in the Property.

9           7.      No violation or breach of the covenants, conditions, restrictions, provisions
    or limitations contained or referred to in this Grant Deed shall defeat or render invalid or in any
10  way impair the lien or charge of any mortgage, deed of trust or other financing or security
    instrument permitted by the Development Agreement, provided, however, that any successor of
11  the Grantee to the Property shall be bound by all covenants, conditions, restrictions, limitations
    and provisions hereof, whether such successor's title was acquired by the foreclosure, deed in lieu
12  of foreclosure, trustee's sale or otherwise.

13          8.      Except as otherwise provided, the covenants contained in Paragraphs 6 and
    7 of this Grant Deed shall remain in perpetuity.  The covenants contained in Paragraph 3, 4 and
14  5 shall remain in effect for the term of the Development Agreement.

15          9.      The covenants contained in Paragraphs 3, 4, 5, 6 and 7 of this Grant Deed
    shall be binding for the benefit of the Grantor, its successors and assigns, and such covenants shall
16  run in favor of the Grantor and such aforementioned parties for the entire period during which
    such covenants shall be in force and effect, without regard to whether the Grantor is or remains
17  an owner of any land or interest therein to which such covenants relate.  The Grantor and such
    aforementioned parties, in the event of any breach of any such covenants, shall have the right to
18  exercise all of the rights and remedies, and to maintain any actions at law or suit in equity or
    other proper proceedings to enforce the curing of such breach.  The covenants contained in this
19  Grant Deed shall be for the benefit of and shall be enforceable only by the Grantor, Grantee, and
    their successors and assigns.
20
            IN WITNESS WHEREOF, the Grantor and Grantee have caused this instrument
21  to be executed on their behalf by their respective officers thereunto duly authorized, this _____
    day of _____, 199__.
22
                                            CITY OF LAS VEGAS DOWNTOWN
23                                          REDEVELOPMENT AGENCY

24                                          By_____
                                               JAN LAVERTY JONES, Chairperson
25                                             Grantor
    ATTEST:
26

Page 2 - Exhibit B

065

SEP 2 0 1995

1

KATHLEEN TIGHE, City Clerk

2

3                                            FREMONT   STREET   PARKING
                                             CORPORATION

4                                            By_____

                        Grantee

5

STATE OF NEVADA          )

6                        ) ss.
COUNTY OF CLARK          )

7

         This instrument was acknowledged before me on _____, 199__, by Jan

8  Laverty Jones, as Chairperson of the City of Las Vegas Downtown Redevelopment Agency.

9

                                        _____

10                                              NOTARY PUBLIC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 3 - Exhibit B

066

SEP 2 0 1995

1

2  STATE OF NEVADA        )
3  COUNTY OF CLARK        ) ss.
                          )

4      This instrument was acknowledged before me on _____, 199__, by
   Kathleen Tighe, as City Clerk of the City of Las Vegas.

5

6                                      _____
   STATE OF NEVADA        )                    NOTARY PUBLIC
7  COUNTY OF CLARK        ) ss.
                          )

8      This instrument was acknowledged before me on _____, 19__, by
9  _____, as _____ of the Fremont Street Experience
   Parking Corporation.

10

11                                     _____
                                              NOTARY PUBLIC
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 4 - Exhibit B

067

SEP 2 0 1995

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## EXHIBIT 1

Block 35 of Clark's Las Vegas Townsite as
shown by a map thereof on file in Book 1 of
Plats, Page 37, in the Office of the County
Recorder of Clark County, Nevada, including,
without limitation, all alleys in such block.

068

SEP 2 0 1995

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

<u>EXHIBIT 2</u>

Exceptions to be agreed upon by the parties.

069

SEP 2 0 1995

Exhibit C

Form of Deed of Trust for Parking Garage Property

WHEN RECORDED MAIL TO:

Bradford R. Jerbic
City Attorney
400 E. Stewart Ave. 9th Floor
Las Vegas, Nevada 89101

STATE OF NEVADA        )
                       ) ss.
COUNTY OF CLARK        )

THIS DEED OF TRUST is made this _____ day of _____, by the FREMONT STREET EXPERIENCE PARKING CORPORATION, Las Vegas, Nevada, as Trustor, to, _____ Las Vegas, Nevada, organized and existing under and by virtue of the laws of the State of Nevada, as Trustee, for the benefit of the CITY OF LAS VEGAS (the "City") and the CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY (the "Agency") as Beneficiaries.  (It is distinctly understood that the word "Trustor" and the word "his" referring to the Trustor, as herein used, are intended to and do include the masculine, feminine and neuter genders and the singular and plural numbers, as indicated by the context.)

## W I T N E S S E T H:

That said Trustor hereby grants, conveys and confirms unto said Trustee in trust with power of sale its real property situate in the City of Las Vegas, State of Nevada, which is described on Exhibit "1" hereto (the "Site"), on which a building for a parking garage and related improvements described in that certain Amended and Restated Development Agreement dated _____, 1995 (the "Agreement") among the Trustor, THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY (the "Company") and the Beneficiaries, subject, however, to the "Permitted Encumbrances" shown on Exhibit "2" hereto.

Trustor and Beneficiary agree that all improvements to the Site and all property owned by Trustor, except such furnishing and personal property which are not physically attached to the Site, shall be deemed to be real property for the purpose of the security interest hereby granted.

TO HAVE AND TO HOLD the same unto the said Trustee and its successors, upon the trusts hereinafter expressed, namely:

As security for (A) the payment of all amounts due from the Trustor, the Company or both, under the Agreement, the Amended and Restated Management Agreement dated _____, 1995 between the City and the Company, or both of such agreements, as they may be amended from time to time, and any other amounts due to either Beneficiaries under the Agreement, the Amended and Restated Management Agreement or both in lawful

Page 1 - Exhibit C

070

SEP 2 0 1995

money of the United States of America; including, without limitation, as such amounts as may be hereafter advanced by either Beneficiary to or for the benefit of the Trustor or the Company, or any of them, or any successor in interest of the Trustor, with interest thereon and any present or future demands of any kind or nature which either Beneficiary, or either of their successors, may have against the Trustor, the Company, or either of them, whether created directly or acquired by assignment; whether absolute or contingent; whether due or not; or whether otherwise secured or not, or whether existing at the time of the execution of this instrument, or arising thereafter; and (B) the payment and performance of every obligation, covenant, promise or agreement of the Trustor or the Company or both contained herein, in the Agreement or in the Amended and Restated Management Agreement.  Trustor grants to Beneficiaries the right to record notice that this deed of trust is security for additional amounts and obligations not specifically mentioned herein but which constitute obligations of the Trustor, the Company or both for which Beneficiaries may claim this Deed of Trust as security.  For the purpose of further securing the above-described secured obligations, subject to the Permitted Encumbrances, Trustor hereby assigns to the Beneficiaries all the rents, issues and profits (collectively "Rents") from the Site.  It is understood that:

       1.     THIS INSTRUMENT SECURES FUTURE ADVANCES.

       2.     THE MAXIMUM AMOUNT OF PRINCIPAL SECURED HEREBY IS [$18,500,000].

AND THIS INDENTURE FURTHER WITNESSETH:

FIRST:  To the extent the Agency warranted title in its Deed to the Trustor, Trustor hereby warrants that title to the Site is vested in Trustor, and that there are no liens, charges or other encumbrances on the Site, save and except the security interest created hereby, and except the Permitted Encumbrances which are set forth in Exhibit "2" hereto.

SECOND:  To the extent not inconsistent with the terms of the Agreement and the Amended and Restated Management Agreement, covenants numbered 1 through 9 of Nevada Revised Statutes ("NRS") § 107.030 are hereby adopted and hereby incorporated by reference into this Deed of Trust with the statutory blanks to be completed as follows: Covenant No. 2, "the total aggregate replacement cost of all buildings and all other improvements located on the site" (minimum insurance coverage for loss or damage by fire on buildings and improvements); Covenant No. 4, "the Prime Rate (determined pursuant to NRS 99.040) plus two percent (2%) per annum" (rate of interest on money expended pursuant to implied covenants); Covenant No. 7, "a reasonable" (amount or percent of attorneys' fees).

THIRD:  The rights, powers and remedies given to Beneficiaries by this Deed of Trust, the Agreement and the Amended and Restated Management Agreement shall be in addition to all rights, powers and remedies given to Beneficiaries by virtue of any statute or rule; exercising any right, power or remedy hereunder shall not be deemed to be a waiver of any other right, power or remedy, nor as a continuing waiver.  Beneficiaries shall have the option of exercising any and all remedies they may possess under NRS Chapters 107 and 104 or any other remedy they possess in law or equity and may exercise such remedies concurrently, consecutively, in any order, or alternatively at their sole discretion.

FOURTH:  It is expressly agreed that the trusts created hereby are irrevocable by the Trustor.

071

SEP 2 0 1995

FIFTH: All the provisions of this instrument shall inure to and bind the heirs, devisees, legal representatives, successors and assigns of each party hereto, respectively. The rights or remedies granted hereunder or by law shall not be exclusive but shall be concurrent and cumulative.

SIXTH: In the event of any tax or assessment on the interest of Beneficiaries under this Deed of Trust, it will be deemed that such taxes or assessments are upon the interest of the Trustor, who agrees to pay such taxes or assessments although the same may be assessed against either of the Beneficiaries or the Trustee.

SEVENTH: In the event of a default in the performance or payment under this Deed of Trust or the security for which this Deed of Trust has been executed, any notice given under NRS § 107.080 shall be given by registered or certified mail to Trustor, addressed to:

Fremont Street Experience Parking Corporation
302 East Carson Avenue
Las Vegas, Nevada
Attention: President

and such notice shall be binding upon the Trustor(s), or assignee(s), or grantee(s) or from the Trustor.

EIGHTH: Trustor may assign all or any portion of the Rents to one or more persons or entities for the purpose of securing indebtedness in an original principal amount not in excess of $4,375,000, provided that (i) not more than $750,000 of such $4,375,000 may be used for purposes other than financing or refinancing improvements to, or equipment located on, the Site; (ii) not more than $125,000 of such $4,375,000 may be used for the purpose of financing or refinancing improvements to the Site other than improvements required pursuant to leases with tenants approved by the Las Vegas City Manager; (iii) not more than $3,500,000 of such $4,375,000 may be used for purposes of financing or refinancing improvements to the Site which are required pursuant to leases with tenants approved by the Las Vegas City Manager; (iv) the indebtedness described in clauses (i) and (ii) of this sentence ("Parking Loan") is borrowed from the manager of the parking garage portion of the Site, is payable first and primarily from parking revenues, and is payable from the net rental revenue of the Retail Space (as defined in the Agreement) only if and to the extent that parking revenues themselves are insufficient to make the required payments on the Parking Loan (it being understood that parking revenues will always be applied before non-parking revenues to payment of the Parking Loan, and if net rental revenue of the Retail Space is ever used to pay such Parking Loan and at a later time there are available parking revenues after making all required payments of the Parking Loan, those available parking revenues will be applied to the uses to which the net rental revenue of the Retail Space used to pay the Parking Loan would have applied if it was not used to pay the Parking Loan); (v) the terms of any such indebtedness must provide that it will be paid in full within fifteen (15) years of the date of the first advance and that interest will be paid on a current basis; and (vi) any refinancing of indebtedness must be repaid within fifteen (15) years of the date of the first advance of the original indebtedness. The rights of such assignees to receive such Rents until all indebtedness secured by such assignments is paid in full shall not be disturbed by Beneficiaries or by any person or entity claiming by, through or under Beneficiaries. Beneficiaries, by their acceptance of this Deed of Trust, agree to the foregoing and further agree to execute and deliver all documents in form and substance reasonably satisfactory to Trustor and Beneficiaries as are necessary to assure and perfect the above assignees' rights.

072

SEP 2 0 1995

1          IN WITNESS WHEREOF, the Trustor has executed and delivered this Deed of

2  Trust as of the day and year first written above.

3                                          TRUSTOR:

4

5                                          FREMONT STREET EXPERIENCE
                                          PARKING CORPORATION

6

7                                          By_____
                                               Title:  President

8  Attest:

9

10  By_____
             Secretary

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 4 - Exhibit C

073

SEP 2 0 1995

1

2  STATE OF NEVADA         )
                           ) ss.
3  COUNTY OF CLARK         )

4         This instrument was acknowledged before me on _____, 199__,
   by _____ as President of the Fremont Street Parking Corporation.
5

6                                           _____
7                                                    Notary Public

   (NOTARY SEAL)
8

9  STATE OF NEVADA         )
                           ) ss.
10 COUNTY OF CLARK         )

11        This instrument was acknowledged before me on _____, 199__, by
   _____ as Secretary of the Fremont Street Parking Corporation.
12

13                                          _____
14                                                   Notary Public

   (NOTARY SEAL)
15

16

17

18

19

20

21

22

23

24

25

26

Page 5 - Exhibit C

074

SEP 2 0 1995

EXHIBIT 1

Block 35 of Clark's Las Vegas Townsite as
shown by a map thereof on file in Book 1 of
Plats, Page 37, in the Office of the County
Recorder of Clark County, Nevada, including,
without limitation, all alleys in such block.

Page 6 - Exhibit C

075

SEP 2 0 1995

1

## EXHIBIT 2

2

3    Exceptions to be agreed upon by the parties.
     Will include Assignments

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

076

SEP 2 0 1995

# AMENDED AND RESTATED MANAGEMENT AGREEMENT
## FREMONT STREET EXPERIENCE PROJECT

This Amended and Restated Management Agreement for the Fremont Street Experience Project (this "Agreement") is made and executed as of this ____ day of _____, 1995 between the **CITY OF LAS VEGAS, NEVADA** (the "City"), a municipal corporation of the State of Nevada (the "State"), and **THE FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY** (the "Company").

## R E C I T A L S

1.   On October 20, 1993, the City and the Company entered into a Management Agreement Fremont Street Experience Project ("Original Agreement") with respect to the management of the "Project," as therein defined ("Original Project").

2.   At the time the Original Agreement was executed, the Original Project was still in the planning stages.

3.   As the development of the Original Project proceeded, the parties determined that in order for the Original Project to accomplish its purposes, certain changes with respect thereto were desirable.

4.   To effect such changes, the parties and the other parties thereto have concurrently herewith amended the "Development Agreement," as defined in the Original Agreement ("Original Development Agreement").

5.   The parties desire to amend the Original Agreement to reflect the changes in the Original Development Agreement and the changes in the Original Project pursuant thereto.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree that the Original Agreement shall be amended and restated in its entirety to read as follows:

WHEREAS, each of the parties to this Agreement represents and warrants that it

077

SEP 2 0 1995

1   has the power to enter into, execute and perform this Agreement as provided herein; and

2           **WHEREAS**, it is the desire of the parties hereto that the Company manage the

3   Fremont Street Experience Project (the "Project"), as herein provided; and

4           **WHEREAS**, the City has adopted its Ordinance No. 3747 (as amended from time

5   to time, the "Ordinance") which creates a pedestrian mall on a part of Fremont Street and

6   adjoining streets, and designated the Company as the Private Operating Entity of that mall

7   pursuant to Ch. 368, 1993 Nevada Session Laws (the "Act").

8           **NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL**

9   **COVENANTS AND CONDITIONS CONTAINED HEREIN, THE PARTIES HERETO**

10   **AGREE AS FOLLOWS:**

11                      **ARTICLE I**

12                      **GENERAL**.

13         1.1.   **Description**. The Project shall consist of the Celestial Vault Project and

14   the Right-of Way Improvements Project (herein, the "Celestial Vault Project" and the "Right-of-

15   Way Improvements Project," respectively), each substantially as described in the Amended and

16   Restated Fremont Street Experience Project Development Agreement among the parties hereto,

17   the City of Las Vegas Downtown Redevelopment Agency (the "Agency") and Fremont Street

18   Experience Parking Corporation (the "Corporation"), dated as of the date hereof (the

19   "Development Agreement"), except that for the purposes of this Agreement the Right-of-Way

20   Improvements Project does not include any portion thereof outside the Mall Area (as defined

21   below). The Celestial Vault Project includes the Celestial Vault Lightshow, as defined in the

22   Development Agreement. The Project and a parking garage project (the "Parking Garage

23   Project"), which is not a part of the "Project" as herein defined, are further described in substance

24   in the Development Agreement and its Exhibits.

25         1.2.   **Purpose**. It is the desire of the parties to this Agreement that the Company

26   shall have overall responsibility for operating and maintaining the Project, including, without

078

SEP 2 0 1995

limitation, the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) and the pedestrian mall created by the Ordinance (the "Mall Area").

## ARTICLE II

### RIGHTS, DUTIES AND RESPONSIBILITIES OF MANAGER.

2.1.   **In General.**  Except as otherwise provided herein, it shall be the duty and responsibility of the Company to maintain the Project as a safe, clean, and attractive area for the residents of and visitors to the City of Las Vegas.  The Company agrees to operate and maintain the Project as a first class attraction in the City of Las Vegas.  This Agreement is intended to give the Company all powers permitted to a private operating entity under the Act, except as otherwise provided herein and in the Ordinance.   Nothing herein shall be deemed to impose any responsibility on the Company with respect to the front of any building facing the Mall Area.

2.2.   **Regulation and Control of Non-Commercial Activity.**

A. Generally. It is understood that the responsibility for the regulation and control of non-commercial activities in the Mall Area shall remain with the City, and such activities shall generally be controlled by an ordinance or ordinances or other form of regulation. "Non-commercial activities" include charitable solicitation activities, activities undertaken in connection with labor disputes, panhandling, loitering, and distribution of published material of a non-commercial nature and any other non-commercial activities protected by the constitution or a statute of the United States or Nevada. The Company shall have the right to propose additional or amended regulations for the regulation and control of non-commercial activities in the Mall Area to the City. If in the opinion of the City Attorney, those proposed regulations would be legal, the Company's proposals will be submitted by staff to the City Council for consideration. Except as otherwise provided by law, including, but not limited to, the Ordinance and other applicable ordinances of the City, the Company is also permitted to regulate non-commercial activity in the Mall Area.

3

079
SEP 2 0 1995

B.  Cross Street Vehicular Traffic.  Casino Center Boulevard and Fourth Street will be through streets across the former Fremont Street.  The City will have the right and the responsibility for determining the traffic patterns for those streets, and excluding their physical intersection with the former Fremont Street, whether parking will be allowed, the size and extent of any taxicab stands, loading zones or other specialized areas in these streets.  The City agrees to consult with the Company in making those rules and to give the Company an opportunity to comment on any changes thereto.  The Company shall be permitted to close Casino Center Boulevard and Fourth Street as provided in the Ordinance.

### 2.3  Regulation and Control of Commercial Activities.

A.  Generally.  It is the intent of the parties that except as otherwise expressly provided in this Agreement or in the Ordinance, the regulation and control of all commercial activities that take place within the Mall Area is delegated to the maximum extent permissible by law to the Company.  Commercial activities include the operation of audio, visual and/or other sensory features in, from or in connection with the Celestial Vault (including, without limitation, the Celestial Vault Lightshow) (collectively, the "Show"), "special events," "mall vending," "mall advertising" and "mall entertainment" (as such quoted terms are defined in the Ordinance) operation of the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) and any other commercial activities.  Commercial activities do not include any activities which the City cannot control under the constitution or statutes of the United States or Nevada.

B.  Business Licenses, Permits and Other Requirements.  Except as otherwise provided in the Ordinance, the activities of the Company and all other commercial activities undertaken in the Mall Area, shall be required to obtain the permits from the City that they would be required to obtain under City ordinances and all fees, taxes and other levies that normally would have to be paid shall be paid.  All permits granted by governmental entities other than the City that are required for any activity undertaken in the Mall Area must be acquired from

4

080

SEP 2 0 1995

1  those entities as provided in applicable ordinances, resolutions, policies, rules, regulations and
2  statutes.  If the City is required to pay a fee or charge to another governmental entity because of
3  activities in the Mall Area conducted by the Company or commercial users using the Mall Area
4  pursuant to an agreement with the Company, the Company is obligated to reimburse the amount
5  of that fee or charge to the City on request of the City.  The Company is not hereby prohibited
6  from contesting any such fee in good faith.

7                    C.    Selection of Commercial Users.  The Company shall have the right
8  to select all concessionaires and other commercial users of the Mall Area, including, but not
9  limited to, the Celestial Vault Project (including, without limitation, the Celestial Vault
10 Lightshow), including, but not limited to, the providers of mall vending and mall entertainment,
11 advertisers in the Mall Area and operators and sponsors of special events all or a portion of which
12 take place in the Mall Area.  In making this selection, the Company agrees to abide by any laws
13 which apply to concessions on public property, including without limitation, to the extent
14 applicable to the Project, the provisions of NRS 426.630 to 426.720.

15                    D.    Fees for Commercial Use.  The Company shall determine, set,
16 collect and retain all fees for commercial use of the Mall Area, other than fees and other
17 governmental charges which are payable to the City or other governmental entities.  The fees must
18 not be fixed so as to discriminate against any person or group of persons in a manner prohibited
19 by law.

20                    E.    The Company will require evidence of proper licensing of all
21 commercial users of the Mall Area.

22         2.4.   **Mall Access.**

23                    The Company shall have the right to regulate access to and along the Mall
24 Area subject to the Ordinance, Section 2.2B above and the following:

25                    A.    Pedestrian Access.  Except as permitted under the Ordinance, the
26 Company shall generally allow access at all times by pedestrians along the entire length of the

5

081

SEP 2 0 1995

former Fremont Street in the Mall Area, and along the entire length of the other former streets therein.  The Company shall be entitled to regulate such pedestrian traffic to the extent permitted by the Ordinance.

B.     Access to Businesses.   Except for emergencies and as permitted under the Ordinance, without the consent of the affected business, pedestrian access shall always be provided to each business abutting the Mall Area to the extent under the control of the Company or persons acting pursuant to an agreement with the Company.

C.     Access By Vehicles.  The Company shall provide a reasonable period of time for vehicle access for commercial deliveries to businesses located along the Mall Area which do not have other useable vehicular access, as provided in the Ordinance.

D.  Other Non-Pedestrian Traffic.  Except to the extent otherwise provided in this Agreement and the Ordinance, the Company is authorized to regulate or prohibit all non-pedestrian traffic in the Mall Area, including, without limitation, all bicycles, roller-blades, skates, skateboards, unicycles, shopping carts or other wheeled traffic (other than wheelchairs and other similar devices for the disabled, whether motorized or not, which are "pedestrian traffic" for purposes of this Article).  The Company is authorized to regulate or prohibit pets in the Mall Area except for "seeing eye" dogs and other pets that assist disabled persons.

2.5.     Nuisances; Interference with Businesses.  The Company shall not use or permit use of the Project by any commercial user of the Project in a manner that violates the law or constitutes an illegal nuisance.  The Company's manner of use of the Mall Area, as distinct from the mere existence of the Project, shall not illegally interfere with any business or constitute an inverse condemnation or taking of any property or business which is operated adjacent to the Mall Area.

2.6.     Maintenance of Mall and Celestial Vault.

A.     Maintenance in General.  The Company understands that it is the intention of the parties that the Project be maintained in good working condition as a first class

6

082

SEP 2 0 1995

facility and the Company agrees to expend sufficient funds to so maintain the Project. The Company will repaint, refurbish or otherwise perform upkeep on all parts of the Project that reasonably require such repainting, refurbishing or upkeep. Those resources that the City had previously expended for maintenance and cleaning of the streets which comprised the Mall Area before creation of the pedestrian mall shall be applied, in addition to those resources currently so applied, to the maintenance and cleaning of all public streets and alleys in the area bounded by, and including, Main Street on the west, Ogden Avenue on the north, Las Vegas Boulevard on the east and Carson Avenue on the south, excluding those portions of Fourth Street and Casino Center Boulevard within the Mall Area. Without limiting the generality of the foregoing, the City will power sweep all streets and alleys in such area not less than twice a week. The Company may provide additional maintenance and repair for Casino Center Boulevard and Fourth Street in addition to that performed by the City.

B. Security. The Company shall provide uniformed security guards for the Project. In addition, for special events, the Company will provide such additional uniformed security guards as are recommended by the Las Vegas Metropolitan Police Department ("LVMPD"). The City will use its best efforts to cause the LVMPD to provide at least as much security in the Mall Area as it currently does.

C. Traffic Diversion. The Company will provide whatever traffic diversion devices and personnel as are necessary to divert traffic from the area under the Celestial Vault Project during the operation of the Show and special events in the Mall Area.

D. [Intentionally Deleted.]

E. [Intentionally Deleted.]

F. [Intentionally Deleted.]

G. Liability Insurance. Prior to the expiration of the insurance required by the Development Agreement, the Company shall furnish or cause to be furnished to the City, duplicate originals or appropriate certificates of comprehensive general liability insurance policies

7

083

SEP 2 0 1995

1  in the amount of at least $25,000,000 combined single limit naming the City, and its officers and

2  employees, as additional insureds.  The Company shall also furnish or cause to be furnished to

3  the City evidence satisfactory to the City that it and any contractor with whom it contracts for the

4  performance of work under this Agreement carries workers' compensation insurance as required

5  by law.

6            H.    Casualty Insurance.   Prior to the expiration of the Development

7  Agreement, the Company shall furnish or cause to be furnished to the City, appropriate

8  certificates of an "All Risk," Fire, Property Damage, and other casualty insurance in an amount

9  equal to the full replacement cost of the Project, including, without limitation, property in transit

10  or elsewhere, and including the interests of the City and the Company, and their related entities,

11  their subcontractors, and contractors.  Such insurance shall include an insurer's waiver of

12  subrogation in favor of each party insured thereunder.  Proceeds of any such insurance shall be

13  made available to reconstruct and repair the damage to the Project for which the insurance was

14  received.

15            I.    Insurance--General.  The insurance policies mentioned in this Section

16  shall provide that they will not be amended or cancelled without 30 days' notice to the City.

17            J.    Failure to Perform.  In the event the Company fails to undertake and

18  perform any activity required in this Section 2.6, the City after reasonable notice to the Company

19  shall have the right, but not the obligation, to undertake that activity with its own funds and

20  submit a bill therefor to the Company.  The Company agrees to pay any such bill within 15 days

21  of receipt.

22                        **ARTICLE III**

23                     **BUDGETS; REVENUES**.

24        3.1.   Budgets.  The Company shall provide to the City a budget for its operation,

25  maintenance and promotional activities for each year at least 30 days before the beginning of the

26

8

084

SEP 2 0 1995

1 year.  The City is entitled to comment on that budget for a period that extends for at least twenty
2 (20) days.

3        3.2.    **Collection of Revenues.**  The Company shall have the right to retain all
4 revenues from all commercial activities undertaken in the Mall Area.  This clause does not allow
5 the Company to collect any fees for permits or other governmental type charges imposed on users
6 of the mall by the City or any other governmental entity.

7        3.3.    **Payments by the City.**

8              A.   <u>Revenues from Mall and Celestial Vault</u>.  The City agrees that the
9 Company may retain all revenues collected by it as provided in Section 3.2 above.

10             B.   <u>Room Tax Revenues</u>.  The City will pay to the Company within two
11 months after the close of each calendar quarter an amount which represents amounts collected
12 from the room tax imposed by the City's Ordinance No. 3722 ("Tax Ordinance") for the
13 preceding calendar quarter in excess of the amounts required for that same period to be applied
14 by the City's ordinance authorizing the issuance of bonds payable from the room tax imposed by
15 the Tax Ordinance (the "Bond Ordinance") to the bonds ("Bonds") secured by that tax or required
16 to be similarly applied by any ordinance authorizing any bonds which are issued in order to refund
17 the Bonds (including, without limitation, a series of refundings).  No payment need be made under
18 this Section to the extent the funds in excess of room tax collections are projected to be needed
19 to pay the Bonds during the current or immediately succeeding quarter.  Upon termination of this
20 Agreement any room tax collections or Bond proceeds not previously used to pay the Bonds or
21 paid to the Company shall be so used or paid.  For purposes of this paragraph, interest on room
22 tax collections, including, but not limited to, interest in the Room Tax Bonds Revenue Fund and
23 the Room Tax Bonds Bond Fund, shall be deemed room tax collections.  The City is aware that
24 the Company is relying on revenues pursuant to this paragraph and agrees that the Bonds may not
25 be redeemed prior to their original stated maturities without the consent of the Company.

26

085

SEP 2 0 1995

C. <u>Use of Revenues</u>. Except as provided in the Development Agreement, the revenues provided to the Company under this Section 3.3 must be used by the Company to pay the costs of managing, operating, maintaining, repairing or improving the Project and the costs of the other services required by this Agreement.

3.4.    **Payments by the Company.** The Company agrees to pay to the Agency, in each year, a management fee computed as described in this Section. The amount of the management fee shall be equal to the amount that would be charged as ad valorem property taxes on the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow). The amount of those taxes in each year shall be determined by multiplying the ad valorem tax rate applied to real property located in the Mall Area by the assessed valuation of the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow), as determined by the Clark County Assessor. The management fee shall be due and payable on the same dates ad valorem taxes are due.

The City agrees to defer the management fee imposed by this Section determined with respect to the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) for a period ("Deferral Period") of 3 years commencing July 1 of the first fiscal year for which the Celestial Vault Project (including, without limitation, the Celestial Vault Lightshow) is assigned an assessed valuation by the Clark County Assessor. In the event that the audits of the Company for the Deferral Period provided pursuant to Article IV of this Agreement reveal that the Company has had in the aggregate a profit (which is defined for this purpose as the excess of operating revenues over operating expenses as computed in accordance with generally accepted accounting principles), on a consolidated basis with the Corporation, during the Deferral Period, the Company shall be obligated to pay to the Agency, within 180 days of the release of the last of such audits, an amount equal to 1/3 of the lesser of (a) the amount of the management fee which was deferred pursuant to this Section or (b) such aggregate profits. The Company shall likewise be required to pay an amount equal to 1/3 of the deferred management fee or aggregate

10

086

SEP 2 0 1995

1   profits for the Deferral Period in each subsequent year until the deferred fee or aggregate profits
2   for the Deferral Period, whichever is less, have been fully repaid to the City.   Should the
3   Company not have an aggregate profit during the Deferral Period, the deferred management fee
4   need not be paid.   The payment required of the deferred management fee shall be in addition to
5   the payment of the normal management fee due under this Section 3.4.   If in any year a property
6   tax is levied on the Celestial Vault Project (including, without limitation, the Celestial Vault
7   Lightshow) or any part thereof, the fee due under this Section shall be reduced by the amount of
8   the tax levied.   Without limiting the generality of the foregoing, should any such tax be levied
9   with respect to the Celestial Vault Project (including, without limitation, the Celestial Vault
10  Lightshow) during the Deferral Period, the management fee due thereafter shall be reduced by
11  the same amount.

12                                      **ARTICLE IV**

13                          **MISCELLANEOUS COVENANTS**

14        4.1.   **Status; Licenses**.   The Company promises to maintain its status as a limited
15  liability company throughout the term of this Agreement.   Except as otherwise provided in the
16  Ordinance, the Company has or will obtain prior to the completion of the Project all licenses and
17  permits required by any governmental entities, including, without limitation, the City, to perform
18  its duties hereunder.

19        4.2   **Employees**.   The Company is an independent contractor of the City.   The
20  Company will hire all employees it needs to carry out the requirements of this Agreement or
21  contract for services or any combination thereof.   No persons hired by the Company or any
22  contractor of the Company will be employees of the City for any purposes.   The Company agrees
23  to pay, and counsel its contractors to pay, all required payroll taxes and levies for their respective
24  employees.

25        4.3.   **No Dilution**.   The Company covenants that, if the same would substantially
26  reduce the Company's net worth during the term of this Agreement, it will not transfer all or a

11

087

SEP 2 0 1995

substantial portion of its assets to another entity, merge into or with another entity, or take any other similar voluntary action without the prior written consent of the City.

      **4.4.**   **Security Interest**. To secure the performance of its obligations hereunder, the Company hereby grants to the City a security interest in all property in which it has granted a security interest to the City and the Agency under the Development Agreement, pari passu with the security interest granted in the Development Agreement.

      **4.5.**  **Inspection of Books**.   Each party covenants that it will allow the other party to inspect its books and records pertaining to the Project and this Agreement at all reasonable times on reasonable notice. The City's books and records with respect to the Project include, but are not limited to, its books and records relating to the Bonds and the room tax.

      **4.6.**   **Audits**.  Each party to this Agreement will have its books and records pertaining to the Project audited by a firm of Certified Public Accountants at least annually, and will furnish a copy of that audit, without charge, to the other party to this Agreement.

**ARTICLE V**

**DEFAULTS**.

      **5.1**   **Events of Default**. Each of the following shall be deemed an "event of default" under this Agreement.

        **A.**     Either party to this Agreement fails to pay an amount under this Agreement when due.

        **B.**     Either party to this Agreement fails to perform any of its duties or obligations hereunder or to abide by any covenant or representation contained in this Agreement.

        **C.**     Either party to this Agreement is dissolved or liquidated without the prior written consent of the other party to this Agreement; however, it is not an "event of default" if the City is dissolved, liquidated or merged pursuant to a statute of the State of Nevada which specifically requires the dissolution, liquidation or merger, so long as another governmental entity

12

088

SEP 2 0 1995

that is legally and financially able to perform assumes responsibility for the obligations of the City hereunder.

D.    The entry of a decree or order for relief by a court having jurisdiction of the premises in respect of either party in an involuntary case under the Federal bankruptcy laws, or any other applicable Federal or state insolvency or similar laws, or appointing a receiver, liquidator, assignee, custodian, trustee, or similar official for any party to this Agreement, or ordering the winding up or liquidation of the affairs of any party to this Agreement, and the continuance of that decree or order unstayed and in effect for a period of 90 consecutive days.

E.    The commencement by any party to this Agreement of a voluntary case under the Federal bankruptcy laws or other applicable Federal or state insolvency or other similar laws, or the consent by a party to this Agreement to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or similar official for or of any substantial part of the property of a party to this Agreement.

F.    A default by any party to the Development Agreement in the performance of any of its duties and obligations thereunder, or failure by any such party to abide by any covenant or representation applicable to that party which is contained in the Development Agreement.  A default by the Agency under this paragraph shall be deemed a default by the City under this Agreement and a default by the Corporation under this paragraph shall be deemed a default by the Company under this Agreement.

Notwithstanding the provisions stated above, none of the above events shall constitute an "event of default" unless the other party to this Agreement gives the defaulting party to this Agreement notice in writing of the default and the default remains uncured for a period of 30 days; but (1) if the default is such that it cannot be cured it shall be an event of default immediately upon the delivery of notice and there is no need for the non-defaulting party to wait 30 days to allow an opportunity for cure prior to exercising the remedies provided hereby and (2)

13

089

SEP 2 0 1995

1 if the default is capable of cure, but not within thirty (30) days, it shall not be an event of default

2 if the defaulting party commences to cure the same within the above-referenced thirty (30) day

3 period and prosecutes such cure to completion with all due diligence.

4         5.2   **Remedies for Default**.

5         A. Remedies of City.  Subject to Section 6.6, if an event of default has

6 occurred and the Company is the defaulting party, the City shall be entitled to exercise all rights

7 that it has under any security interests granted by the Company or the Corporation in any of the

8 Company or Corporation assets hereunder or under the Development Agreement.  The proceeds

9 of any sale of or foreclosure on any property in which a security interest has been granted may

10 be applied by the City toward curing the default, toward otherwise meeting the Company's

11 obligation under this Agreement, the Development Agreement, or both, and toward repaying or

12 defeasing any bonds issued by the City or the Agency issued in whole or in part to fund any

13 portion of the Project, provided that in no event may the  City recover more than once for any

14 item of damage and any surplus shall be paid to the Company.  In addition, the City may

15 terminate this Agreement, the Development Agreement or both and shall have no liability to the

16 Company thereafter for any money or property whatsoever with respect to such termination.

17         If an event of default has occurred, subject to Section 6.6, the City shall also have

18 the right to bring any suit, action or proceeding at law or in equity to enforce its rights under the

19 provisions of this Agreement and to require that the Company carry out the agreements that it has

20 made hereunder or in the Development Agreement.  The suit may be for specific performance,

21 for damages, or for both, and the City may also, by action in equity, enjoin any acts or things

22 which are unlawful or in violation of the City's rights under this Agreement.  Upon an event of

23 default, the City shall also be entitled to commence an action for the appointment of a receiver

24 or receivers for the Project and the Company's assets, and of the rents, revenues, income products

25 and profits thereof.

26

090

SEP 2 0 1995

B. **Remedies of Company.** Subject to Section 6.6, in the event of a default by the City hereunder, the Company shall be entitled to bring a lawsuit at law or in equity seeking damages from the City on account of the breach, and the Company shall also be entitled to bring a lawsuit for specific performance to order the City to comply with its duties under this Agreement, or bring an action for an injunction to enjoin acts of the City or the Agency which may be unlawful or in violation of the rights of the Company under this Agreement. The City is aware that the failure of the City or the Agency to perform their obligations in the Development Agreement with respect to the Parking Garage Project, including, but not limited to, their obligation to provide the Corporation with possession of and title to the Parking Garage Property, as defined and provided in the Development Agreement, and/or to deposit $15.2 million into the account described in Section 4.3 of the Development Agreement, constitutes a default hereunder which shall substantially damage the Company and that any limitations in the Development Agreement on the Company's or Corporation's ability to recover damages for such default do not apply to any claim by the Company hereunder as a result of such default.

5.3. **Mutual Remedies.** In addition to the above, the parties to this Agreement shall have all other rights and remedies afforded them by law or in equity for the enforcement of this Agreement if an event of default has occurred and the other party is the defaulting party. Subject to Section 6.6, no right or remedy conferred by this Agreement is intended to be exclusive of any other right or remedy, and each and every said right or remedy is cumulative in addition to any other right or remedy given under this Agreement or now or hereafter existing at law or in equity, or by statute.

5.4. **No Implied Waivers.** The delay or omission of any party in exercising any right or power accruing upon any event of default hereunder shall not exhaust or impair any such right or power, and shall not be construed to be a waiver of any such default or acquiescence therein. Every power or remedy given by this Agreement or at law or in equity may be exercised from time to time and in any manner as may be deemed expedient.

15

091

SEP 2 0 1995

5.5.   **Effect of Waiver**.   No waiver of any individual default hereunder by any party shall extend toward any subsequent or other event of default hereunder, or shall impair any rights or remedies for any such subsequent or other event of default hereunder.

## ARTICLE VI

## MISCELLANEOUS.

6.1.   **Indemnification**.

A.    The Company agrees to protect and indemnify and hold the City, its officers and employees and agents harmless from and against any and all claims, losses, expenses, suits, actions, decrees, judgments, awards, attorneys' fees, and court costs which the City, its officers, employees or agents or any combination thereof may suffer or which may be sought against or recovered or obtained from the City, its officers, employees or agents or any combination thereof as a result of or by reason of or arising out of or in consequence of (i) the operation or maintenance of the Project by the Company pursuant to this Agreement, including, without limitation, any claims of any business located on or adjacent to the Mall Area or the owner of any such business or of the property on which it is located that the manner of operation or maintenance of the Project by the Company (including, without limitation, any use of the Mall Area authorized by the Company) unreasonably interferes with that business or property or constitutes an inverse condemnation of all or a part of that business or property, (ii) any environmental or hazardous waste condition heretofore or hereafter existing on any of the property which is a part of the Project which was caused by the Company, any commercial users of the Project acting pursuant to an agreement with the Company or any contractors, subcontractors, or agents of the Company or any such users or anyone who is directly employed by the Company or any such users or any of their contractors, subcontractors, or agents, in connection with the Project, or (iii) any act or omission, negligent or otherwise, of the Company, any of the above-described commercial users of the Project or any contractors, subcontractors, agents of the

16

092

SEP 2 0 1995

Company or any such users or anyone who is directly employed by the Company or any such users or any of their contractors, subcontractors or agents, in connection with the Project.

B.     The Company agrees that it shall at its sole cost and expense defend the City, its officers, employees and agents and each of them in any suit or action for which the Company has agreed to indemnify the City, its officers, employees or agents.  The City shall promptly notify the Company of any claim made against it for which it may seek indemnification and shall fully cooperate with the Company in the defense and/or settlement thereof.  If the Company fails to defend the City as herein provided, the City shall have the right but not the obligation to defend the same and charge all of the direct or incidental costs of such defense (including, without limitation, any attorneys' fees or court costs) to, and recover the same from, the Company.

C.     No indemnification is required to be paid by the Company for any claim, loss or expense arising from the willful misconduct or gross negligence of the City or its officers or employees.

D.     The provisions of this Section shall survive the termination of this Agreement.  It is not intended by the parties hereto that this indemnification provision revive any claim of or extend any statute of limitations which has run against any third party.

6.2.    **No Third-Party Beneficiaries**.  None of the provisions of this Agreement is intended to constitute the general pubic, any member thereof, or any other person a third party beneficiary hereunder or to authorize anyone who is not a party to this Agreement to maintain any suit for personal injuries, other damage, or any other cause of action, pursuant to this Agreement.

6.3.    **Force Majeure**.     In the event timely performance is prevented by an occurrence beyond the control of and without the fault of the party that is required to perform (financial inability excepted), such as, but not limited to, an act of God, the act of war, flood, earthquake, labor dispute, governmental regulations (other than existing applications of existing regulations of which the parties could reasonably be anticipated to be aware on the date hereof)

17

093

SEP 2 0 1995

or control and shortages of materials, the time in which performance is required to occur shall be continued for a reasonable period of time, not less than the number of days the party was delayed by the occurrence.

6.4. **No Property Interest**. The parties agree that this Agreement, as distinct from the Development Agreement, does not in any manner grant or provide a property interest in the Project to the Company.

6.5. **Contract Interpretation**. All questions concerning interpretation or clarification of this Agreement will be resolved if possible by the representatives of the City and the Company administering this Agreement. If those parties are unable to resolve the question, any party to this Agreement may request in writing a meeting of the President of the Company and the Manager of the City to attempt to resolve the question. The parties agree to use their best efforts to cause those individuals to meet within five (5) days of a request. If there is no resolution to the question within ten (10) days after such request any party may request binding arbitration as provided in Section 6.6.

6.6. **Arbitration**. All claims, disputes, or other questions that may arise between the City and the Company concerning any provision or provisions of this Agreement which cannot otherwise be settled and which have not been waived, must be submitted to and be finally settled by binding arbitration in the manner set forth in this Section. After expiration of the ten (10) day period referred to in Section 6.5, any party involved in such dispute, by written notice to the others, may demand arbitration. The notice to arbitrate shall provide a complete statement of the nature of the claim and the amount of money in dispute, if known. The notice to arbitrate shall be null and void if received beyond the time allowed by law for the presentation of the claim to the City Council, if applicable, or filing of a lawsuit, whichever occurs first, presenting the same claims as those presented in the notice to arbitrate.

Except as provided to the contrary in these provisions on arbitration, the arbitration shall be in conformity with and subject to applicable rules and procedures of the

18

094

SEP 2 0 1995

1 American Arbitration Association.  If the American Arbitration Association is not then in
2 existence or for any reason fails or refuses to act, the arbitration shall be in conformity with and
3 subject to the provisions of the Nevada Uniform Arbitration Act as they stand amended at the time
4 of the notice.  The arbitrators shall be persons experienced in the subject matter of the arbitration
5 and they shall be bound by this Agreement.  All arbitrators shall be impartial and unrelated,
6 directly or indirectly, so far as employment of services is concerned, to any party.  The City, on
7 the one hand, and the Company, on the other, shall pay one-half the cost of arbitration including,
8 without limitation, arbitrators' fees.  Within twenty (20) days after notice requiring arbitration,
9 the City and the Company shall appoint one arbitrator and give notice of the appointment to the
10 other party.   The two arbitrators shall choose a third arbitrator within ten (10) days after
11 appointment of the second.  If any party fails to appoint an arbitrator, or if the two arbitrators fail
12 to choose a third, the appointment shall be made by the then presiding judge of the Eighth Judicial
13 District Court of the State of Nevada, acting in his or her individual and nonofficial capacity, on
14 the application of any party and on five (5) days' notice to the other party; provided that any party
15 may, by notice given before commencement of the arbitration hearing, consent to arbitration by
16 the arbitrator appointed by the other party.  In that event, no further appointments of arbitrators
17 shall be made and any other arbitrators previously appointed shall be dismissed.

18                        All arbitration proceedings shall be held in Clark County, Nevada.  The
19 arbitrator(s) shall investigate the facts and shall hold hearings at which the parties may present
20 evidence and arguments, be represented by counsel and conduct cross-examination.   The
21 arbitrator(s) shall render a written decision upon the matter presented to them by majority vote
22 within ninety (90) days after the date upon which the last arbitrator is appointed.  The parties
23 waive any right to a trial de novo and the decision rendered in such arbitration shall be final and
24 binding on the parties and judgment thereon may be entered by any court having jurisdiction
25 thereof.

26

SEP 2 0 1995

1   All fees, costs and/or expenses of the arbitration, excluding preparation and
2   presentation, shall be assessed equally against the City and the Company and shall be paid one-
3   half by the City and one-half by the Company.

4   The Company shall carry on the management, operation and maintenance
5   of the Project, and the City shall continue to perform, during any arbitration, court proceedings
6   or any other disputes, unless the duty of such party to so perform is the subject of the dispute.

7   The City and the Company shall each pay their own costs for preparation
8   of and presentation of all claims.

9   For purposes of payment of an arbitrated claim under the terms of this
10  Agreement, the definition of due and payable of a claim, shall be the date of the arbitration
11  decision of that claim, plus forty-five (45) calendar days.  Interest will be allowed from the date
12  the arbitrators decide payment should have been made at the prime rate referred to in NRS 99.040
13  plus 2% annum.

14  6.7.  **Successors; Assignments**.  This Agreement shall be binding upon and inure
15  to the benefit of the parties hereto and their respective successors and assigns.  Except as
16  otherwise permitted herein, no assignment of this Agreement or any right or obligation hereunder
17  by any party hereto shall be valid unless the other party hereto consents to such assignment in
18  writing.

19  6.8.  **Entire Agreement**.  This Agreement, including, without limitation, the
20  exhibits hereto, and the Development Agreement constitute the entire agreement of the parties
21  hereto.  This Agreement may be modified by the parties hereto, but only by a written instrument
22  signed by each party.

23  6.9.  **Further Assurances**.  The Company and the City agree to do such further
24  acts and things and to execute and deliver to the other such additional certificates, documents and
25  instruments as the other may reasonably require or deem advisable to carry into effect the
26

20

096

SEP 2 0 1995

1    purposes of this Agreement or to better assure and confirm unto the other its rights, powers and

2    remedies hereunder.

3              6.10.   **Notices**.   All notices, demands, instructions and other communications

4    required or permitted to be given to or made upon any party hereto shall be in writing and shall

5    be personally delivered or sent by registered or certified mail, postage prepaid, addressed as

6    follows:

7              If to the City:

8                        City of Las Vegas, Nevada
                         c/o City Manager
9                        400 East Stewart Avenue, 10th Floor
                         Las Vegas, Nevada 89101
10
              If to the Company:
11
                         The Fremont Street Experience
12                           Limited Liability Company
                         302 East Carson Avenue, Suite 808
13                       Las Vegas, Nevada 89101
                         Attn:  Donald D. Snyder
14
              If any notice hereunder is given to the City, a copy shall be forwarded by certified
15
     mail, postage prepaid, to the City's Director of Economic and Urban Development, the City
16
     Treasurer and the City Attorney, at:
17
                         Director of Economic and Urban Development
18                       City Hall
                         400 East Stewart Avenue
19                       Las Vegas, Nevada 89101

20                       City Treasurer
                         City Hall
21                       400 East Stewart Avenue
                         Las Vegas, Nevada 89101
22
                                        and
23
                         City Attorney
24                       City Hall
                         400 East Stewart Avenue
25                       Las Vegas, Nevada 89101

26

21

097
SEP 2 0 1995

If notice hereunder is given to the Company, a copy shall be forwarded by certified mail, postage prepaid, to the Company's counsel, at:

> Lionel Sawyer & Collins
> Attn: Jeffrey P. Zucker
> 1700 Bank of America Plaza
> 300 Fourth Street
> Las Vegas, Nevada 89101

Notices delivered personally shall be deemed received on delivery and notices by mail shall be deemed received upon receipt or first attempted delivery, whichever first occurs.

Any party hereto may change the above addresses by notice delivered to the other parties as provided in this Section, provided that a notice of change of address shall not be effective against any party until actually received by such party.

6.11.   [Intentionally Deleted.]

6.12.   **Severability**.  If any provision of this Agreement is deemed to be invalid or unenforceable, such invalidity or unenforceability shall not affect the remaining provisions hereof that can be given effect without the invalid or unenforceable provision and the parties agree to replace such invalid or unenforceable provision with a valid provision which has, as nearly as possible, the same effect.

6.13.   **Authorized Representatives.**  Each party hereto shall by written notice to the other party designate an authorized representative, who will be responsible for all acts  and approvals on behalf of that party except as otherwise specified in that notice.  The authorized representative may be changed from time to time by notice to the other party designating the new authorized representative.  Any such designation by the City must be signed by the Mayor and the City Clerk.  Any such designation by the Company must by signed by the President thereof. Until another person is designated, the Company hereby designates Donald D. Snyder, its President, as its authorized representative and the City hereby designates its Acting Manager, Larry Barton as its authorized representative.

22

098

SEP 2 0 1995

6.14. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

6.15. **Termination Date**. Except as otherwise provided in Section 6.1D hereof, this Agreement shall be in effect from the date and year first mentioned above until the date of all of the Bonds or any bond refunding the Bonds (including, without limitation, a series of refunds) have been retired. This Agreement may be thereafter extended for up to four (4) periods of five (5) years each at the option of the Company. Prior to such termination the City shall pay to the Company all funds the Company is entitled to receive pursuant to Section 3.3B.

6.16. **Interpretation**. The captions appearing at the commencement of the Articles and Sections hereof are descriptive only and for convenience in reference to this Agreement and in no way whatsoever define, limit or describe the scope or intent of this Agreement, nor in any way affect this Agreement.

6.17. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be regarded as an original and all of which shall constitute the same Agreement.

6.18. **Time Calculation**. Whenever in this Agreement a reference is made to a period of days, the same shall mean calendar days unless otherwise specified, provided that should

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

23

099

SEP 2 0 1995

1  any time period so computed end on a non-business day, the time shall be extended to the next

2  business day.

3          **IN WITNESS WHEREOF** the City and the Company have caused this Amended

4  and Restated Management Agreement Fremont Street Experience Project to be executed as of the

5  day and year first mentioned above.

6  (SEAL)                          CITY OF LAS VEGAS, NEVADA

7

8  _____     By:_____
   City Clerk                              Mayor

9

10                                 THE FREMONT STREET EXPERIENCE LIMITED
                                   LIABILITY COMPANY

11

12  _____    By:_____
    Secretary                              President

13

14

15

16

17

18

19

20

21

22

23

24

25

26

24

100

SEP 2 0 1995

Exhibit E

Form of Airspace Easement
### GRANT OF AIRSPACE EASEMENT

For and consideration of the payment of the sum of Ten and No/100ths Dollars ($10.00), the receipt and sufficiency of which is hereby acknowledged, and other good and valuable consideration hereinafter set forth below, _____ (the "Grantor"), as the owner of the real property (the "Property") described on Exhibit "A" attached hereto and incorporated herein, hereby grants, gives and conveys to the City of Las Vegas, a municipal corporation of the State of Nevada (the "Grantee") an easement for the use and enjoyment of the Grantee as hereinafter described.

1.    EASEMENT DESCRIPTION.  The easement granted herein (the "Easement") is legally described on Exhibit "B" attached hereto and incorporated herein as a part of this Grant.

2.    USE OF EASEMENT.  The parties hereto acknowledge that the Grantee and The Fremont Street Experience Limited Liability Company (the "FSELLC") have entered into an agreement providing for the construction of a celestial vault over Fremont Street from Main Street to Fourth Street to serve as the support structure for the display and transportation of a sky parade with an accompanying aerial light show (the "Improvements"). The Easement granted herein shall be used in connection with the construction, support, operation, maintenance, repair and use of the Improvements.

3.    CONSIDERATION.  In addition to the payment of the sum set forth above, the Grantor hereby executes this Grant in consideration of the benefit to be derived from the anticipated increase in visitors to the downtown area of the City of Las Vegas as a result of the grant of the Easement herein to the Grantee and the construction of the Improvements.

4.    TERM.  The Easement shall commence as of the date of execution set forth below and shall continue in full force and effect for a term of ninety-nine (99) years or until such time as none of the Improvements exist, whereupon all rights and interest enjoyed by the Grantee shall also cease.

5.    WAIVER OF CONDEMNATION CLAIM.  Grantor hereby waives and releases the Grantee and the City of Las Vegas Downtown Redevelopment Agency, their successors, assigns, transferees or agents, from any and all claims, damages, costs, expenses, and any and all rights of recovery, for the taking of property without the payment of just compensation such as, but not necessarily limited to, claims for the denial or restriction of ingress or egress, light and air or view, which may result from, arise out of, or in any way be connected to, the construction, support, operation, maintenance, location, design, installation, development or use of the Improvements, or any combination thereof, or the closure of Fremont Street as a result of, or related to, the Improvements, except that the waiver and release granted herein shall not apply to any claims for negligent injury or death to persons or damage to property which might be suffered or result to Grantor, or its business invitees, from the construction of the Improvements.

6.    REPAIRS AND MAINTENANCE.

a.    Grantee shall, at all times during the existence of this Grant and at

Page 1 - Exhibit E

101
SEP 2 0 1995

its own cost and expense, repair and maintain the Improvements in the Easement in a good and safe condition.

b.      In the event that Grantee refuses or fails to repair or maintain the Improvements within the time provided in Section 7, Grantor may, at its option, make any repair or maintenance reasonably deemed necessary for the public safety by Grantor, and may make demand upon the Grantee for payment of the cost thereof.  The failure to repay the reasonable cost thereof shall constitute a breach of this Grant by Grantee.

7.      BREACH OF GRANT.  In the event that a breach occurs in the performance of any term, covenant or condition of this Grant on Grantee's part to be kept and performed and such breach continues for a period of thirty (30) days after the delivery of written notice thereof from Grantor to Grantee, Grantor shall have the right, immediately upon the expiration of such thirty (30) day period, to remedy the breach and to hold Grantee responsible for any and all damages resulting therefrom, subject to the Grantee making an appropriation therefor.  If the Grantee is a municipality and fails to make an appropriation therefor and to pay the damages within a reasonable time, or the default is not otherwise cured as provided herein, then the Grantor's sole and only remedy against the Grantee is to terminate this Grant.  In all other events, the Grantor shall not be entitled to terminate this Grant as a result of a breach.

For purposes of this Grant, the Grantee shall not be considered to be in breach of this Grant if the breach is such that it cannot be cured within thirty (30) days after the delivery of written notice thereof and the Grantee has commenced to cure the breach within the aforementioned time period and diligently pursues it to completion.

8.      NOTICES.  All notices, demands, instructions, and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, addressed as follows:

If to the Grantor:      _____
                        _____
                        _____
                        _____

If to the Grantee:      City Manager's Office
                        City of Las Vegas
                        City Hall Complex, 10th Floor
                        400 East Stewart Avenue
                        Las Vegas, Nevada 89101

Notices delivered personally shall be deemed received on delivery and notices by mail shall be deemed received upon receipt or first attempted delivery, whichever first occurs.

Any party hereto may change the above addresses by notice delivered to the other parties as provided in this Section, provided that a notice of change of address shall not be effective against any party until actually received by such party.

9.      ASSIGNMENT.  Grantee may transfer and assign its rights

Page 2 - Exhibit E

102
SEP 2 0 1995

hereunder, or any portion thereof, to its Redevelopment Agency or to any person or entity created for the purpose of leasing, operating or maintaining the Improvements including, but not limited to, FSELLC.

10.   LAW AND REGULATIONS.  Grantee shall keep and maintain any Improvements constructed within the boundaries of the Easement granted herein in compliance with all current or to be enacted laws, statutes, ordinances, orders, rules and regulations (federal, state, municipal or other governmental agencies having jurisdiction thereof) during the term of this Grant, provided the Grantee may contest any of the aforegoing and shall not be deemed in default of this Grant so long as the Grantee is prosecuting such contest in good faith and with due diligence.

11.   MISCELLANEOUS.

a.   This Grant shall not be construed either for or against the Grantor or the Grantee, but shall be interpreted in accordance with the general tenor of its language.

b.   The laws of the State of Nevada shall govern the validity, construction, performance and effect of this Grant.

c.   The captions appearing at the commencement of the sections hereof are descriptive only and for convenience in reference to this Grant and in no way whatsoever define, limit or describe the scope or intent of this Grant, nor in any way affect this Grant.

d.   This Grant contains the entire agreement between the parties concerning the grant of this airspace easement and cannot be changed or terminated orally.

e.   If any term, covenant or condition of this Grant, or any application thereof, should be held by a court of competent jurisdiction to be invalid, void or unenforceable, all terms, covenants and conditions of this Grant, and all applications thereof, not held invalid, void or unenforceable, shall continue in full force and effect and shall in no way be affected, impaired or invalidated thereby.

f.   The terms, provisions, covenants and conditions contained in this Grant shall apply to, bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the Grantor and the Grantee, respectively.  The covenants and restrictions contained in this Grant are intended to run with the Property and to benefit the Grantee and the Improvements.

IN WITNESS WHEREOF, the parties have caused this Grant to be executed the day and year first above written.

CITY OF LAS VEGAS


_____
JAN LAVERTY JONES, Mayor

"Grantee"

ATTEST:


Page 3 - Exhibit E

103

SEP 2 0 1995

1

2  KATHLEEN M. TIGHE, City Clerk

3

4                                                 _____

5                                         By_____

6                                                     "Grantor"

7  ATTEST:

8  _____

9                       , Secretary

10

11

12  STATE OF _____    )
                                         :ss
13  COUNTY OF _____   )

14          This instrument was acknowledged before me, a notary public, on this ___ day of

15  _____, 1993, by JAN LAVERTY JONES, as the Mayor of the City of Las Vegas.

16                                         _____

17                                         NOTARY PUBLIC

18

19  STATE OF _____    )
                                         :ss
20  COUNTY OF _____   )

21          This instrument was acknowledged before me, a notary public, on this ___ day of

22  _____,  1993,  by  _____,  Grantor,  as  the

23  _____ of _____.

24                                         _____

25                                         NOTARY PUBLIC

26

Page 4 - Exhibit E

104
SEP 2 0 1995

# Exhibit F

## Public Bidding Policies

1.     There be a minimum time period of twenty-one (21) days between availability of the project specifications and bid opening.

2.     A pre-bid conference should be scheduled sufficiently in advance of bid opening to respond to any issues raised by prospective bidders and to issue any necessary addenda to the plans and specifications.

105

SEP 2 0 1995

CLARK COUNTY


PREVAILING WAGE RATES

FOR

PUBLIC WORKS

STATE OF NEVADA


10/1/93

through

9/30/94


Robert Miller
Governor

F. T. MacDonald
Labor Commissioner

SEP 2 0 1995

# TABLE OF CONTENTS

106

AIR BALANCE TECHNICIANS . . . . . . . . . . . . . . . . . . 1
ALARM INSTALLERS . . . . . . . . . . . . . . . . . . . . . . 1
ASBESTOS WORKERS (INSULATORS) . . . . . . . . . . . . . . . 1
BOILERMAKERS . . . . . . . . . . . . . . . . . . . . . . . . 1
BRICKLAYER . . . . . . . . . . . . . . . . . . . . . . . . . 1
CARPENTERS . . . . . . . . . . . . . . . . . . . . . . . . . 1
CEMENT MASONS . . . . . . . . . . . . . . . . . . . . . . . 1
COMMUNICATION ELECTRONIC TECHNICIAN . . . . . . . . . . . . 1
DRYWALLERS . . . . . . . . . . . . . . . . . . . . . . . . . 1
ELECTRICIANS . . . . . . . . . . . . . . . . . . . . . . . . 2
ELECTRICIANS - LINE . . . . . . . . . . . . . . . . . . . . 2
ELECTRICIANS - NEON SIGN . . . . . . . . . . . . . . . . . . 2
ELEVATOR CONSTRUCTORS . . . . . . . . . . . . . . . . . . . 2
FENCE ERECTOR . . . . . . . . . . . . . . . . . . . . . . . 2
FLOOR COVERERS . . . . . . . . . . . . . . . . . . . . . . . 2
GLAZIERS . . . . . . . . . . . . . . . . . . . . . . . . . . 2
HIGHWAY STRIPER . . . . . . . . . . . . . . . . . . . . . . 2
HOD CARRIERS - BRICK MASON TENDERS . . . . . . . . . . . . . 2
HOD CARRIERS - PLASTERER TENDERS . . . . . . . . . . . . . . 3
IRON WORKERS . . . . . . . . . . . . . . . . . . . . . . . . 3
LABORERS . . . . . . . . . . . . . . . . . . . . . . . . . . 3
LATHERER . . . . . . . . . . . . . . . . . . . . . . . . . . 3
MILLWRIGHTS . . . . - . . . . . . . . . . . . . . . . . . . 3
OPERATING ENGINEERS . . . . . . . . . . . . . . . . . . . . 3
OPERATING   ENGINEERS  -  CRANES,  PILEDRIVING  &  HOISTING
     EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . 4
OPERATING ENGINEERS - SURVEYORS . . . . . . . . . . . . . . 4
OPERATING ENGINEERS - TUNNEL . . . . . . . . . . . . . . . . 5
PAINTERS . . . . . . . . . . . . . . . . . . . . . . . . . . 5
PILEDRIVERS . . . . . . . . . . . . . . . . . . . . . . . . 5
PLASTERERS . . . . . . . . . . . . . . . . . . . . . . . . . 5
PLUMBERS\PIPEFITTER . . . . . . . . . . . . . . . . . . . . 5
PLUMBER IRRIGATION . . . . . . . . . . . . . . . . . . . . . 6
REFRIGERATION . . . . . . . . . . . . . . . . . . . . . . . 6
ROOFERS . . . . . . . . . . . . . . . . . . . . . . . . . . 6
SHEET METAL WORKERS . . . . . . . . . . . . . . . . . . . . 6
SPRINKLER FITTERS . . . . . . . . . . . . . . . . . . . . . 6
TAPERS . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
TEAMSTERS . . . . . . . . . . . . . . . . . . . . . . . . . 6
TILE & TERRAZZO WORKERS . . . . . . . . . . . . . . . . . . 6
TRAFFIC BARRIER ERECTOR . . . . . . . . . . . . . . . . . . 6
WELL DRILLERS . . . . . . . . . . . . . . . . . . . . . . . 6
CARPENTERS AND DRYWALL ZONE RATES . . . . . . . . . . . . . 7
CEMENT MASONS ZONE RATES . . . . . . . . . . . . . . . . . . 7
ELECTRICIAN ZONES RATES . . . . . . . . . . . . . . . . . . 7
LABORER & HOD-CARRIER ZONE RATE . . . . . . . . . . . . . . 8
MILLWRIGHTS ZONE RATES . . . . . . . . . . . . . . . . . . . 8
TEAMSTER ZONE RATES . . . . . . . . . . . . . . . . . . . . 8
LABORERS CLASSIFICATIONS . . . . . . . . . . . . . . . . . . 9
OPERATING ENGINEERS CLASSIFICATIONS . . . . . . . . . . . . 10
OPERATING   ENGINEERS  -  CRANES,  PILEDRIVING  &  HOISTING
     EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . 14
OPERATING ENGINEERS - SURVEYORS (non-licensed) . . . . . . . 15
OPERATING ENGINEERS - TUNNEL CLASSIFICATIONS AND WAGE RATES 15
TEAMSTERS CLASSIFICATIONS . . . . . . . . . . . . . . . . . 16

CLARK COUNTY

|  | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|

AIR BALANCE TECHNICIANS:

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Journeyman----------------------- | 25.62 | 7.50 | 33.12 |
| Foreman-------------------------- | 28.12 | 7.50 | 35.62 |
| General Foreman------------------ | 30.12 | 7.50 | 37.62 |

ALARM INSTALLERS:

| | | | |
|---|---|---|---|
| Journeyman----------------------- | 22.70 | 8.64 | 31.34 |

ASBESTOS WORKERS (INSULATORS):
HAZARDOUS MATERIAL APPLICATION AND REMOVAL

| | | | |
|---|---|---|---|
| Mechanic------------------------- | 22.87 | 7.43 | 30.30 |
| Foreman-------------------------- | 24.87 | 7.43 | 32.30 |
| General Foreman------------------ | 25.87 | 7.43 | 33.30 |

Removal refers to removal of hazardous material from mechanical systems.

BOILERMAKERS:

| | | | |
|---|---|---|---|
| Journeyman----------------------- | 26.18 | 7.64 | 33.82 |

BRICKLAYERS:

| | | | |
|---|---|---|---|
| Bricklayer----------------------- | 18.35 | 2.80 | 21.15 |
| Foreman Supervising- 2-5 Journeymen--------------- | 18.85 | 2.80 | 21.65 |
| Foreman supervising 6 or more journeymen-------------------- | 19.35 | 2.80 | 22.15 |

CARPENTERS:

| | | | |
|---|---|---|---|
| Carpenter------------------------ | 19.54 | 7.07 | 26.61 |
| ADD   Welder--------------------------- | 19.89 | 7.07 | 26.96 |
| ZONE   Foreman-------------------------- | 21.21 | 7.07 | 28.28 |
| RATES   General Foreman------------------ | 23.05 | 7.07 | 30.12 |

SEE ZONE RATES ON PAGE 7

CEMENT MASONS:

| | | | |
|---|---|---|---|
| ADD   Cement Mason--------------------- | 20.73 | 4.70 | 25.43 |
| ZONE   Foreman-------------------------- | 22.23 | 4.70 | 26.93 |
| RATES   General Foreman------------------ | 23.84 | 4.70 | 28.54 |

SEE ZONE RATES ON PAGE 7

COMMUNICATION ELECTRONIC TECHNICIAN:

| | | | |
|---|---|---|---|
| Journeyman----------------------- | 15.53 | 0.00 | 15.53 |

DRYWALLERS:

| | | | |
|---|---|---|---|
| ADD   Journeyman----------------------- | 19.54 | 7.07 | 26.61 |
| ZONE   SEE ZONE RATES PAGE 7 | | | |
| RATES | | | |

EFFECTIVE 10/1/93 thru 9/30/94

CLARK COUNTY

|  | | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|---|

108

SEP 2 0 1995

**ELECTRICIANS:**

| | | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|---|
| ADD | Wireman & Technician------------- | 22.70 | 8.64 | 31.34 |
| ZONE | Cable Splicer-------------------- | 23.03 | 8.65 | 31.68 |
| RATES | Wireman Welder------------------- | 23.03 | 8.65 | 31.68 |
| | Foreman-------------------------- | 25.22 | 8.72 | 33.94 |
| | General Foreman------------------ | 27.75 | 8.79 | 36.54 |

**ELECTRICIANS - LINE:**

| | | | | |
|---|---|---|---|---|
| ADD | Lineman, Technician------------- | 22.52 | 5.28 | 27.80 |
| ZONE | Operator------------------------ | 20.19 | 5.16 | 25.35 |
| RATES | Groundman----------------------- | 13.18 | 4.88 | 18.06 |
| | Foreman------------------------- | 25.08 | 5.35 | 30.43 |
| | General Foreman----------------- | 27.64 | 5.46 | 33.10 |
| | SEE ZONE RATES ON PAGE 7 | | | |

**ELECTRICIANS - NEON SIGN:**
Electrician, Fabricator. Glass Blower.
Welder. Painter, Plastic Fabricator.

| | | | |
|---|---|---|---|
| Layout--------------------------- | 19.52 | 0.49 | 20.01 |
| Foreman-------------------------- | 19.87 | 0.49 | 20.36 |
| Helper--------------------------- | 8.78 | 0.49 | 9.27 |

**ELEVATOR CONSTRUCTORS:**

| | | | |
|---|---|---|---|
| Mechanic in Charge--------------- | 40.29 | 8.54 | 48.83 |
| Mechanic------------------------- | 35.81 | 8.27 | 44.08 |
| Helper--------------------------- | 25.07 | 7.62 | 32.69 |
| Probationary Helper-------------- | 17.91 | 7.19 | 25.10 |

**FENCE ERECTOR:**

| | | | |
|---|---|---|---|
| Fence Erector-------------------- | 17.72 | 4.62 | 22.34 |

**FLOOR COVERERS:**

| | | | |
|---|---|---|---|
| Floor Coverer-------------------- | 17.62 | 2.92 | 20.54 |
| Foreman-------------------------- | 18.50 | 2.92 | 21.42 |

**GLAZIERS:**

| | | | |
|---|---|---|---|
| Master Glazier------------------- | 23.16 | 6.10 | 29.26 |
| Architectural Glazier------------ | 14.08 | 6.10 | 20.18 |

Ratio:  For every 3 Master Glaziers working, there shall be no more than 1 Architectural Glazier assigned for work on structures exceeding 2 stories.

**HIGHWAY STRIPER:**

| | | | |
|---|---|---|---|
| Journeyman----------------------- | 21.42 | 5.24 | 26.66 |

**HOD CARRIERS - BRICK MASON TENDERS:**

| | | | | |
|---|---|---|---|---|
| ADD | Hod Carrier - Brick Mason Tender- | 16.10 | 2.80 | 18.90 |
| ZONE | Foreman------------------------- | 17.10 | 2.80 | 19.90 |
| RATES | SEE ZONE RATES ON PAGE 8 | | | |

EFFECTIVE 10/1/93 thru 9/30/94

PAGE  2

CLARK COUNTY

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|

HOD CARRIERS - PLASTERER TENDERS:

| | | | | |
|---|---|---|---|---|
| ADD | Hod Carrier - Plasterer Tender -- | 19.21 | 5.84 | 25.05 |
| ZONE | Foreman - Hod Carrier------------ | 20.21 | 5.84 | 26.05 |
| RATES | General Foreman------------------ | 21.32 | 5.84 | 27.16 |

SEE ZONE RATES ON PAGE 8

IRON WORKERS:

Reinforcing, Ornamental &

| | | | |
|---|---|---|---|
| Structural----------------------- | 23.69 | 8.86 | 32.55 |
| Foreman-------------------------- | 25.19 | 8.86 | 34.05 |
| General Foreman------------------ | 26.69 | 8.86 | 35.55 |

LABORERS:

| | | | | |
|---|---|---|---|---|
| ADD | Group 1-------------------------- | 17.72 | 4.62 | 22.34 |
| ZONE | Group 2-------------------------- | 17.93 | 4.62 | 22.55 |
| RATES | Group 3-------------------------- | 18.03 | 4.62 | 22.65 |
| | Group 4-------------------------- | 18.12 | 4.62 | 22.74 |
| | Group 5-------------------------- | 18.22 | 4.62 | 22.84 |
| | Flagperson & Construction Clean-up- | 13.72 | 4.62 | 18.34 |

Foreman:  $1.00 above highest Journeyman supervised.
SEE ZONE RATES ON PAGE 8
GROUP EXPLANATION ON PAGE 9

LATHERERS:

| | | | |
|---|---|---|---|
| Journeyman----------------------- | 19.54 | 7.07 | 26.61 |

MILLWRIGHTS:

| | | | | |
|---|---|---|---|---|
| | Millwright----------------------- | 21.79 | 5.82 | 27.61 |
| | Welder--------------------------- | 22.14 | 5.82 | 27.96 |
| ADD | Foreman-------------------------- | 23.54 | 5.82 | 29.36 |
| ZONE | Foreman over Welder-------------- | 23.93 | 5.82 | 29.75 |
| RATES | General Foreman------------------ | 25.47 | 5.82 | 31.29 |
| | General Foreman over Welder------ | 25.90 | 5.82 | 31.72 |

SEE ZONE RATES ON PAGE 8

OPERATING ENGINEERS:

| | | | |
|---|---|---|---|
| Group 1 ------------------------- | 22.25 | 9.52 | 31.77 |
| Group 2 ------------------------- | 22.53 | 9.52 | 32.05 |
| Group 3 ------------------------- | 22.82 | 9.52 | 32.34 |
| Group 4 ------------------------- | 22.96 | 9.52 | 32.48 |
| Group 5 -----Multi Shift Only---- | 24.06 | 9.52 | 33.58 |
| Group 6 ------------------------- | 23.18 | 9.52 | 32.70 |
| Group 7 -----Multi Shift Only---- | 24.28 | 9.52 | 33.80 |
| Group 8 ------------------------- | 23.29 | 9.52 | 32.81 |
| Group 9 -----Multi Shift Only---- | 24.39 | 9.52 | 33.91 |
| Group 10------------------------- | 23.41 | 9.52 | 32.93 |
| Group 11-----Multi Shift Only---- | 24.51 | 9.52 | 34.03 |
| Group 12------------------------- | 23.58 | 9.52 | 33.10 |
| Group 13------------------------- | 23.68 | 9.52 | 33.20 |
| Group 14------------------------- | 23.71 | 9.52 | 33.23 |

EFFECTIVE 10/1/93 thru 9/30/94

110

CLARK COUNTY

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|

SEP 2 0 1995

OPERATING ENGINEERS  - CONTINUED

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Group 15-------------------------- | 23.79 | 9.52 | 33.31 |
| Group 16-------------------------- | 23.91 | 9.52 | 33.43 |
| Group 17-------------------------- | 24.08 | 9.52 | 33.60 |
| Group 18-------------------------- | 24.18 | 9.52 | 33.70 |
| Group 19-------------------------- | 24.29 | 9.52 | 33.81 |
| Group 20-------------------------- | 24.41 | 9.52 | 33.93 |
| Group 21-------------------------- | 24.58 | 9.52 | 34.10 |
| Group 22-------------------------- | 24.68 | 9.52 | 34.20 |
| Group 23-------------------------- | 24.79 | 9.52 | 34.31 |
| Group 24-------------------------- | 24.91 | 9.52 | 34.43 |
| Group 25-------------------------- | 25.08 | 9.52 | 34.60 |

ADD $ .50 per hour for workers working "multiple" shift
ADD $1.00 per hour for workers working "special" shift
                GROUP EXPLANATION ON PAGE 10

OPERATING ENGINEERS - CRANES, PILEDRIVING & HOISTING EQUIPMENT:

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Group 1-------------------------- | 22.25 | 9.52 | 31.77 |
| Group 2-------------------------- | 22.53 | 9.52 | 32.05 |
| Group 3-------------------------- | 22.82 | 9.52 | 32.34 |
| Group 4-------------------------- | 22.96 | 9.52 | 32.48 |
| Group 5-------------------------- | 23.18 | 9.52 | 32.70 |
| Group 6-------------------------- | 23.29 | 9.52 | 32.81 |
| Group 7-------------------------- | 23.41 | 9.52 | 32.93 |
| Group 8-------------------------- | 23.58 | 9.52 | 33.10 |
| Group 9-------------------------- | 23.75 | 9.52 | 33.27 |
| Group 10-------------------------- | 24.75 | 9.52 | 34.27 |
| Group 11-------------------------- | 25.75 | 9.52 | 35.27 |
| Group 12-------------------------- | 26.75 | 9.52 | 36.27 |
| Group 13-------------------------- | 27.75 | 9.52 | 37.27 |

ADD $ .50 per hour for workers working "multiple" shift
ADD $1.00 per hour for workers working "special" shift
                GROUP EXPLANATION ON PAGE 10

OPERATING ENGINEERS - SURVEYORS:

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Group 1-------------------------- | 22.82 | 9.52 | 32.34 |
| Group 2-------------------------- | 22.96 | 9.52 | 32.48 |
| Group 3-------------------------- | 23.18 | 9.52 | 32.70 |
| Group 4-------------------------- | 23.46 | 9.52 | 32.98 |
| Group 5-------------------------- | 23.58 | 9.52 | 33.10 |
| Group 6-------------------------- | 23.68 | 9.52 | 33.20 |
| Group 7-------------------------- | 23.71 | 9.52 | 33.23 |
| Group 8-------------------------- | 24.08 | 9.52 | 33.60 |
| Group 9-------------------------- | 24.21 | 9.52 | 33.73 |
| Group 10-------------------------- | 24.71 | 9.52 | 34.23 |

ADD $ .50 per hour for workers working "multiple" shift
ADD $1.00 per hour for workers working "special" shift
                GROUP EXPLANATION ON PAGE 15

EFFECTIVE 10/1/93 thru 9/30/94

CLARK COUNTY

111

SEP 2 0 1995

|  | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| OPERATING ENGINEERS – TUNNEL: | | | |
| Group 1----------------------------- | 22.75 | 9.52 | 32.27 |
| Group 2----------------------------- | 23.03 | 9.52 | 32.55 |
| Group 3----------------------------- | 23.32 | 9.52 | 32.84 |
| Group 4----------------------------- | 23.46 | 9.52 | 32.98 |
| Group 5----------------------------- | 23.68 | 9.52 | 33.20 |
| Group 6----------------------------- | 23.59 | 9.52 | 33.11 |
| Group 7----------------------------- | 23.91 | 9.52 | 33.43 |
| Group 8----------------------------- | 24.08 | 9.52 | 33.60 |
| Group 9----------------------------- | 24.21 | 9.52 | 33.73 |

ADD $ .50 per hour for workers working "multiple" shift
ADD $1.00 per hour for workers working "special" shift
    GROUP EXPLANATION ON PAGE 15

PAINTERS:

|  | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Brush & Roller Painter. Spray Painter. Paperhanger, Sandblaster, Pot Tender. Nozelman. Marbleizing. Metal Leafing, Sign Painting, Acid Staining, Graining, Buffing and Hazard------ | 21.42 | 5.24 | 26.66 |
| Structural Steel Painter (Brush), Structural Steel Painter (Spray). Sandblaster - Structural Steel. | | | |
| Buffing Steel ------------------- | 21.77 | 5.24 | 27.01 |
| Steeplejack---------------------- | 23.17 | 5.24 | 28.41 |
| Special Coating------------------ | 22.42 | 5.24 | 27.66 |
| Foreman-------------------------- | $1.85 above highest paid Journeyman supervised. | | |

PILEDRIVERS (Not for equipment operation):
(see Operating Engineer Piledriver for equipment operation)

|  | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Piledriver Bridge Carpenter------ | 20.69 | 7.07 | 27.76 |
| Certified Welder----------------- | 21.04 | 7.07 | 28.11 |
| Diver (wet pay)------------------ | 47.52 | 7.07 | 54.59 |
| Foreman-------------------------- | 22.76 | 7.07 | 29.83 |

PLASTERERS:

|  | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Plasterer------------------------ | 21.36 | 4.70 | 26.06 |
| Foreman-------------------------- | 22.86 | 4.70 | 27.56 |
| General Foreman------------------ | 23.71 | 4.70 | 28.41 |

PLUMBERS\PIPEFITTER:

|  | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| Plumber - Commercial ------------ | 24.30 | 5.12 | 29.42 |
| Foreman - Commercial------------- | 26.76 | 5.12 | 31.88 |
| General Foreman - Commercial----- | 29.21 | 5.12 | 34.33 |
| Plumber - Industrial ------------ | 24.30 | 5.12 | 29.42 |
| Foreman - Industrial ------------ | 26.76 | 5.12 | 31.88 |
| General Foreman - Industrial----- | 29.21 | 5.12 | 34.33 |

Commercial rates apply to any facility with a public entrance.
Industrial rates apply on heavy construction such as dams.
power plants, water treatment plants, etc.

EFFECTIVE 10/1/93 thru 9/30/94

CLARK COUNTY

112

SEP 2 0 1995

| | BASE RATE | FRINGE BENEFITS | TOTAL |
|---|---|---|---|
| PLUMBER IRRIGATION: | | | |
| Plumber--------------------------- | 21.45 | 0.00 | 21.45 |
| REFRIGERATION: | | | |
| Journeyman----------------------- | 24.30 | 5.12 | 29.42 |
| ROOFERS: | | | |
| Roofer--------------------------- | 15.50 | 2.04 | 17.54 |
| Foreman-------------------------- | 16.76 | 2.04 | 18.80 |
| Helpers-------------------------- | 7.61 | .10 | 7.71 |
| SHEET METAL WORKERS: | | | |
| Sheet Metal Worker--------------- | 25.62 | 7.50 | 33.12 |
| Foreman-------------------------- | 28.12 | 7.50 | 35.62 |
| General Foreman------------------ | 30.12 | 7.50 | 37.62 |
| SPRINKLER FITTERS: (Fire Prevention) | | | |
| Sprinkler Fitter----------------- | 23.65 | 7.03 | 30.68 |
| Foreman-------------------------- | 25.15 | 7.03 | 32.18 |
| TAPERS: | | | |
| Journeyman----------------------- | 21.42 | 5.24 | 26.66 |
| TEAMSTERS: | | | |
| Group 1-------------------------- | 18.35 | 4.67 | 23.02 |
| Group 2-------------------------- | 18.46 | 4.67 | 23.13 |
| Group 3-------------------------- | 18.51 | 4.67 | 23.18 |
| Group 4-------------------------- | 18.67 | 4.67 | 23.34 |
| Group 5-------------------------- | 18.85 | 4.67 | 23.52 |
| Group 6-------------------------- | 19.00 | 4.67 | 23.67 |

ADD ZONE RATES

Foreman-------------------------- $.75 over highest Journeyman supervised.

All off road vehicles------------ 19.35  4.67  24.02
SEE ZONE ON PAGE 8
GROUP EXPLANATION ON PAGE 16

| TILE & TERRAZZO WORKERS: | | | |
|---|---|---|---|
| Mechanic------------------------- | 19.42 | 2.80 | 22.22 |
| Floating/mud work---------------- | 19.42 | 2.80 | 22.22 |
| Helper--------------------------- | 13.45 | 2.80 | 16.25 |
| TRAFFIC BARRIER ERECTOR: | | | |
| Traffic Barrier Erector---------- | 21.14 | 0.00 | 21.14 |
| WELL DRILLERS: | | | |
| Driller-------------------------- | 22.00 | 0.00 | 22.00 |
| Helper--------------------------- | 8.82 | 0.00 | 8.82 |

EFFECTIVE 10/1/93 thru 9/30/94

In addition to the Carpenter rates and Drywall rates listed above
for all construction, add the following applicable amounts:

**113**

**SEP 2 0 1995**

    Zone #1 -  20 mile radius around Las Vegas (measured from the
               intersection of Maryland Parkway and Charleston Blvd.)
               = Free Zone.
    Zone #2 -  20 to 40 mile radius from the intersection of
               Maryland Parkway and Charleston Blvd.
               = $1.50 per hour above base rate.
    Zone #3 -  Over 40 mile radius from the intersection of Maryland
               Parkway and Charleston Blvd.
               = $3.25 per hour above base rate.
    Laughlin - $2.00 per hour above base rate.

No zone rate shall be paid if a workman has been a bona fide resident for a period
of six (6) months prior to employment, in one of the areas described below:
Pahrump, Caliente, Pioche. Overton, Logandale, Laughlin, Mesquite. Alamo, Beatty,
Indian Springs. Lathrop Wells, Tonopah; if the residence is within 20 miles from
the post office in each community.

CEMENT MASONS ZONE RATES
In addition to the Cement Mason rates listed on Page 1, for all
construction. add the following applicable amounts:
Zone #1 =  0 to 20 miles from L.V. City Hall- Free Zone
Zone #2 = 20 to 40 miles from L.V. City Hall- $1.50 per hr.
Zone #3 = 40 to 60 miles from L.V. City Hall- $2.50 per hr.
Zone #4 =  over 60 miles from L.V. City Hall- $3.00 per hr.
Laughlin area - $2.50 per hr.

ELECTRICIAN ZONES RATES
In addition to the Electrician - Line hourly rates listed on page 2,
add the following applicable amounts:
Zone #1 - 15 mile radius from Main and Fremont Street = Free Zone
Zone #2 - 15 to 35 mile radius from Main and Fremont Street:
    Lineman. Technician:  add $1.00 Foreman:  add $1.11
    Operator:  add $.90          General Foreman:  add $1.22
    Groundman: add $.75
Zone #3 - 35 to 55 miles radius from Main and Fremont Street:
    Lineman. Technician:  add $2.00  Foreman:  add $2.22
    Operator:  add $1.80          General Foreman:  add $2.44
    Groundman: add $1.50
Zone #4 - Beyond the 55 mile radius from Main and Fremont Street:
    Lineman. Technician:  add $3.00   Foreman:  add $3.33
    Operator:  add $2.70          General Foreman:  add $3.66
    Groundman:  add $2.25

EFFECTIVE 10/1/93 thru 9/30/94

LABORER & HOD CARRIER ZONE RATES:
In addition to the Laborer rates listed on Pages 2 & 3, add the following
applicable amounts:
Zone #1 -  0 - 20 mile radius from the L.V. City Hall = Free Zone            114
Zone #2 - 20 - 40 mile radius from the L.V. City Hall = $1.50 above Z-1
Zone #3 - 40 - 60 mile radius from the L.V. City Hall = $2.50 above Z-1
Zone #4 - 60 plus mile radius from the L.V. City Hall = $3.00 above Z-1  SEP 2 0 1995
Laughlin Area = $2.25 above Z-1


MILLWRIGHTS ZONE RATES
In addition to the Millwrights rates listed on Page 3, for all
construction, add the following applicable amounts:
Zone #1 - 0 - 20 mile radius from the intersection of Maryland
           Parkway and Charleston Blvd. = Free Zone.
Zone #2 - 20 to 40 mile radius from the intersection of
           Maryland Parkway and Charleston Blvd.
           = $1.50 per hour above base rate.
Zone #3 - Over 40 mile radius from the intersection of Maryland
           Parkway and Charleston Blvd.
           = $3.25 per hour above base rate.

TEAMSTER ZONE RATES
All zone rates are calculated from the Las Vegas City Hall.
        Zone #1 = ( 0-20 miles)    Base Wage Rate
        Zone #2 = (20-40 miles)    Base Wage Rate plus    $1.50
        Zone #3 = (40-60 miles)    Base Wage Rate plus    $2.50
        Zone #4 = (over 60 miles)  Base Wage Rate plus    $3.00
        Laughlin Area              Base Wage Rate plus    $2.25

EFFECTIVE 10/1/93 thru 9/30/94

LABORERS CLASSIFICATIONS

**GROUP 1**
    Dry packing of concrete & filling of formbolt holes
    Fine grader, highway & street paving, airport runways & similar
     type heavy construction
    Gas & oil pipeline laborer
    Guinea chaser
    Laborer, asbestos removal (non-mechanical)
    Laborer, general, construction
    Laborer, packing rod steel & pans
    Laborer, temporary water lines (portable type)
    Landscape gardener and nurseryman
    Tarman and mortarman, kettleman, potman and man applying asphalt, lay-kold creosote, lime,
     and similar type materials ("applying" means applying, dipping, brushing or handling of
     such materials for pipewrapping and waterproofing)
    Underground laborer, including caisson bellowers
    Window cleaner

**GROUP 2**
Asphalt raker, ironer, spreader, luteman
Buggymobile man
Cement dumper (on one yard or larger mixers & handling bulk cement)
Cesspool digger and installer
Chucktender (except tunnels)
Concrete core cutter
Concrete curer, impervious membrane & oiler of all materials
Concrete saw man, excluding tractor type, cutting, scoring old or new concrete
Gas and oil wrapper, pot tender and form man
Making and caulking of all non-metallic pipe joints
Operators and tenders of pneumatic and electric tools, vibrating machines,
    hand propelled trenching machines, impact wrench multiplate and similar mechanical tools
    not separately classified herein.
Operator of cement grinding machine
Riprap stonepaver
Roto-scraper
Sandblaster (pot tender)
Scaler
Septic tank digger and installer (lead man)
Tank scaler and cleaner
Tree climber, faller, chain saw operator, Pittsburgh chipper and similar type brush shredders

**GROUP 3**
Concrete vibrator operator
Cutting torch operator
Gas and oil pipeline laborer, certified
Gas and oil pipeline wrapper
Jackhammer and/or pavement breaker
Laying of all non-metallic pipe, including sewer pipe, drain pipe, underground tile and landscape
    sprinklers
Mudcutter
Scaler (using bos'n chair or safety belt or power tools)

**GROUP 4**
Cribber or shorer, lagging, sheeting, trench bracing, hand guided lagging hammer
Head rock slinger
Powderman-blaster, all work of loading holes, placing and blasting of all powder and explosives of
    whatever type, regardless of method used for such loading and placing
Sandblaster (nozzleman)
Steel header-board man

**GROUP 5**
Driller (core, diamond or wagon), Joy driller model TW-M-2A, Gardner-Denver model DH 143 and
    similar type drills
Gas and oil pipeline - fusion
Gas and oil pipeline wrappers, 6" pipe and over

EFFECTIVE 10/1/93 thru 9/30/94                                    PAGE  9

115

SEP 2 0 1995

116

SEP 2 0 1995

GROUP 1
    Bargeman
    Brakeman
    Compressor operator
    Ditch witch with seat, or similar type equipment
    Elevator operator - inside
    Engineer oiler
    Generator operator
    Generator, pump or compressor plant operator
    Heavy duty repairman helper
    Pump operator
    Signalman
    Switchman

GROUP 2
    Concrete mixer operator - skip type
    Conveyor operator
    Fireman
    Hydrostatic pump operator
    Oiler crusher - asphalt or concrete plant
    Rotary drill helper (oilfield)
    Skiploader - wheel type up to 3/4 yard, without attachment
    Tar pot fireman
    Temporary heating plant operator
    Trenching machine oiler

GROUP 3
    Equipment greaser-rack
    Ford Ferguson - with dragtype attachments
    Helicopter radioman - ground
    Power concrete curing machine operator
    Power concrete saw operator
    Power-driven jumbo form setter operator
    Stationary pipe wrapping and cleaning machine operator

GROUP 4
    Asphalt plant fireman
    Backhoe operator (Mini-max or similar type)
    Boring Machine Operator
    Boxman or Mixerman (Asphalt or Concrete)
    Chip spreading machine operator
    Concrete pump operator (small portable)
    Drilling Machine Operator, Small Auger Types (Texoma Super Economatic, or
        similar types - Hughes 100 or 200, or similar types - drilling depth
        of 30" maximum)
    Equipment greaser (grease truck)
    Guard Rail Post Driver Operator
    Highline Cableway Signalman
    Hydra-hammer - Aerostomper
    Power sweeper operator
    Roller operator (compacting)
    Screed operator (asphalt or concrete)
    Trenching machine operator (up to 6 feet)

GROUP 5
    Equipment greaser, grease truck (multi shift)

EFFECTIVE 10/1/93 thru 9/30/94

GROUP 6
    Asphalt plant engineer
    Batch plant operator
    Bit sharpener
    Concrete joint machine operator (canal & similar type)
    Concrete planer operator
    Deck engine operator
    Derrickman (oilfield type)
    Drilling machine operator, bucket or auger types (Caldweld 100 Bucket or similar
        types - Watson 1000 Auger or similar types - Texoma 330, 500 or 600 Auger or
        similar types - drilling depth of 45' maximum)
    Drilling Machine Operator (including water wells)
    Hydrographic seeder machine operator (straw, pulp or seed)
    Jackson Track Maintainer, or similar type
    Kalamazoo switch tamper, or similar type
    (Group 6 continued on next page.)
    Machine tool operator
    Maginnis internal full slab vibrator
    Mechanical berm, curb or gutter (concrete or asphalt)
    Mechanical finisher operator (concrete, Clary-Johnson-Bidwell or similar)
    Pavement breaker operator
    Road oil mixing machine operator
    Roller operator (asphalt or finish)
    Rubber-tired earth moving equipment (single engine, up to & including 25 yds. struck)
    Self-propelled tar pipelining machine operator
    Skiploader operator (crawler & wheel type, over 3/4 yds. and up to and including 1 - 1/2 yds.)
    Slip form pump operator (power driven hydraulic lifting device for concrete forms)
    Tractor operator - bulldozer, tamper-scraper (single engine up to 100 h.p.,
        flywheel & similar types, up to and including D-5 and similar type)
    Tugger Hoist (1 drum)
    Welder  (general)
GROUP 7
    Welder general (Multi Shift)
GROUP 8
    Asphalt or concrete spreading operator (tamping or finishing)
    Asphalt paving machine operator (Barber Greene or similar types)
    Backhoe operator (up to & including 3/4 yds.) Small Ford, Case or similar.
    Cast in place pipelaying machine operator
    Combination mixer and compressor operator (gunite work)
    Compactor operator - self-propelled
    Concrete mixer operator - paving
    Crushing plant operator
    Drill doctor
    Drilling Machine Operator, Bucket or Auger Types (Caldweld 150 Bucket or
        or similar types - Watson 1500, 2000, 2500 Auger or Similar types -
        Texoma 700, 800 Auger or similar types - drilling depth of 60' maximum
    Elevating grader operator
    Grade checker
    Gradall operator
    Grouting machine operator
    Heavy duty repairman
    Kalamazoo balliste regulator (or similar type)
    Kolman belt loader & similar type
    LeTourneau bolb compactor or similar type
    Loader operator (Athey, Euclid, Sierra & similar types)
    Pneumatic concrete placing machine operator (Hackley-Presswell or similar type)
    Pumpcrete gun operator
    Rotary drill operator (excluding Caisson type)
    Rubber-tired earth moving equipment operator (single engine, Caterpillar, Euclid, Athey Wagon
        & similar types with any and all attachments over 25 yds. and up to and
        including 50 cubic yards struck)
    Rubber-tired earth moving equipment operator (multiple engine up to and including 25, yds. struck)
    Rubber-tired scraper operator (self-loading - paddle wheel type -
        John Deere, 1040 & similar single unit)
    Self-propelled curb and gutter machine operator

117

SEP 2 0 1995

118

SEP 20 1995

Skiploader operator (crawler & wheel type - over 1 1/2 yds.
   up to and including 6 1/2 yds.)
Surface heaters and planer operator
Tractor compressor drill combination operator
Tractor operator (any type larger than D-5 - 100 flywheel h.p. and
   over. or similar - Bull Dozer, Tamper, Scraper and Push Tractor, single engine)
Tractor operator (boom attachments)
Traveling pipe wrapping, cleaning and bending machine operator
Trenching machine operator (over 6 foot depth capacity, manufacturer's rating)

GROUP 9
Heavy duty repairman (Multi Shift)

GROUP 10
Drilling Machine Operator, Bucket or Auger Types (Caldweld 200 Bucket or
   or similar types - Watson 3000 or 5000 Auger or Similar types - Texoma
   900 Auger or similar types - drilling depth of 105' maximum)
Dual drum mixer
Heavy Duty repairman - welder combination
Monorail locomotive operator (single engine)
Motor patrol - blade operator (Euclid & similar type - except Quad 9 cat)
Multiple engine tractor operator
Pre-Stressed Wrapping Machine Operator
Rubber-tired earth moving equipment operator (single engine, over 50 yds. struck)
Rubber-tired earth moving equipment operator (multiple engine
   Euclid, Caterpillar & similar type - over 25 yds. and up to 50 yds. struck)
Tower crane repairman
Tractor loader operator (crawler and wheel-type over 6 1/2 yds.)
Welder, certified
Woods mixer operator (& similar Pugmill equipment)

GROUP 11
Heavy duty repairman welder combination, welder certified (Multi Shift)

GROUP 12
Auto grader operator
Automatic slit form operator
Drilling Machine Operator, Bucket or Auger Types (Caldweld, Auger 200 CA or
   or similar types - Watson, Auger 6000 or similar types - Hughes Super Duty,
   Auger 200 or similar types - drilling depth of 175 maximum)
Hoe Ram or similar with compressor
Mass excavator operator - less than 750 cubic yards.
Mechanical finishing machine operator
Mobile form traveler operator
Motor patrol (multiple engine)
Pipe mobile machine operator
Rubber-tired earth moving equipment operator (multiple engine
   Euclid, Caterpillar & similar type - over 50 cubic yds. struck)
Rubber-tired scraper operator
Rubber-tired self-loading scraper operator (paddle wheel auger type self-loading
   - two [2] or more units)
Vermeer Rock Trencher (or similar type)

GROUP 13
Rubber-Tired earth Moving Equipment Operator, operating equipment with
   the push-pull system (single engine, up to and including 25 yds. struck.)

GROUP 14
Canal liner operator
Canal trimmer operator
Remote controlled earthmoving equipment operator
Wheel excavator operator (over 750 cubic yards per hour)

GROUP 15
Rubber-tired earth moving equipment operator (single engine
   Euclid, Athey Wagon, & similar types with any and all attachments
   - over 25 yds. and up to 50 yds. struck)
Rubber-Tired earth Moving Equipment Operator, operating equipment with
   the push-pull system (multiple engine, up to and including 25 yds. struck.)

119

SEP 2 0 1995

GROUP 16

Rubber-tired earth moving equipment operator operating equipment with
the push-pull system (single engine - over 50 yds. struck)
Rubber-Tired earth Moving Equipment Operator, operating equipment with
the push-pull system (multiple engine. Euclid. Caterpillar and similar.
over 25 yds. and up to 50 yds. struck.)

GROUP 17

Rubber-Tired earth Moving Equipment Operator, operating equipment with
the push-pull system (multiple engine. Euclid. Caterpillar and similar.
over 50 yds. struck.)
Tandem tractor operator (operating crawler type tractors in tandem -
Quad 9 and similar type.)

GROUP 18

Rubber-Tired earth Moving Equipment Operator, operating in Tandem
(scrapers. belly dumps. and similar types in any combinations. excluding
compaction units - single engine. up to and including 25 yds. struck).

GROUP 19

Concrete Pump Operator - truck mounted
Rubber-Tired Earth Moving Equipment Operator. operating in Tandem (scrapers.
belly dumps. and similar types in any combination. excluding compaction units -
single engine. Caterpillar. Euclid. Athey Wagon. and similar types with
any and all attachments over 25 yds. and up to and including 50 cu. yds. struck)
Rubber-Tired Earth Moving Equipment Operator. operating in Tandem (scrapers.
belly dumps. and similar types in any combination, excluding compaction units -
multiple engine. up to and including 25 cu. yds. struck)

GROUP 20

Rubber-Tired Earth Moving Equipment Operator. operating in Tandem (scrapers.
belly dumps. and similar types in any combination. excluding compaction units -
single engine. Caterpillar. Euclid. Athey wagon. and similar types excluding
compaction units - single engine. over 50 cu. yds. struck)
Rubber-Tired Earth Moving Equipment Operator. operating in Tandem (scrapers.
belly dumps. and similar types in any combination. excluding compaction units -
multiple engine. Euclid. Caterpillar. and similar over 25 yds. and up to
50 cu. yds. struck)

GROUP 21

Rubber-Tired Earth Moving Equipment Operator. operating in Tandem (scrapers.
belly dumps. and similar types in any combination. excluding compaction units -
multiple engine. Caterpillar. Euclid. Athey Wagon. and similar types
over 50 cu. yds. struck).

GROUP 22

Rubber-tired earth moving equipment operator. operating equipment with the
tandem push-pull system (single engine. up to and including 25 yds. struck)

GROUP 23

Rubber-Tired Earth Moving Equipment Operator. operating equipment with the Tandem
Push-Pull system (single engine. Caterpillar. Euclid. Athey Wagon. and similar types with
any and all attachments over 25 yds. and up to and including 50 cu. yds. struck).
Rubber-Tired Earth Moving Equipment Operator. operating equipment with the Tandem
Push-Pull System (multiple engine. up to and including 25 yds. struck)

GROUP 24

Rubber-Tired Earth Moving Equipment Operator. operating equipment with the Tandem
Push-Pull System (single engine. over 50 yds. struck).
Rubber-Tired Earth Moving Equipment Operator. operating equipment with the Tandem
Push-Pull System (multiple engine. Euclid. Caterpillar and similar type. over
25 yds. and up to 50 cu. yds. struck.)

GROUP 25

Rubber-Tired Earth Moving Equipment Operator. Operating equipment with the Tandem
Push-Pull System (multiple engine. Euclid. Caterpillar and similar type. over
50 cubic yds. struck).

GROUP 1 — Engineer Oiler
Forklift Operator (under 5 tons capacity)

GROUP 2 — Truck Crane Oiler

GROUP 3 — A-Frame or Winch Truck Operator
Ross Carrier Operator (Jobsite)

GROUP 4 — Bridge-Type Unloader and Turntable Operator
Helicopter Hoist Operator

GROUP 5 — Stinger Crane (Austin-Western or similar type)
Tugger Hoist Operator (1 drum)

GROUP 6 — Bridge Crane Operator
Cretor Crane Operator (Oiler required)
Forklift Operator (over 5 tons)
Hoist Operator (Chicago Boom and similar type)
Lift Mobile Operator
Lift slab machine operator (Vagtborg & similar type)
Material Hoist Operator
Polar Gantry Crane Operator
Shovel, Backhoe, Dragline, Clamshell Operator
(over 3/4 yd. and up to 5 cu. yds. M.R.C.)
Tugger Hoist Operator (2 drum)

GROUP 7
Pedestal Crane Operator
Shovel, Backhoe, Dragline, Clamshell Operator (Over 5 cu. yds. M.R.C.)
Tower Crane Repairman
Tugger Hoist Operator (3 Drum)

GROUP 8
Crane Operator (up to and including 25 ton capacity)
Crawler Transporter Operator
Derrick Barge Operator (up to and including 25 ton capacity)
Hoist Operator, Stiff Legs, Guy Derrick and similar type (up to and including 25 ton capacity)
Shovel, Backhoe, Dragline, Clamshell Operator (over 7 cu. yds. M.R.C.)

GROUP 9
Crane Operator (over 25 tons up to and including 50 ton M.R.C.)
Derrick Barge Operator (over 25 tons, up to and including 50 ton M.R.C.)
Highline Cableway Operator
Hoist Operator, Stiff Legs, Guy Derrick and similar type
(over 25 tons, up to and including 50 ton capacity)
K-Crane
Polar Crane Operator
Tower Crane Operator

GROUP 10
Crane Operator (over 50 tons, up to and including 100 ton M.R.C.)
Derrick Barge Operator (over 50 tons, up to and including 100 ton M.R.C.)
Hoist Operator, Stiff Legs, Guy Derrick and similar type
(over 50 tons, up to and including 100 ton M.R.C.)
Mobile Tower Crane Operator (over 50 tons, up to and including
100 ton M.R.C.)

GROUP 11
Crane Operator (over 100 up to and including 200 ton M.R.C.)
Derrick Barge Operator (over 100 tons, up to and including 200 ton M.R.C.)
Hoist Operator, Stiff Legs, Guy Derrick and similar type (over 100 tons, up to and
including 200 ton M.R.C.)
Mobile Tower Crane Operator (over 100 tons, up to and including
200 ton M.R.C.)

EFFECTIVE 10/1/93 thru 9/30/94

120

SEP 20 1995

121

SEP 2 0 1995

GROUP 12
    Crane Operator (over 200 tons, up to and including 300 ton M.R.C.)
    Derrick Barge Operator (over 200 tons, up to and including 300 ton M.R.C.)
    Hoist Operator, Stiff Legs, Guy Derrick and similar type
        (over 200 tons, up to and including 300 ton M.R.C.)
    Mobile Tower Crane Operator (over 200 tons, up to and including
        300 ton M.R.C.)

GROUP 13
    Crane Operator (over 300 tons)
    Derrick Barge Operator (over 300 tons)
    Helicopter Pilot
    Hoist Operator, Stiff Legs, Guy Derrick and similar type (over 300 tons)
    Mobile Tower Crane Operator (over 300 tons)


OPERATING ENGINEERS - SURVEYORS (non-licensed)
    GROUP 1:  Chainman
    GROUP 2:  Rodman
    GROUP 3:  Instrumentman
    GROUP 4:  Hydrographic Engineering Technician I (Chainman)
    GROUP 5:  Party Chief
    GROUP 6:  E.D.M. or Fathometer Instrumentman
    GROUP 7:  Certified Party Chief
    GROUP 8:  Hydrographic Engineer Party Chief
    GROUP 9:  Certified Hydrographic Engineer Party Chief
    GROUP 10: Chief of Parties


OPERATING ENGINEERS - TUNNEL CLASSIFICATIONS AND WAGE RATES

    GROUP 1:  Heavy Duty Repairman Helper
    GROUP 2:  Skiploader (wheel type up to 3/4 yd. without attachment)
    GROUP 3:  Chainman
              Power-Driver Jumbo Form Setter Operator
    GROUP 4:  Dinkey Locomotive or Motorman (up to and including 10 tons)
              Rodman
    GROUP 5:  Bit Sharpener
              Equipment Greaser (Grease Truck)
              Instrumentman
              Slip form Pump Operator (power driven hydraulic lifting device
                      for concrete forms)
              Tugger Hoist Operator (1 drum)
              Tunnel Locomotive Operator (over 10 and up to and including 30 tons)
              Welder-General
    GROUP 6:  Backhoe Operator (up to and including 3/4 yd., small Ford, Case or similar)
              Drill Doctor
              Grouting Machine Operator
              Heading Shield Operator
              Heavy Duty Repairman
              Loader Operator (Athey, Euclid, Sierra and similar types)
              Mucking Machine Operator (1/4 yd. - rubber-tired, rail or track type)
              Pneumatic Concrete Placing Machine Operator (Hackley-Presswell or similar type)
              Pneumatic heading Shield (tunnel)
              Pumpcrete Gun Operator
              Tractor Compressor Drill Combination Operator
              Tugger Hoist Operator (2 drum)
              Tunnel Locomotive Operator (over 30 tons)
    GROUP 7:  Heavy Duty Repairman-Welder Combination
    GROUP 8:  Party Chief
    GROUP 9:  Certified Chief of Party
              Tunnel Mole Boring Machine Operator


EFFECTIVE 10/1/93 thru 9/30/94

PAGE  15

122

SEP 2 0 1995

GROUP 1

Busses. job site. up to 25 passengers
Dump truck - less than 12 yds. water level
Pick up driver
Service station attendant
Service truck driver. teamster equipment
Truck repairman helper
Trucks - less than 15 tons legal payload capacity
Warehouseman
Water & fuel trucks - under 2.500 gallons
Working flat rack driver

GROUP 2

Bootman
Busses. job site more than 25 passengers
Dump trucks - 12 yds. but less than 16 yds. water level
Truck Greaser
Trucks - legal payload capacity between 15 and 20 tons
Gas & oil pipeline working truck drivers.
   (includes winch trucks and all size trucks)
Water & fuel trucks - 2.500 gallons to 4.000 gallons

GROUP 3

Dumpcrete truck (less than 6 1/2 yds. water level)
Tireman
Transit mix trucks (under 3 yds.)
Warehouse clerk

GROUP 4

Dump trucks (16 yds. up to and including 22 yds. water level)
Dumpcrete truck (6 1/2 yds. water level and over)
Dumpster truck
Euclid type spreader truck
Forklift driver
Ross carrier driver (highway)
Stock room clerk
Transit mix trucks (3 yds. but less than 6 yds.)
Trucks (20 tons but less than 30 tons legal payload capacity)
Water & fuel trucks (4.000 gallons but less than 6.000 gallons)

GROUP 5

Dump trucks (over 22 yds. water level)
Road oil spreader truck
Transit mix trucks (6 yds. or more)
Trucks (30 tons & over. legal payload capacity)
Highway water & fuel trucks (6.000 gallons and over)

GROUP 6

DW. DW 10 & 20 Euclid-type equipment. LeTourneau Pulls.
Terra Cobras & similar equipment. PB & similar trucks
Truck repairman. all equipment with 7 or more axles

EFFECTIVE 10/1/93 thru 9/30/94

123

SEP 2 0 1995

# EMPLOYMENT PLAN FOR THE FREMONT STREET EXPERIENCE PARKING CORPORATION

# EMPLOYMENT PLAN FOR THE
# FREMONT STREET EXPERIENCE
# PARKING CORPORATION

124

SEP 2 0 1995

The Employment Plan of the Fremont Street Experience Parking Corporation (the "Corporation") is prepared in accordance with NRS 279.572(2) and the City of Las Vegas Downtown Redevelopment Agency Employment Plan Policy (hereinafter the "Policy") dated June 3, 1992. Inasmuch as a portion of the Fremont Street Experience project (hereinafter the "Project") is being partially funded by the Redevelopment Agency, this Plan outlines the steps to be taken by the Corporation to assist it in achieving compliance with the Policy. In accordance with the Policy, developers and build-to-suit owners which receive redevelopment project funds are encouraged to hire individuals who live within the area of the operations and are economically disadvantaged residents, physically handicapped, members of racial minorities, veterans or women.

The plan herein is divided into two parts, as contemplated by the Policy. Since the Corporation is an entity which is proposing to use redevelopment funds to construct commercial, office or retail space, it hereby submits an employment plan in its capacity as a "developer." In addition, the Corporation, as a prospective owner/lessee of space which will have been acquired by use of redevelopment funds, hereby submits an employment plan in its capacity as a "build-to-suit owner/lessee" for the post-construction phase of the Project.

125

SEP 2 0 1995

## PART I:

### Developer Employment Plan

The Developer Employment Plan shall apply during the construction phase of the Project.

1.    <u>Description of the Facilities to be Constructed</u>.  The facilities to be constructed by the Corporation with Redevelopment Agency funds on Fremont Street will consist of a parking structure situated on the block bounded by Fremont Street, Carson Avenue, Fourth Street and Las Vegas Boulevard, which will contain a parking garage for approximately 1,500 vehicles, shell retail store space of approximately 39,000 gross square feet, and an additional 39,000 gross square feet for administrative offices, float storage and staging.

2.    <u>Contracts for construction of the Project</u>.  The Corporation will promote the utilization of women and minority-owned business enterprises for the construction of the parking structure, as discussed more fully in paragraph 3 below.  In this regard, it will establish, as targets, the participation goals established by the City in its "Minority and Women-Owned Business Enterprise Policy."  These goals represent the dollar value of subcontracts and materials agreements awarded to minority and women-owned businesses expressed as a proportion of the total dollar value of bids.

The Policy requests a list and the amount of contracts to be let for the construction of the redevelopment project.  Since the Corporation has not yet caused the bid documents to be prepared, it is premature to identify the subcontracts and materials agreements that will be required for construction.  When the construction drawings and bid documents have been received, the Corporation, through its construction

-2-

126
SEP 2 0 1995

manager, will seek input regarding the bid estimates from various contractors and subcontractors, including minority and women-owned business firms. Bid documents will then be completed and disseminated, using the City's Minority Vendors Directory, as described below. It is anticipated that these documents will be prepared approximately three months after the signing of the Development Agreement. At such time, the Corporation will submit an Addendum to this Plan identifying the construction contracts.

3. <u>Manner of Involving Minority and Women-Owned Businesses</u>. The Corporation hereby certifies that, for the construction phase of the parking structure, it shall use and instruct its project manager and construction manager to use the City's Minority Vendors Directory to locate potential subcontractors. These entities shall notify qualified vendors identified in such directory of contracts to be let for construction, in sufficient time to allow effective participation by minority and women-owned firms. A copy of the notification shall be submitted to the Redevelopment Agency.

In addition to the above, the Corporation will perform the following tasks:

(a) Advertise in the newspapers of general circulation, trade association papers and minority and women-focused media concerning subcontracting opportunities, giving sufficient time to allow the opportunity for effective participation by women and minority-owned businesses;

(b) Contact and coordinate with the City's Minority Business Officer and Redevelopment Agency representatives to obtain lists and information concerning City-certified minority and women-owned business enterprises;

-3-

127
SEP 2 0 1995

(c)     Utilize referral agencies such as minority and women community organizations, professional associations and small business assistance offices or other organizations that provide assistance in the recruitment and placement of minority and women-owned business enterprises;

(d)     When appropriate, break down contracts into economically feasible units to facilitate participation by minority and women-owned businesses;

(e)     Ensure access by interested minority and women-owned business enterprises to plans and specifications and adequate information about the scope of services and other requirements; and

(f)     Offer information to interested minority and women-owned business firms regarding the obtaining of bonding, lines of credit and/or insurance.

### PART II:

### Build-To-Suit Owner/Lessee Employment Plan

The Build-To-Suit Owner/Lessee Employment Plan shall apply to the Corporation's hiring of new permanent employees during the post-construction phase of the Project.  In addition, even though portions of the Project are not being supported by redevelopment funds, the Corporation and The Fremont Street Experience Limited Liability Company (the "Company") will adopt the employment objectives stated in the Policy for the entire Project.  In this regard, both the Corporation and the Company recognize that subcontractors of permanent operations will be required to adhere to the Employment Plan, to the extent possible, which will be effected through contractual language included in any agreements with such subcontractors.

128

SEP 2 0 1995

1.    Description of existing opportunities for employment within the area.

Economically, the downtown core of the Redevelopment District has seen a steady decline in job growth, market share and revenues. Socially, the area has begun to exhibit classic symptoms of a decaying infrastructure: increased homelessness, widespread panhandling in the downtown business and tourist district, increased crime and boarded-up businesses. Further, a prevailing perception of downtown is currently being shared by local residents and tourists alike -- Downtown is unsafe, unclean and generally run down.  Fremont Street, which gave rise to gaming in Las Vegas, has subsequently been overshadowed by the accomplishments of her sister -- the Strip.

Similar symptoms of decay have been brewing in the residential areas surrounding the district.  For example, as the downtown core has experienced a decline in economic factors, unemployment has likewise declined in surrounding areas, and is higher than in other parts of Las Vegas.  It is clear that Downtown and the adjoining neighborhoods, including and surrounding the Redevelopment District, share a symbiotic relationship -- one cannot survive if the other fails.  The economic situation in the downtown business district directly affects the opportunities for employment for those residents of the Redevelopment District and surrounding areas.  Thus, an analysis of the hotel/casino industry, Downtown's major employer, is outlined below to show how the Fremont Street Experience is designed to improve opportunities for employment in the surrounding residential areas.

In 1988, downtown casinos earned a net income of $77 million, on total revenues of nearly $900 million, representing a healthy 8.6% profit margin.  The gaming revenue growth rate over the previous year was 10.9%.  Downtown's share of the

gaming market was over 20% and the properties enjoyed an occupancy rate of 86.9%. Indicative of this encouraging economic picture was the Golden Nugget's massive renovation and expansion in 1987. Additionally, in 1988, Fitzgerald's purchased and renovated the Sundance, and the Fremont renovated its facade. Downtown's future looked healthy, vibrant and secure.

By 1992, this picture had changed dramatically. Despite efforts by the properties to maintain market share and competitive viability, they were irreversibly shaken by several events: the opening of two mega-resorts on the Strip; proliferation of gaming outside the state; the growth of Laughlin; and the success of border and neighborhood casinos.

In 1991, downtown casinos reported a loss of $39 million on total revenues of nearly $1 billion. While rebounding somewhat in 1992, margins are far below historic levels and clearly unacceptable. By 1992, Downtown's share of the gaming market had dropped to 16%; while Laughlin's share had risen from 9.4% in 1988 to 11.5% in 1992.

Downtown's share of room inventory declined from 21.5% to 15.6% in 1992, and is expected to decline even further as the Strip and Laughlin continue their fast-paced growth. Job growth, which continues to post healthy increases on the Strip and in Laughlin, remains stagnant Downtown.

It is anticipated that the Fremont Street Experience will reverse this downward trend by stimulating economic growth in all areas. Property values are expected to increase, generating more city tax dollars. As a result of the Fremont Street Experience, not only will the 18,000 current casino jobs be maintained, but additional job

130

SEP 2 0 1995

growth will likewise occur as hotels respond to the new positive infrastructure. The Project is also expected to be a catalyst for the Union Pacific land development, as well as the Main Street Station property and surrounding areas.

The impact and importance of this industry to the district is significant. Currently, there are:

A.   18,000 direct jobs in downtown hotel/casinos, with $500,000,000 of payroll and other benefits.

B.   22,000 total jobs in the entire downtown core filled by residents of Las Vegas.

C.   45,000 total jobs, when adding the indirect jobs of suppliers and service providers created by the downtown hotel/casinos. This assumes a very conservative multiple of 1.5 indirect jobs for every direct gaming job.

Downtown revitalization is crucial to both the economic and social growth of the community. From an economic standpoint, the downtown core may be viewed as the heart that pumps lifeblood into the entire area. Should these businesses fail, so too will the many surrounding smaller businesses which depend on traffic primarily generated by the hotel/casinos in the Fremont corridor.

From a social standpoint, revitalization is perhaps even more critical to the livelihood of the community. Cities which have successfully completed the physical enhancement portion of their redevelopment now have the economic resources to effectively deal with vital social concerns such as homelessness, affordable housing, job training, drug intervention and welfare reforms. It is the hope and plan of the Corporation and the Company that the Fremont Street Experience serve as an economic

and social stimulus to community growth by improving opportunities for employment in the areas surrounding Downtown.

The intent of the Policy is that a project benefited by redevelopment funds create new jobs for residents of the: (1) Redevelopment Area, (encompassing portions of Census Tracts 3.01, 3.02 and 4, and Census Tracts 6, 7, 8, 9 and 11); (2) the City of Las Vegas Special Impact Area (encompassing portions of Census Tracts 3.01 and 3.02); and/or (3) Census Tracts 5.03 and 5.04. These areas are outlined on two area maps shown on Attachment "A" one of which is entitled, "Employment Plan Target Area," the other of which is an enlargement of the Target Area. The information shown in Attachment "B," taken from 1990 Census data compiled by the City's Community Planning and Development Department, contains a statistical breakdown in terms of race and employment categories for each of the Census Tracts identified above.

2. <u>Estimate and description of new jobs created as a result of the Project.</u> Excluding employment for the parking garage,[1] it is estimated that 95 new permanent jobs will be created as a direct result of the Project. The anticipated job categories and number of personnel (including management and support personnel) in each category are as follows: Overall Management (2); Marketing and Special Projects (4); Finance and Administration (3); Support Services (1); Facilities Management (1); Purchasing (1); Human Resources (2); Security Services (22); Show Operations (1.5); System Operations (12); Show Maintenance (1.5); Electronic Services (6); Electrical Services (2); Mechanical Services (3); Custodial Services (32); and Warehouse Services (1).

---

[1] The Corporation has not yet determined whether it will operate the parking garage itself, or contract with a third party for the management of the garage.

SEP 2 0 1995

3.   <u>Description of the steps to be taken to achieve objective.</u>  It is the intent of the Corporation and the Company to fill as many as possible new permanent jobs created as a direct result of the Project by hiring persons residing in the targeted areas who are economically disadvantaged, physically handicapped, members of racial minorities, veterans and women.  A variety of steps are planned in order to meet this objective.  First, the Corporation and the Company will advertise in newspapers of general circulation, trade association papers and minority and women-focused media concerning new permanent employment opportunities associated with the Project.

Second, the Corporation and the Company will utilize the following referral agencies to seek assistance in identifying qualified job applicants:

(a)   Nevada Employment Security Department;

(b)   Nevada Business Services;

(c)   Nevada Black Chamber of Commerce;

(d)   Latin Chamber of Commerce;

(e)   Las Vegas Indian Center;

(f)   Nevada Association for the Handicapped;

(g)   Nevada Welfare Department;

(h)   Women's Development Center;

(i)   St. Vincent's Job Desk;

(j)   Community College of Southern Nevada;

(k)   Bureau of Vocational Rehabilitation of Southern Nevada;

(l)   Dr. Martin Luther King, Jr. Committee;

(m)   Nevada Partners;

133

SEP 2 0 1995

(n)    The City of Las Vegas Housing Authority; and

(o)    The Governor's Committee on Employment for Individuals with Disabilities.

Further, the Corporation and the Company will work closely with the Minority Business Officer for the City of Las Vegas and Redevelopment Agency officials to obtain assistance in its hiring activities.

4.    The Corporation and the Company certify that they will pay a minimum rate which is the higher of the federal minimum wage or the market rates paid by employers in similar businesses in order to ensure that redevelopment jobs provide decent standards of living for employees.

5.    The Corporation and the Company will notify in writing all of the referral agencies of job positions which are initially available for hire at least 30 working days prior to anticipated initial hiring dates.  Thereafter, for the filling of subsequent positions, the Corporation and the Company will endeavor to give all previously responsive agencies a notification in writing within a reasonable time prior to anticipated hiring dates. Both of the above-referenced notifications will include a description of the required job qualifications, the rate of pay, the anticipated hiring date and the date by which the referral agency must refer qualified applicants in order to be considered for hiring.  The Corporation and the Company will copy the Redevelopment Agency on all such written correspondence.

6.    The Corporation and the Company will work closely with the agencies designated in item 3 above to assist them in the design and establishment of programs to train and upgrade the skills of qualified employees to fill the needs of their businesses.

134

SEP 2 0 1995

# Employment Plan Target Area



GIS maps are normally produced
only to meet the needs of the City

No Warranty is made as to
the accuracy or quality of maps.

Geographic Information System

09 June 1992

```
 0      1642'   3283'
```





ATTACHMENT "A"

136

SEP 2 0 1995

# ATTACHMENT "B"

1990 Census of Population and Housing
Clark County, Nevada
City of Las Vegas
Tract 3.01

137

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---|
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 361 |
| Black . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,957 |
|     Percent of total population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85.7 |
| American Indian, Eskimo, or Aleut . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
|     Percent of total population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.8 |
| Asian or Pacific Islander . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
|     Percent of total population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.3 |
| Other race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93 |
| Hispanic origin (of any race) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 161 |
|     Percent of total population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.7 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---|
| Occupied housing units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,207 |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 |
| Black . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,133 |
|     Percent of occupied units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93.9 |
| American Indian, Eskimo, or Aleut . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
|     Percent of occupied units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.7 |
| Asian or Pacific Islander . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
|     Percent of occupied units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.3 |
| Other race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
| Hispanic origin (of any race) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
|     Percent of occupied units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.1 |

## LABOR FORCE STATUS

| | |
|---|---|
| Persons 16 years and over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,764 |
| In labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,554 |
|     Percent in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56.2 |
| Civilian labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,554 |
|     Employed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,292 |
|     Unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 262 |
|         Percent unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16.9 |
| Armed Forces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0 |
| Not in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,210 |

ATTACHMENT "B"

Males 16 years and over ............................... 1,481
In labor force ...................................... 887
    Percent in labor force ............................. 59.9
Civilian labor force ................................ 887
    Employed ....................................... 708
    Unemployed .................................... 179
        Percent unemployed ........................... 20.2
Armed Forces ..................................... 0
Not in labor force ................................. 594

Females 16 years and over ............................. 1,283
In labor force ...................................... 667
    Percent in labor force ............................. 52.0
Civilian labor force ................................ 667
    Employed ....................................... 584
    Unemployed .................................... 83
        Percent unemployed ........................... 12.4
Armed Forces ..................................... 0
Not in labor force ................................. 616

Females 16 years and over ............................. 1,283
With own children under 6 years ...................... 147
    Percent in labor force ............................. 51.7
With own children 6 to 17 years only .................. 157
    Percent in labor force ............................. 80.9

Own children under 6 years in families and subfamilies ................ 279
All parents present in household in labor force .......................... 171

Own children 6 to 17 years in families and subfamilies ................ 454
All parents present in household in labor force ......................... 301

Persons 16 to 19 years .............................. 203
Not enrolled in school and not high school graduate ...................... 54
    Employed or in Armed Forces ................................. 22
    Unemployed ................................... 6
Not in labor force ................................. 26

1990 Census of Population and Housing
Clark County, Nevada
City of Las Vegas
Tract 3.02

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 288 |
| Black | 3,806 |
| Percent of total population | 90.8 |
| American Indian, Eskimo, or Aleut | 21 |
| Percent of total population | 0.5 |
| Asian or Pacific Islander | 18 |
| Percent of total population | 0.4 |
| Other race | 60 |
| Hispanic origin (of any race) | 169 |
| Percent of total population | 4.0 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 1,306 |
| White | 98 |
| Black | 1,184 |
| Percent of occupied units | 90.7 |
| American Indian, Eskimo, or Aleut | 6 |
| Percent of occupied units | 0.5 |
| Asian or Pacific Islander | 4 |
| Percent of occupied units | 0.3 |
| Other race | 14 |
| Hispanic origin (of any race) | 41 |
| Percent of occupied units | 3.1 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 2,560 |
| In labor force | 1,565 |
| Percent in labor force | 61.1 |
| Civilian labor force | 1,546 |
| Employed | 1,143 |
| Unemployed | 403 |
| Percent unemployed | 26.1 |
| Armed Forces | 19 |
| Not in labor force | 995 |

Males 16 years and over ................................... 1,003
In labor force ........................................... 691
Percent in labor force ................................ 68.9
Civilian labor force ................................... ...............
Percent in labor force ................................ 56.1
Civilian labor force ................................... 867
Employed ............................................ 628
Unemployed ......................................... 239
Percent unemployed .............................. 27.6
Armed Forces ........................................ 7
Not in labor force ..................................... 683

Females 16 years and over ............................ 1,557
With own children under 6 years ..................... 500
Percent in labor force ................................ 55.0
With own children 6 to 17 years only ................ 232
Percent in labor force ................................ 70.7

Own children under 6 years in families and subfamilies ............... 749
All parents present in household in labor force ...................... 394

Own children 6 to 17 years in families and subfamilies ............... 899
All parents present in household in labor force ...................... 505

Persons 16 to 19 years ................................ 308
Not enrolled in school and not high school graduate ...................... 108
Employed or in Armed Forces ...................... 20
Unemployed ......................................... 39
Not in labor force ..................................... 49

1990 Census of Population and Housing
    Clark County, Nevada
    City of Las Vegas
    Tract 4

1 4 1

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 4,295 |
| Black | 828 |
| Percent of total population | 12.0 |
| American Indian, Eskimo, or Aleut | 164 |
| Percent of total population | 2.4 |
| Asian or Pacific Islander | 325 |
| Percent of total population | 4.7 |
| Other race | 1,275 |
| Hispanic origin (of any race) | 2,185 |
| Percent of total population | 31.7 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 3,033 |
| White | 2,166 |
| Black | 358 |
| Percent of occupied units | 11.8 |
| American Indian, Eskimo, or Aleut | 56 |
| Percent of occupied units | 1.8 |
| Asian or Pacific Islander | 101 |
| Percent of occupied units | 3.3 |
| Other race | 352 |
| Hispanic origin (of any race) | 628 |
| Percent of occupied units | 20.7 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 5,546 |
| In labor force | 3,708 |
| Percent in labor force | 66.9 |
| Civilian labor force | 3,699 |
| Employed | 3,331 |
| Unemployed | 368 |
| Percent unemployed | 9.9 |
| Armed Forces | 9 |
| Not in labor force | 1,838 |

| | |
|---|---:|
| Males 16 years and over | 3,064 |
| In labor force | 2,195 |
| Percent in labor force | 71.6 |
| Civilian labor force | 2,195 |
| Employed | 1,972 |
| Unemployed | 223 |
| Percent unemployed | 10.2 |
| Armed Forces | 0 |
| Not in labor force | 869 |
| | |
| Females 16 years and over | 2,482 |
| In labor force | 1,513 |
| Percent in labor force | 61.0 |
| Civilian labor force | 1,504 |
| Employed | 1,359 |
| Unemployed | 145 |
| Percent unemployed | 9.6 |
| Armed Forces | 9 |
| Not in labor force | 969 |
| | |
| Females 16 years and over | 2,482 |
| With own children under 6 years | 412 |
| Percent in labor force | 61.9 |
| With own children 6 to 17 years only | 220 |
| Percent in labor force | 65.0 |
| | |
| Own children under 6 years in families and subfamilies | 610 |
| All parents present in household in labor force | 387 |
| | |
| Own children 6 to 17 years in families and subfamilies | 710 |
| All parents present in household in labor force | 500 |
| | |
| Persons 16 to 19 years | 275 |
| Not enrolled in school and not high school graduate | 113 |
| Employed or in Armed Forces | 66 |
| Unemployed | 0 |
| Not in labor force | 47 |

1990 Census of Population and Housing
   Clark County, Nevada
   City of Las Vegas
   Tract 5.03

143

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---|
| White | 3,255 |
| Black | 336 |
| Percent of total population | 6.1 |
| American Indian, Eskimo, or Aleut | 57 |
| Percent of total population | 1.0 |
| Asian or Pacific Islander | 437 |
| Percent of total population | 8.0 |
| Other race | 1,393 |
| Hispanic origin (of any race) | 2,059 |
| Percent of total population | 37.6 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---|
| Occupied housing units | 2,016 |
| White | 1,392 |
| Black | 135 |
| Percent of occupied units | 6.7 |
| American Indian, Eskimo, or Aleut | 19 |
| Percent of occupied units | 0.9 |
| Asian or Pacific Islander | 123 |
| Percent of occupied units | 6.1 |
| Other race | 347 |
| Hispanic origin (of any race) | 526 |
| Percent of occupied units | 26.1 |

## LABOR FORCE STATUS

| | |
|---|---|
| Persons 16 years and over | 4,087 |
| In labor force | 2,973 |
| Percent in labor force | 72.7 |
| Civilian labor force | 2,973 |
| Employed | 2,722 |
| Unemployed | 251 |
| Percent unemployed | 8.4 |
| Armed Forces | 0 |
| Not in labor force | 1,114 |

| | |
|---|---:|
| Males 16 years and over | 2,282 |
| In labor force | 1,914 |
| Percent in labor force | 83.9 |
| Civilian labor force | .............. |
| Percent in labor force | 58.7 |
| Civilian labor force | 1,059 |
| Employed | 975 |
| Unemployed | 84 |
| Percent unemployed | 7.9 |
| Armed Forces | 0 |
| Not in labor force | 746 |
| | |
| Females 16 years and over | 1,805 |
| With own children under 6 years | 365 |
| Percent in-labor force | 70.1 |
| With own children 6 to 17 years only | 246 |
| Percent in labor force | 61.4 |
| | |
| Own children under 6 years in families and subfamilies | 599 |
| All parents present in household in labor force | 421 |
| | |
| Own children 6 to 17 years in families and subfamilies | 867 |
| All parents present in household in labor force | 669 |
| | |
| Persons 16 to 19 years | 263 |
| Not enrolled in school and not high school graduate | 60 |
| Employed or in Armed Forces | 50 |
| Unemployed | 0 |
| Not in labor force | 10 |

1990 Census of Population and Housing
    Clark County, Nevada
    City of Las Vegas
    Tract 5.04

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 2,805 |
| Black | 1,225 |
| Percent of total population | 21.2 |
| American Indian, Eskimo, or Aleut | 111 |
| Percent of total population | 1.9 |
| Asian or Pacific Islander | 289 |
| Percent of total population | 5.0 |
| Other race | 1,353 |
| Hispanic origin (of any race) | 2,285 |
| Percent of total population | 39.5 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 2,084 |
| White | 1,177 |
| Black | 426 |
| Percent of occupied units | 20.4 |
| American Indian, Eskimo, or Aleut | 39 |
| Percent of occupied units | 1.9 |
| Asian or Pacific Islander | 104 |
| Percent of occupied units | 5.0 |
| Other race | 338 |
| Hispanic origin (of any race) | 597 |
| Percent of occupied units | 28.6 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 3,893 |
| In labor force | 2,697 |
| Percent in labor force | 69.3 |
| Civilian labor force | 2,634 |
| Employed | 2,325 |
| Unemployed | 309 |
| Percent unemployed | 11.7 |
| Armed Forces | 63 |
| Not in labor force | 1,196 |

Males 16 years and over ................................... 1,923
In labor force ......................................... 1,504
  Percent in labor force ............................... 78.2
Civilian labor force ................................... 1,456
  Employed ........................................... 1,314
  Unemployed ......................................... 142
    Percent unemployed ............................... 9.8
Armed Forces ......................................... 48
Not In labor force ..................................... 419

Females 16 years and over .............................. 1,970
In labor force ......................................... 1,193
  Percent in labor force ............................... 60.6
Civilian labor force ................................... 1,178
  Employed ........................................... 1,011
  Unemployed ......................................... 167
    Percent unemployed ............................... 14.2
Armed Forces ......................................... 15
Not in labor force ..................................... 777

Females 16 years and over .............................. 1,970
With own children under 6 years ........................ 509
  Percent in labor force ............................... 57.6
With own children 6 to 17 years only .................... 384
  Percent in labor force ............................... 70.3

Own children under 6 years in families and subfamilies .... 878
All parents present in household in labor force ........... 541

Own children 6 to 17 years in families and subfamilies .... 1,044
All parents present in household in labor force ........... 743

Persons 16 to 19 years ................................. 344
Not enrolled in school and not high school graduate ....... 81
  Employed or in Armed Forces ......................... 23
  Unemployed ......................................... 0
  Not in labor force ................................... 58

1990 Census of Population and Housing
Clark County, Nevada
City of Las Vegas
Tract 6

147

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 2,252 |
| Black | 285 |
| Percent of total population | 9.9 |
| American Indian, Eskimo, or Aleut | 33 |
| Percent of total population | 1.1 |
| Asian or Pacific Islander | 106 |
| Percent of total population | 3.7 |
| Other race | 202 |
| Hispanic origin (of any race) | 447 |
| Percent of total population | 15.5 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 1,432 |
| White | 1,153 |
| Black | 157 |
| Percent of occupied units | 11.0 |
| American Indian, Eskimo, or Aleut | 19 |
| Percent of occupied units | 1.3 |
| Asian or Pacific Islander | 41 |
| Percent of occupied units | 2.9 |
| Other race | 62 |
| Hispanic origin (of any race) | 150 |
| Percent of occupied units | 10.5 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 2,472 |
| In labor force | 1,739 |
| Percent in labor force | 70.3 |
| Civilian labor force | 1,739 |
| Employed | 1,527 |
| Unemployed | 212 |
| Percent unemployed | 12.2 |
| Armed Forces | 0 |
| Not in labor force | 733 |

| | |
|---|---:|
| Males 16 years and over | 1,413 |
| In labor force | 1,156 |
| Percent in labor force | 81.8 |
| Civilian labor force | 1,156 |
| Employed | 1,026 |
| Unemployed | 130 |
| Percent unemployed | 11.2 |
| Armed Forces | 0 |
| Not in labor force | 257 |
| | |
| Females 16 years and over | 1,059 |
| In labor force | 583 |
| Percent in labor force | 55.1 |
| Civilian labor force | 583 |
| Employed | 501 |
| Unemployed | 82 |
| Percent unemployed | 14.1 |
| Armed Forces | 0 |
| Not in labor force | 476 |
| | |
| Females 16 years and over | 1,059 |
| With own children under 6 years | 140 |
| Percent in labor force | 50.7 |
| With own children 6 to 17 years only | 85 |
| Percent in labor force | 76.5 |
| | |
| Own children under 6 years in families and subfamilies | 194 |
| All parents present in household in labor force | 135 |
| | |
| Own children 6 to 17 years in families and subfamilies | 188 |
| All parents present in household in labor force | 136 |
| | |
| Persons 16 to 19 years | 115 |
| Not enrolled in school and not high school graduate | 73 |
| Employed or in Armed Forces | 30 |
| Unemployed | 16 |
| Not in labor force | 27 |

1990 Census of Population and Housing
Clark County, Nevada
City of Las Vegas
Tract 7

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 2,369 |
| Black | 805 |
| Percent of total population | 22.6 |
| American Indian, Eskimo, or Aleut | 24 |
| Percent of total population | 0.7 |
| Asian or Pacific Islander | 118 |
| Percent of total population | 3.3 |
| Other race | 248 |
| Hispanic origin (of any race) | 420 |
| Percent of total population | 11.8 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 1,425 |
| White | 1,116 |
| Black | 155 |
| Percent of occupied units | 10.9 |
| American Indian, Eskimo, or Aleut | 6 |
| Percent of occupied units | 0.4 |
| Asian or Pacific Islander | 65 |
| Percent of occupied units | 4.6 |
| Other race | 83 |
| Hispanic origin (of any race) | 138 |
| Percent of occupied units | 9.7 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 3,442 |
| In labor force | 1,218 |
| Percent in labor force | 35.4 |
| Civilian labor force | 1,218 |
| Employed | 1,024 |
| Unemployed | 194 |
| Percent unemployed | 15.9 |
| Armed Forces | 0 |
| Not in labor force | 2,224 |

SEP 20 1995   130

| | |
|---|---:|
| Males 16 years and over | 2,676 |
| In labor force | 878 |
| Percent in labor force | 32.8 |
| Civilian labor force | 878 |
| Employed | 742 |
| Unemployed | 136 |
| Percent unemployed | 15.5 |
| Armed Forces | 0 |
| Not in labor force | 1,798 |
| | |
| Females 16 years and over | 766 |
| In labor force | 340 |
| Percent in labor force | 44.4 |
| Civilian labor force | 340 |
| Employed | 282 |
| Unemployed | 58 |
| Percent unemployed | 17.1 |
| Armed Forces | 0 |
| Not in labor force | 426 |
| | |
| Females 16 years and over | 766 |
| With own children under 6 years | 32 |
| Percent in labor force | 53.1 |
| With own children 6 to 17 years only | 27 |
| Percent in labor force | 74.1 |
| | |
| Own children under 6 years in families and subfamilies | 71 |
| All parents present in household in labor force | 37 |
| | |
| Own children 6 to 17 years in families and subfamilies | 111 |
| All parents present in household in labor force | 72 |
| | |
| Persons 16 to 19 years | 76 |
| Not enrolled in school and not high school graduate | 15 |
| Employed or in Armed Forces | 3 |
| Unemployed | 0 |
| Not in labor force | 12 |

1990 Census of Population and Housing
  Clark County, Nevada
  City of Las Vegas
  Tract 8

151

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 1,873 |
| Black | 137 |
|     Percent of total population | 5.8 |
| American Indian, Eskimo, or Aleut | 30 |
|     Percent of total population | 1.3 |
| Asian or Pacific Islander | 231 |
|     Percent of total population | 9.7 |
| Other race | 103 |
| Hispanic origin (of any race) | 291 |
|     Percent of total population | 12.3 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 1,419 |
| White | 1,174 |
| Black | 101 |
|     Percent of occupied units | 7.1 |
| American Indian, Eskimo, or Aleut | 15 |
|     Percent of occupied units | 1.1 |
| Asian or Pacific Islander | 88 |
|     Percent of occupied units | 6.2 |
| Other race | 41 |
| Hispanic origin (of any race) | 130 |
|     Percent of occupied units | 9.2 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 2,196 |
| In labor force | 1,342 |
|     Percent in labor force | 61.1 |
| Civilian labor force | 1,342 |
| Employed | 1,178 |
| Unemployed | 164 |
|     Percent unemployed | 12.2 |
| Armed Forces | 0 |
| Not in labor force | 854 |

Males 16 years and over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                1,330
In labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                894
    Percent in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                67.2
Civilian labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                894
    Employed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                778
    Unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                116
        Percent unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                13.0
Armed Forces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                0
Not in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                436

Females 16 years and over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                866
In labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                448
    Percent in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                51.7
Civilian labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                448
    Employed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                400
    Unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                48
        Percent unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                10.7
Armed Forces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                0
Not in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                418

Females 16 years and over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                866
With own children under 6 years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                61
    Percent in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                67.2
With own children 6 to 17 years only . . . . . . . . . . . . . . . . . . . . . . . . . . .                49
    Percent in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                73.5

Own children under 6 years in families and subfamilies . . . . . . . . . . . . . . .                78
All parents present in household in labor force . . . . . . . . . . . . . . . . . . . . .                43

Own children 6 to 17 years in families and subfamilies . . . . . . . . . . . . . . . .                90
parents present in household in labor force . . . . . . . . . . . . . . . . . . . . . . . .                72

Persons 16 to 19 years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                57
Not enrolled in school and not high school graduate . . . . . . . . . . . . . . . . . .                26
    Employed or in Armed Forces . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                20
    Unemployed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                6
    Not in labor force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                0

1990 Census of Population and Housing
Clark County, Nevada
City of Las Vegas
Tract 9

153

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 1,194 |
| Black | 190 |
|     Percent of total population | 11.2 |
| American Indian, Eskimo, or Aleut | 28 |
|     Percent of total population | 1.7 |
| Asian or Pacific Islander | 102 |
|     Percent of total population | 6.0 |
| Other race | 182 |
| Hispanic origin (of any race) | 325 |
|     Percent of total population | 19.2 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 1,101 |
| White | 811 |
| Black | 143 |
|     Percent of occupied units | 13.0 |
| American Indian, Eskimo, or Aleut | 13 |
|     Percent of occupied units | 1.2 |
| Asian or Pacific Islander | 57 |
|     Percent of occupied units | 5.2 |
| Other race | 77 |
| Hispanic origin (of any race) | 145 |
|     Percent of occupied units | 13.2 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 1,574 |
| In labor force | 1,012 |
|     Percent in labor force | 64.3 |
| Civilian labor force | 1,012 |
|     Employed | 852 |
|     Unemployed | 160 |
|         Percent unemployed | 15.8 |
| Armed Forces | 0 |
| Not in labor force | 562 |

Males 16 years and over ................................................. 1,089
In labor force ........................................................... 752
Percent in labor force ............................................... 69.1
Civilian labor force ................................................... 752
Employed ......................................................... 608
Unemployed ...................................................... 144
Percent unemployed ........................................... 19.1
Armed Forces ........................................................... 0
Not in labor force ..................................................... 337

Females 16 years and over ............................................. 485
In labor force ........................................................... 260
Percent in labor force ............................................... 53.6
Civilian labor force ................................................... 260
Employed ......................................................... 244
Unemployed ...................................................... 16
Percent unemployed ........................................... 6.2
Armed Forces ........................................................... 0
Not in labor force ..................................................... 225

Females 16 years and over ............................................. 485
With own children under 6 years ...................................... 47
Percent in labor force ............................................... 66.0
With own children 6 to 17 years only ................................. 16
Percent in labor force ............................................... 100.0

Own children under 6 years in families and subfamilies ............... 67
All parents present in household in labor force ....................... 48

Own children 6 to 17 years in families and subfamilies ............... 66
All parents present in household in labor force ....................... 57

Persons 16 to 19 years ................................................. 20
Not enrolled in school and not high school graduate .................. 13
Employed or in Armed Forces ....................................... 0
Unemployed ......................................................... 0
Not in labor force ................................................... 13

1990 Census of Population and Housing
Clark County, Nevada
City of Las Vegas
Tract 11

**155**

SEP 2 0 1995

## RACE AND HISPANIC ORIGIN

| | |
|---|---:|
| White | 2,766 |
| Black | 344 |
| Percent of total population | 7.1 |
| American Indian, Eskimo, or Aleut | 69 |
| Percent of total population | 1.4 |
| Asian or Pacific Islander | 319 |
| Percent of total population | 6.6 |
| Other race | 1,369 |
| Hispanic origin (of any race) | 2,394 |
| Percent of total population | 49.2 |

## RACE AND HISPANIC ORIGIN OF HOUSEHOLDER

| | |
|---|---:|
| Occupied housing units | 2,241 |
| White | 1,484 |
| Black | 177 |
| Percent of occupied units | 7.9 |
| American Indian, Eskimo, or Aleut | 27 |
| Percent of occupied units | 1.2 |
| Asian or Pacific Islander | 132 |
| Percent of occupied units | 5.9 |
| Other race | 421 |
| Hispanic origin (of any race) | 774 |
| Percent of occupied units | 34.5 |

## LABOR FORCE STATUS

| | |
|---|---:|
| Persons 16 years and over | 3,862 |
| In labor force | 2,758 |
| Percent in labor force | 71.4 |
| Civilian labor force | 2,758 |
| Employed | 2,361 |
| Unemployed | 397 |
| Percent unemployed | 14.4 |
| Armed Forces | 0 |
| Not in labor force | 1,104 |

Males 16 years and over ................................................ 2,319
In labor force ...................................................... 1,790
   Percent in labor force ........................................... 77.2
Civilian labor force ................................................. 1,790
   Employed ..................................................... 1,542
   Unemployed ................................................... 248
      Percent unemployed ........................................ 13.9
Armed Forces ....................................................... 0
Not in labor force ................................................... 529

Females 16 years and over ............................................. 1,543
In labor force ...................................................... 968
   Percent in labor force ........................................... 62.7
Civilian labor force ................................................. 968
   Employed ..................................................... 819
   Unemployed ................................................... 149
      Percent unemployed ........................................ 15.4
Armed Forces ....................................................... 0
Not in labor force ................................................... 575

Females 16 years and over ............................................. 1,543
With own children under 6 years ....................................... 341
   Percent in labor force ........................................... 52.8
With own children 6 to 17 years only ................................... 163
   Percent in labor force ........................................... 83.4

Own children under 6 years in families and subfamilies ................. 580
All parents present in household in labor force ......................... 357

Own children 6 to 17 years in families and subfamilies ................. 477
parents present in household in labor force ............................ 321

Persons 16 to 19 years ............................................... 204
Not enrolled in school and not high school graduate ..................... 78
   Employed or in Armed Forces ................................... 15
   Unemployed ................................................... 38
   Not in labor force ............................................. 25

157

SEP 2 0 1995

Exhibit I

Fees Waived

Waivable

|  | Parking Structure | Vault | Street | Floats |
|---|---|---|---|---|
| All Development, Building and Trade Permits, Onsite and Offsite | Yes | Yes | Yes | Yes |
| All Plan Check Fees | Yes | Yes | Yes | Yes |
| Sewer Connection Fees | No* | No* | No* | N/A |
| Transportation | No | N/A | N/A | N/A |
| State Water Planning | No | N/A | N/A | N/A |
| Tortoise Fees | No | N/A | N/A | N/A |
| Performance Bonds | Yes | N/A | N/A | N/A |
| Fees for Variances, Special Use Permits, etc. | Yes | N/A | N/A | N/A |

City will not waive the Special Inspector fee.

*Credit can be given for existing fixtures.

Page 1 - Exhibit I



March 20, 2015

City of Las Vegas, Nevada
c/o City Manager
400 East Stewart Avenue, 10th Floor

Ladies and Gentlemen:

Pursuant to Section 6.15 of that Amended and Restated Management Agreement Fremont Street Experience Project between us dated as of September 27, 1995, as amended (the "Agreement") the undersigned hereby exercises its first renewal right in order to extend the term of the Agreement until July 1, 2020.  Under the Agreement the undersigned continues to have the right to further extend the term for up to three periods of five years each.

Pursuant to Section 6.10 of the Agreement the undersigned hereby informs you that all communications to the undersigned should be addressed to:

> The Fremont Street Experience Limited Liability Company
> 425 Fremont Street
> Las Vegas, NV 89101
> Attn: Jeff Victor

All notices to the undersigned's counsel should be addressed to:

> Fennemore Craig, P.C.
> Attn:  Jeffrey P. Zucker
> 1400 Bank of America Plaza
> 300 South Fourth Street
> Las Vegas, NV 89101

Pursuant to Section 6.13 of the Agreement the undersigned designates Jeff Victor, its President, as its authorized representative.

Sincerely,

The Fremont Street Experience Limited Liability Company

By _____
Jeff Victor, President

cc:  City Manager (495 South Main Street address)
     Director of Economic and Urban Development (both addresses)
     City Treasurer (both addresses)
     City Attorney (both addresses)

---

**Fremont Street Experience, LLC**
**425 Fremont Street, Suite 250**
**Las Vegas, NV 89101**
**Phone:  (702) 678-5600**
**Fax:  (702) 678-5611**

# EXHIBIT 4



# City of Las Vegas

## SPECIAL EVENT PERMIT

### FESTIVUS

**Application/Permit**   **362490**

---

**Event Title:** FESTIVUS                                          Audience: 21 and older

**Dates:**        *Setup:* Jul 08,2022   8:00 PM        *Teardown:* Nov 27,2022   5:00 AM



# City of Las Vegas
## SPECIAL EVENT PERMIT
FESTIVUS

**Application/Permit**     362490

| Start | | Finish | | Participants | Attendees |
|---|---|---|---|---|---|
| 08-Jul-2022 | 8:00 pm | 09-Jul-2022 | 5:00 am | 150 | 2,000 |
| 09-Jul-2022 | 8:00 pm | 10-Jul-2022 | 5:00 am | 150 | 2,000 |
| 10-Jul-2022 | 8:00 pm | 11-Jul-2022 | 5:00 am | 150 | 2,000 |
| 15-Jul-2022 | 8:00 pm | 16-Jul-2022 | 5:00 am | 150 | 2,000 |
| 16-Jul-2022 | 8:00 pm | 17-Jul-2022 | 5:00 am | 150 | 2,000 |
| 17-Jul-2022 | 8:00 pm | 18-Jul-2022 | 5:00 am | 150 | 2,000 |
| 22-Jul-2022 | 8:00 pm | 23-Jul-2022 | 5:00 am | 150 | 2,000 |
| 23-Jul-2022 | 8:00 pm | 24-Jul-2022 | 5:00 am | 150 | 2,000 |
| 24-Jul-2022 | 8:00 pm | 25-Jul-2022 | 5:00 am | 150 | 2,000 |
| 29-Jul-2022 | 8:00 pm | 30-Jul-2022 | 5:00 am | 150 | 2,000 |
| 30-Jul-2022 | 8:00 pm | 31-Jul-2022 | 5:00 am | 150 | 2,000 |
| 31-Jul-2022 | 8:00 pm | 01-Aug-2022 | 5:00 am | 150 | 2,000 |
| 05-Aug-2022 | 8:00 pm | 06-Aug-2022 | 5:00 am | 150 | 2,000 |
| 06-Aug-2022 | 8:00 pm | 07-Aug-2022 | 5:00 am | 150 | 2,000 |
| 07-Aug-2022 | 8:00 pm | 08-Aug-2022 | 5:00 am | 150 | 2,000 |
| 12-Aug-2022 | 8:00 pm | 13-Aug-2022 | 5:00 am | 150 | 2,000 |
| 13-Aug-2022 | 8:00 pm | 14-Aug-2022 | 5:00 am | 150 | 2,000 |
| 14-Aug-2022 | 8:00 pm | 15-Aug-2022 | 5:00 am | 150 | 2,000 |
| 19-Aug-2022 | 8:00 pm | 20-Aug-2022 | 5:00 am | 150 | 2,000 |
| 20-Aug-2022 | 8:00 pm | 21-Aug-2022 | 5:00 am | 150 | 2,000 |
| 21-Aug-2022 | 8:00 pm | 22-Aug-2022 | 5:00 am | 150 | 2,000 |
| 26-Aug-2022 | 8:00 pm | 27-Aug-2022 | 5:00 am | 150 | 2,000 |
| 27-Aug-2022 | 8:00 pm | 28-Aug-2022 | 5:00 am | 150 | 2,000 |
| 28-Aug-2022 | 8:00 pm | 29-Aug-2022 | 5:00 am | 150 | 2,000 |
| 02-Sep-2022 | 8:00 pm | 03-Sep-2022 | 5:00 am | 150 | 2,000 |
| 03-Sep-2022 | 8:00 pm | 04-Sep-2022 | 5:00 am | 150 | 2,000 |
| 04-Sep-2022 | 8:00 pm | 05-Sep-2022 | 5:00 am | 150 | 2,000 |
| 09-Sep-2022 | 8:00 pm | 10-Sep-2022 | 5:00 am | 150 | 2,000 |
| 10-Sep-2022 | 8:00 pm | 11-Sep-2022 | 5:00 am | 150 | 2,000 |
| 11-Sep-2022 | 8:00 pm | 12-Sep-2022 | 5:00 am | 150 | 2,000 |
| 16-Sep-2022 | 8:00 pm | 17-Sep-2022 | 5:00 am | 150 | 2,000 |
| 17-Sep-2022 | 8:00 pm | 18-Sep-2022 | 5:00 am | 150 | 2,000 |
| 18-Sep-2022 | 8:00 pm | 19-Sep-2022 | 5:00 am | 150 | 2,000 |
| 23-Sep-2022 | 8:00 pm | 24-Sep-2022 | 5:00 am | 150 | 2,000 |
| 24-Sep-2022 | 8:00 pm | 25-Sep-2022 | 5:00 am | 150 | 2,000 |
| 25-Sep-2022 | 8:00 pm | 26-Sep-2022 | 5:00 am | 150 | 2,000 |
| 30-Sep-2022 | 8:00 pm | 01-Oct-2022 | 5:00 am | 150 | 2,000 |
| 01-Oct-2022 | 8:00 pm | 02-Oct-2022 | 5:00 am | 150 | 2,000 |
| 02-Oct-2022 | 8:00 pm | 03-Oct-2022 | 5:00 am | 150 | 2,000 |
| 07-Oct-2022 | 8:00 pm | 08-Oct-2022 | 5:00 am | 150 | 2,000 |
| 08-Oct-2022 | 8:00 pm | 09-Oct-2022 | 5:00 am | 150 | 2,000 |
| 09-Oct-2022 | 8:00 pm | 10-Oct-2022 | 5:00 am | 150 | 2,000 |
| 14-Oct-2022 | 8:00 pm | 15-Oct-2022 | 5:00 am | 150 | 2,000 |
| 15-Oct-2022 | 8:00 pm | 16-Oct-2022 | 5:00 am | 150 | 2,000 |
| 16-Oct-2022 | 8:00 pm | 17-Oct-2022 | 5:00 am | 150 | 2,000 |
| 21-Oct-2022 | 8:00 pm | 22-Oct-2022 | 5:00 am | 150 | 2,000 |



# City of Las Vegas

## SPECIAL EVENT PERMIT

### FESTIVUS

*Application/Permit*   **362490**

| | | | | | |
|---|---|---|---|---|---|
| 22-Oct-2022 | 8:00 pm | 23-Oct-2022 | 5:00 am | 150 | 2,000 |
| 23-Oct-2022 | 8:00 pm | 24-Oct-2022 | 5:00 am | 150 | 2,000 |
| 28-Oct-2022 | 8:00 pm | 29-Oct-2022 | 5:00 am | 150 | 2,000 |
| 29-Oct-2022 | 8:00 pm | 30-Oct-2022 | 5:00 am | 150 | 2,000 |
| 30-Oct-2022 | 8:00 pm | 31-Oct-2022 | 5:00 am | 150 | 2,000 |
| 31-Oct-2022 | 8:00 pm | 01-Nov-2022 | 5:00 am | 150 | 2,000 |
| 04-Nov-2022 | 8:00 pm | 05-Nov-2022 | 5:00 am | 150 | 2,000 |
| 05-Nov-2022 | 8:00 pm | 06-Nov-2022 | 5:00 am | 150 | 2,000 |
| 06-Nov-2022 | 8:00 pm | 07-Nov-2022 | 5:00 am | 150 | 2,000 |
| 11-Nov-2022 | 8:00 pm | 12-Nov-2022 | 5:00 am | 150 | 2,000 |
| 12-Nov-2022 | 8:00 pm | 13-Nov-2022 | 5:00 am | 150 | 2,000 |
| 13-Nov-2022 | 8:00 pm | 14-Nov-2022 | 5:00 am | 150 | 2,000 |
| 18-Nov-2022 | 8:00 pm | 19-Nov-2022 | 5:00 am | 150 | 2,000 |
| 19-Nov-2022 | 8:00 pm | 20-Nov-2022 | 5:00 am | 150 | 2,000 |
| 20-Nov-2022 | 8:00 pm | 21-Nov-2022 | 5:00 am | 150 | 2,000 |
| 25-Nov-2022 | 8:00 pm | 26-Nov-2022 | 5:00 am | 150 | 2,000 |
| 26-Nov-2022 | 8:00 pm | 27-Nov-2022 | 5:00 am | 150 | 2,000 |
| 27-Nov-2022 | 8:00 pm | 28-Nov-2022 | 5:00 am | 150 | 2,000 |

Notification to area residents and businesses required.  personal contact thru FSE Security staffing

*Location:*

FREMONT STREET EXPERIENCE

The event will be held on 'Private Property'

*Description:*

Music and entertainment event. Restricted access to FSE- Restricted access to 21+ on each event date. Restrictions include No Strollers, No Package Beverages, No Coolers, No Chairs, No Backpacks/Luggage, No Costume Masks, No Face Paint, No Glass/Aluminum, No Weapons- Fake or Real- any instrument or device for use that can be used in attack or defense against an opponent, adversary or victim. Prohibited weapons include but not limited to: all guns and knives fake or real, martial arts weapons, brass knuckles, air guns, electrical weapons such as Stun Guns/Tasers, anything that expel a projectile, sharp tools, bats, protective sprays, anything explosive, simulated weapons including toy guns, swords and pistols, common items such as razor blades, pipes, chains, ice picks, or similar instruments with sharp edges. All equipment and bags are subject to search.

*Contact(s):*

| *Contact/Company Name:* | *Phone:* | *Mobile:* | *E-Mail* |
|---|---|---|---|
| *  MARK REDDON | (702)287-5895 | (702)678-5600 | mreddon@vegasexperience.com |

*Review/Comments:*



# City of Las Vegas

## SPECIAL EVENT PERMIT

### FESTIVUS

**Application/Permit**    **362490**

| | | | |
|---|---|---|---|
| ADMINSVS | Approved | 07/07/2022 | JASMINE FREEMAN |
| | * Per City Manager direction and approval | | |
| BUS SRVS | Approved | 07/07/2022 | MINERVA GOMEZ |
| CURRENT PL | Approved | 07/07/2022 | ALFREDO SOLIS III |
| DETENTION | Waived | 07/07/2022 | JASMINE FREEMAN |
| | * Waived per direction and approval of City Manager | | |
| ENVRMNTL | Approved | 07/07/2022 | SHERRI MCMAHON |
| FIRE DEPT | Conditions | 07/07/2022 | MICHAEL SVOBODA |
| | * Approved For Security Screening Points Only, No Closure Of The Mall Area. Exiting Points To Remain Accessible At All Times | | |
| METRO | Approved | 07/08/2022 | |
| | * Approved by Officer L. Abbott P#8548 | | |
| PWADMIN | Approved | 07/07/2022 | KRISTINA HAYES |

**Vending Information:**
Vendors are not authorized to participate at this event.

**Alcohol Sales/DistributionInformation:**
Alcohol beverages are not authorized to be served at the event.

**Temporary Structural Information:**
- 4th St entrance to FSE to Casino Center, 3rd north entrance from Ogden, FSE barricades
- Temporary fencing will be used during this event.   possibly at entrance 4th street and 3rd North entrance
- Temporary event signage may be used for this event as specified:  all digital displays as well as FSE Canopy/ signs at all entrances

**Entertainment/Special Effects:**
- This event will have live entertainment.  concert series schedule as well as live entertainment on all stages on FSE

**Other Logistical Details:**
- Main Entrance:              4th Street & FSE
- Event Parking:              FSE Parking garage, city & hotel garages and lots
- Emergency Access Points:   4th Street/Casino Center/3rd North/Main Street/1st

**Safety and Security Details:**
- Metro will be utilized for this event.   plans determined by LVMPD
- City Marshalls will be utilized for this event.    plans determined by Marshals
- Private Security will be utilized for this event.
  Security personnel should wear distinctive attire that is  clearly visible and identifiable.
    Security Personnel:40
    Security Company: FSE Security
- Command Post: none
- Should Advanced Life Support (ALS) transport be needed, you are required to use the City of Las Vegas 9-1-1 system.

**Sanitation and Cleanup:**
- The applicant is responsible for leaving the site free of debris, litter or any other evidence of occupancy upon completion.
  FSE Maintenance

**General Provisions:**
- The applicant shall display a copy of this and any other permits during the hours of operation.
- All applicable City code requirements shall be satisfied.
- Combustible materials will not be located within 50 feet of any structure on, or adjacent to this site.
- The applicant is responsible for leaving the site free of debris, litter or any other evidence of occupancy upon completion.



# City of Las Vegas
## SPECIAL EVENT PERMIT
### FESTIVUS

*Application/Permit*      **362490**

*Field Inspection Details:*

Fire and Rescue Inspection    2310751  553-USE      Closed - 7/7/2022

CITY OF LAS VEGAS APPROVAL _Jasmine Freeman_      Date _7/12/22_
_updated_

# EXHIBIT 5

  

**Fremont Street**
**EXPERIENCE**
**PARKING CORPORATION**

## NOTICE TO ALL BUSINESSES
### *EFFECTIVE ON JUNE 25*

As COVID-19 restrictions have been relaxed in the state and around the country, The Fremont Street Experience Limited Liability Company ("FSE") is experiencing higher-than-normal pedestrian traffic throughout the Pedestrian Mall.  To continue providing the safest and most business-friendly environment possible, all businesses are reminded of the various sections of Las Vegas Municipal Code ("LVMC") Chapter 11.68, and particularly the sections referenced below, and your obligation to comply with those rules.

We thank you in advance for your cooperation.

---

### LVMC § 11.68.060

*The City of Las Vegas authorizes FSE to "determine the uses of the Pedestrian Mall for any purpose that will enhance the movement, convenience, enjoyment, entertainment, recreation or relaxation of pedestrians, and other purposes necessary or appropriate to carry out the provisions of the Pedestrian Mall Act…." This includes merchandising, exhibiting, advertising and any other use or activity.*

### LVMC § 11.68.070(B)

*The City of Las Vegas delegates to FSE the authority to control and regulate the "uses to be permitted or restricted on the Pedestrian Mall by occupants of abutting property" to "serve the convenience and enjoyment of pedestrians and the location of such uses."*

### LVMC § 11.68.100(B)(2)

*All vending and other commercial activity in the Pedestrian Mall is prohibited unless conducted by or on behalf of FSE.*

**These three sections grant to FSE the authority to control and regulate any and all commercial activity on the Pedestrian Mall, including uses by "occupants of the abutting property."  Absent express written permission from FSE, abutting businesses must remain on their property, and may not venture onto the Pedestrian Mall when conducting any kind of commercial activity.  This activity includes attempts to lure potential customers into their businesses.**

**This rule applies equally to FSE members and non-members.  Kiosk operators must remain within the confines of their rented space and may not venture beyond those boundaries to lure customers to their businesses.**

---

**Fremont Street Experience, LLC**
**425 Fremont Street, Suite 250**
**Las Vegas, NV 89101**
**Phone: (702) 678-5600**
**Fax: (702) 678-5611**

Outside businesses (those not operating from an abutting property) are also prohibited from engaging in commercial activity on the Pedestrian Mall without express written permission of FSE. Recently, we have noticed an uptick in such businesses operating on the Pedestrian Mall, with some companies offering free limousine rides to their businesses. These companies are not authorized to engage in such commercial activity on the Pedestrian Mall. If you see such activity, please report it to FSE security immediately.

Please take note that engaging in any kind of commercial activity on the Pedestrian Mall may also violate LVMC § 6.02.120, which requires licensed businesses to operate from a "fixed place of business from which the business <u>will actually be conducted</u>."

## LVMC § 11.68.070(D)

*The City of Las Vegas delegates to FSE the authority to control and regulate "use of the Pedestrian Mall for advertising purposes and the charging of a fee in connection therewith."*

Under this section, businesses may not advertise on the Pedestrian Mall without written permission from FSE. This prohibition applies to all kinds of advertising, such as walking billboards, ad circulars, and coupons. Signage and advertising on the exterior of abutting properties that are visible within the Pedestrian Mall are also subject to this rule.

## LVMC § 11.68.100(B)(5)

*All amplified sound which originates from within the Pedestrian Mall or from properties or businesses abutting the boundaries of the Pedestrian Mall is prohibited, except where conducted by or on behalf of The Fremont Street Experience Limited Liability Company, or as permitted by LVMC § 11.68.107.*

This section specifically prohibits abutting businesses from directing amplified sound into the Pedestrian Mall. Note that this restriction is in addition to common law prohibitions against nuisance, as well as the City's noise ordinances contained in LVMC Chapter 9.16.

**Fremont Street Experience**
**425 Fremont Street**
**Las Vegas, NV 89101**
**Phone: (702) 678-5600**
**Fax: (702) 678-5611**
**www.vegasexperience.com**